IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE: SEARCH WARRANTS | Case No. 3:21MJ_____ (SDV) |
| | June 8, 2021 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Andrew Hoffman, a Special Agent of the Drug Enforcement Administration, being

duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION

1.    I make this affidavit in support of applications for warrants to search:

   a.  200 Glover Avenue, Apartment 226, Norwalk, CT ("TARGET
       PREMISES ONE");

   b.  587 Capitol Avenue, Bridgeport, CT ("TARGET PREMISES TWO");

   c.  327 Park Avenue, Bloomfield, CT ("TARGET PREMISES THREE");

   d.  The Action Audio Store LLC, 2814 Main Street, Hartford, CT ("TARGET
       PREMISES FOUR");

   e.  30 Fox Trail, Mashantucket, CT ("TARGET PREMISES FIVE"); and

   f.  ▇▇▇Marcel Street, Bridgeport, CT ("TARGET PREMISES SIX")

   (collectively, the "TARGET PREMISES").

This affidavit is made in support of applications for search warrants under Rule 41 of the Federal

Rules of Criminal Procedure to search each TARGET PREMISES, further described in each

respective Attachment A, for the things described in Attachment B.  Based on the facts set forth

in this affidavit, there is probable cause to believe that violations of Title 21, United States Code,

Section 841(a)(1) (possession with intent to distribute and distribution of controlled substances),

Title 21, United States Code, Section 846 (attempt and conspiracy to commit possession with intent to distribute and distribution of controlled substances), Title 21, United States Code, Section 843(b) (use of a communication facility), and Title 18, United States Code, Sections 1956 (money laundering) (collectively, the "TARGET OFFENSES"), have been committed by members of the WILEY drug trafficking organization, and that contraband, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located at each TARGET PREMISES, described in each respective Attachment A.

2.    I make this affidavit in support of applications for warrants to seize and search:

   a. a 2021 black Mercedes-Benz AMG GT 63 bearing Connecticut registration number BB10729 and vehicle identification number W1K7X8JBXMA037538 ("TARGET VEHICLE ONE");

   b. a 2021 white Mercedes Benz GLE 350 4matic bearing Connecticut registration BB10799 and VIN 4JGFB4KB9MA417364 ("TARGET VEHICLE TWO");

   c. a 2017 white Bentley Bantayga bearing Connecticut Registration BB90593 and VIN SJAAC2Z0HC016054 ("TARGET VEHICLE THREE"); and

   d. a 2013 black Honda Accord bearing Connecticut Registration BC32740 and VIN 1HGCR2E51DA102279 ("TARGET VEHICLE FOUR");

(collectively, the "TARGET VEHICLES").

This affidavit is made in support of applications for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure to search each TARGET VEHICLE, further described in each respective Attachment A, for the things described in Attachment B.  Based on the facts set

forth in this affidavit, there is probable cause to believe that violations of the TARGET OFFENSES have been committed by members of the WILEY drug trafficking organization, and that contraband, evidence, fruits, and instrumentalities of these offenses, more fully described Attachment B, are located in each TARGET VEHICLE, described in each respective Attachment A, and that the TARGET VEHICLES represent instrumentalities of these offenses and/or fruits of these offenses.

      3.    I make this affidavit in support of applications for warrants to seize:

           a.  A cellular telephone, the TARGET TELEPHONE, assigned telephone number (203) 690-0831, and accessed through International Mobile Subscriber Identity (IMSI) number 310260297711433, used by Tajh Wiley ("the TARGET TELEPHONE"), and any other cellular telephones possessed by Tajh Wiley;

           b.  any cellular telephone seized from the person of WILEY, and from any premises in which WILEY is located that this Court has authorized to search based upon this affidavit (that is, TARGET PREMISES ONE, TARGET PREMISES TWO, TARGET PREMISES THREE, TARGET PREMISES FOUR, TARGET PREMISES FIVE, TARGET PREMISES SIX, TARGET VEHICLE ONE, TARGET VEHICLE TWO, TARGET VEHICLE THREE, and TARGET VEHICLE FOUR);

           c.  A cellular telephone assigned telephone number (860) 334-9200, without a known International Mobile Equipment Identity Number (IMEI), used by Jammal Gant (the "GANT TELEPHONE");

d. A cellular telephone assigned telephone number (860) 982-4489, with International Mobile Equipment Identity Number (IMEI) 310260292523294, used by Kenston Harry (the "HARRY TELEPHONE");

e. A cellular telephone assigned telephone number (203) 383-3479, without a known International Mobile Equipment Identity Number (IMEI), used by Peter Munoz (the "MUNOZ TELEPHONE");

f. A cellular telephone assigned telephone number (203) 685-9545, without a known IMEI number, used by Charles Richardson (the "RICHARDSON TELEPHONE");

g. A cellular telephone assigned telephone number (475) 239-0625, with International Mobile Equipment Identity Number (IMEI) 352853112754840, used by Destiny Wade (the "WADE TELEPHONE");

h. A cellular telephone assigned telephone number (914) 316-2139, with International Mobile Equipment Identity Number (IMEI) 353776391059590, used by Jevaughn Watson (the "WATSON TELEPHONE");

(the GANT, HARRY, MUNOZ, RICHARDSON, WADE, and WATSON telephones, collectively, the "WIRE TELEPHONES").

I further make this affidavit to search the TARGET TELEPHONE, the HARRY TELEPHONE, the GANT TELEPHONE, the MUNOZ TELEPHONE, the RICHARDSON TELEPHONE, the WADE TELEPHONE, and the WATSON TELEPHONE, and to search, as necessary, any cellular telephone found on WILEY's person, and/or found in WILEY's vehicle (TARGET

4

VEHICLE ONE), and/or cellular telephones unlocked using WILEY's biometric characteristics. This affidavit is made in support of applications for search warrants under Rule 41 of the Federal Rules of Criminal Procedure to search the TARGET TELEPHONE and each WIRE TELEPHONE, further described in each respective Attachment A, for the things described in Attachment B. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of the TARGET OFFENSES have been committed by members of the WILEY drug trafficking organization, and that the TARGET TELEPHONE and WIRE TELEPHONES constitute instrumentalities of the commission of the TARGET OFFENSES and are evidence and contain evidence of these offenses, more fully described in Attachment B.

## II.   AGENT BACKGROUND

4.     I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since 1998. Upon completion of the 17-week DEA Basic Agent Academy in Quantico, Virginia, I was assigned to the DEA New York Division Office in New York City. In 2008, I was selected for a foreign assignment with the DEA Caribbean Division where I was stationed on the island of Curacao. In 2013, upon completion of the foreign assignment, I was assigned to my current assignment as part of the Bridgeport High Intensity Drug Trafficking Area Task Force ("Task Force"), which is comprised of personnel from the DEA, Connecticut State Police, Bridgeport Police Department, Norwalk Police Department, Stamford Police Department, Stratford Police Department, and Milford Police Department. Prior to joining the DEA, I was a Probation and Parole Officer for the State of Florida for approximately five years.

5.     During the course of my career, I have participated in numerous criminal investigations, including investigations into suspected narcotics trafficking, firearms trafficking,

violent criminal activity, racketeering and money laundering. My participation in these investigations has included coordinating controlled purchases of narcotics utilizing confidential informants and cooperating witnesses; coordinating the execution of search and arrest warrants; conducting electronic and physical surveillance; use of judicially authorized tracking devices placed on target vehicles; judicially authorized receipt of location information from cellular providers related to certain cellular telephones; analyzing records related to narcotics trafficking; and testifying in Grand Jury and District Court proceedings. I have led investigations into organized criminal enterprises to include violent street gangs and complex narcotics trafficking organizations. I have participated in numerous Title III wiretap investigations, and on numerous occasions I have served as the affiant on successful applications seeking court-authorization to intercept wire and electronic communications under Title 18, United States Code, Sections §§ 2510, et seq.

**III.    BASIS OF INFORMATION**

6.    I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

a. my experience investigating drug trafficking organizations, specifically those that distribute and sell controlled substances, including cocaine and marijuana, and my experience investigating the laundering of criminally derived proceeds of drug trafficking organizations;

b. oral and written reports, and documents about this investigation that I have received from members of the DEA, local law enforcement, and other federal law enforcement agencies;

c.  discussions I have had personally concerning this investigation with experienced drug trafficking and money laundering investigators;

d.  oral and written reports, and discussions that I have had with local law enforcement concerning pending criminal cases;

e.  public records;

f.  records received from financial institutions and casinos;

g.  telephone toll records, pen register and trap and trace information, and telephone subscriber information;

h.  location information and data received from cellular providers;

i.  data received from GPS tracking devices;

j.  location information received from cellular telephone providers;

k.  data and content received from forensically analyzed cellular telephones;

l.  data and content received from social media providers;

m.  physical surveillance conducted by DEA and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

n.  video surveillance; and

o.  Title III interceptions.

7.    In particular, I also relied on intercepted wire and electronic communications occurring to and from the cellular telephone bearing the number (203) 690-0831, and accessed through International Mobile Subscriber Identity (IMSI) number 310260297711433, (the "TARGET TELEPHONE"), a prepaid cellular telephone without subscriber information and

used by Tajh Wiley, whose service provider is T-Mobile, a cellular telephone service provider located at 4 Sylvan Way, Parsippany, New Jersey ("the PROVIDER").

8.     On April 15, 2021, the Government presented to United States District Judge Michael P. Shea an Application for authorization to intercept wire and electronic communications occurring to and from the TARGET TELEPHONE used by WILEY. The Application was granted on April 15, 2021, and the interception of communications over the TARGET TELEPHONE began on April 16, 2021 and ended on or about May 14, 2021.

9.     On May 18, 2021, the Government presented to United States District Judge Michael P. Shea an Application for continued authorization to intercept wire and electronic communications occurring to and from the TARGET TELEPHONE used by WILEY. The Application was granted on May 18, 2021, and the interception of communications over the TARGET TELEPHONE began on May 18, 2021. Interception of communications over the TARGET TELEPHONE is ongoing and will continue, absent extension, until June 16, 2021.

10.     I have reviewed pertinent intercepted communications and corresponding call summaries and draft transcripts ("line sheets"), for communications in which the members of the WILEY drug trafficking organization have participated or been referenced, or intercepted communications and line sheets, pertaining to members of the WILEY drug trafficking organization, and the TARGET PREMISES and TARGET VEHICLES.

11.     Here, the intercepted communications, in some instances, are simply summarized to reflect the nature of the conversation and are not necessarily a verbatim reproduction. In other instances, portions of the intercepted communications are set forth in quotation marks and reflect the actual words used by the participants, based upon the monitors' line sheets, which are subject to revision. Unidentified males who participated in the intercepted calls are reflected below using

the letters "UM." Unidentified females are indicated by the letters "UF." Where communications are unclear but summarized phonetically, the phonetic spelling is marked "PH."

12.     To the extent that participants communicate with one another using coded, cryptic or slang words and phrases, the meaning of those communications have been interpreted based upon the training and experience of DEA investigators. Those interpretations are placed in brackets or are explained in detail immediately following the call summary, where necessary. Where portions of communications are unintelligible, either due to a bad connection, background noise, and/or the parties speaking over one another, those portions of the communications are marked unintelligible ("U/I"). For purposes of this Affidavit, summaries of wire communications and content or electronic communications have been cleaned up so that they can be more easily read.

13.     Since this Affidavit is being submitted for the limited purpose of securing search warrants, I have not included each and every fact known to me concerning this investigation or every aspect of the investigation to date.  I have set forth only the facts that I believe are necessary to establish the foundation for probable cause for search warrants.

## IV. BACKGROUND ON THE WILEY DRUG TRAFFICKING ORGANIZATION

14.     DEA is currently investigating the WILEY drug trafficking organization. The WILEY drug trafficking organization, led by WILEY, is a Connecticut-based drug trafficking organization that is actively distributing cocaine and marijuana in Connecticut and elsewhere. The investigation has revealed the involvement of known and unknown coconspirators of the WILEY drug trafficking organization involved in the distribution of controlled substances. The investigation has also revealed the use of the TARGET PREMISES, the TARGET VEHICLES,

the TARGET TELEPHONE (and other cellular telephones used by WILEY), and the WIRE TELEPHONES in furtherance of the WILEY drug trafficking organization.

      a.   Background on Members of the WILEY Drug Trafficking Organization[1]

    15.    **TAJH WILEY ("WILEY"), a.k.a. "Yung."** WILEY is the leader of the WILEY drug trafficking organization. WILEY is believed to be a resident of Norwalk, Connecticut, residing at TARGET PREMISES ONE, and is believed to be approximately 25 years old (born 1995). WILEY uses the TARGET TELEPHONE to communicate daily in furtherance of the WILEY drug trafficking organization, including intercepted communications with each TARGET SUBJECT. Intercepted communications have revealed WILEY's use of the TARGET TELEPHONE to facilitate cocaine and marijuana transactions. Intercepted communications have also revealed WILEY's acquisition, transfer, and use of criminally derived proceeds from the WILEY drug trafficking organization.

    16.    **MYRON BROWN ("BROWN"), a.k.a. "Farid."** BROWN is believed to be a resident of Chester, Pennsylvania and is believed to be approximately 47 years old (born 1973). Based on pertinent communications intercepted over the TARGET TELEPHONE and physical surveillance, DEA investigators believe that BROWN traffics cocaine for the WILEY drug trafficking organization, including a transaction that occurred in late April 2021. DEA investigators have identified a telephone number actively used by BROWN, (215) 558-0334.

    17.    **SASHERY FELIZ ("FELIZ").** FELIZ is believed to be a resident of New York City, though her address is unknown to investigators, and is believed to be approximately 26 years old (born 1994). Based on pertinent communications intercepted over the TARGET

---

[1] Since this Affidavit is being submitted for the limited purpose of securing search warrants, I have not included each and every known member of the WILEY drug trafficking organization known to DEA investigators.

TELEPHONE, DEA investigators believe that FELIZ supplies controlled substances to the WILEY drug trafficking organization and conducts cash transactions with WILEY using mobile payment platforms. DEA investigators have identified a telephone number used by FELIZ until recently, (787) 513-5728. FELIZ is believed to have disused the telephone number in May 2021.

18.    **KENSTON HARRY ("HARRY").** HARRY is believed to be a resident of Bloomfield, Connecticut, residing at TARGET PREMISES THREE, and is believed to be approximately 40 years old (born 1981). Based on pertinent communications intercepted over the TARGET TELEPHONE and physical surveillance, DEA investigators believe that HARRY packages, distributes, stores and sells cocaine and marijuana for the WILEY drug trafficking organization using his residence, TARGET PREMISES THREE, and business, TARGET PREMISES FOUR. DEA investigators have identified a telephone number actively used by HARRY, (860) 982-4489.

19.    **JAMMAL GANT, a.k.a. Prince ("GANT").** GANT (a member of the Mashantucket Pequot Tribal Nation) is a resident of Ledyard, Connecticut (within Mashantucket Pequot Tribal Nation land), residing at TARGET PREMISES FIVE, and approximately 36 years old (born 1984). Based on pertinent communications intercepted over the TARGET TELEPHONE and physical surveillance, DEA investigators believe that GANT distributes and sells controlled substances for the WILEY drug trafficking organization and stores controlled substances for the organization. DEA investigators have identified a telephone number actively used by GANT, (860) 334-9200.

20.    **PETER MUNOZ, a.k.a. Peter Escalante-Munoz ("MUNOZ").** MUNOZ is believed to be a resident of Bridgeport, Connecticut and is believed to be approximately 33 years old (born 1987). Based on pertinent communications intercepted over the TARGET

11

TELEPHONE and physical surveillance, DEA investigators believe that MUNOZ distributes controlled substances and brokers transactions for the WILEY drug trafficking organization. DEA investigators have identified a telephone number actively used by MUNOZ, (203) 383-3479.

21.     **CHARLES RICHARDSON ("RICHARDSON").** RICHARDSON is believed to be a resident of Bridgeport, Connecticut, residing at TARGET PREMISES TWO, and is believed to be approximately 67 years old (born 1954). Based on pertinent communications intercepted over the TARGET TELEPHONE and physical surveillance, DEA investigators believe that RICHARDSON, WILEY's uncle, stores and sells cocaine and marijuana for the WILEY drug trafficking organization using TARGET PREMISES TWO. DEA investigators have identified a telephone number actively used by RICHARDSON, (203) 685-9545.

22.     **DESTINY WADE ("WADE").** WADE is believed to be a resident of Norwalk, Connecticut, residing with WILEY at TARGET PREMISES ONE, and is believed to be approximately 27 years old (born 1993). Based on pertinent communications intercepted over the TARGET TELEPHONE and physical surveillance, DEA investigators believe that WADE facilitates the laundering of criminal proceeds for the WILEY drug trafficking organization, and leases and finances TARGET VEHICLE ONE for WILEY, which is used in furtherance of the drug organization. DEA investigators have identified a telephone number actively used by WADE, (475) 239-0625.

23.     **Jevaughn WATSON, a.k.a. Russ ("WATSON").** WATSON is believed to be a resident of Ansonia, Connecticut and is believed to be approximately 27 years old (born 1993). Based on pertinent communications intercepted over the TARGET TELEPHONE and physical surveillance, DEA investigators believe that WATSON has purchased, or brokered transactions

for, large quantities of cocaine. DEA investigators have identified a telephone number actively used by WATSON, (914) 316-2139.

## V. FACTS SUPPORTING PROBABLE CAUSE

### a. Use of Encrypted Communications

24.     WILEY uses the TARGET TELEPHONE to access methods of communication that are end-to-end encrypted, meaning that the content of those communications is not intercepted and investigators cannot determine when those communications are sent or other parties involved. Specifically, WILEY uses Apple FaceTime and Apple iMessage, communications services provided by the technology company Apple Inc., which are encrypted communications services (voice and video communications, and text communications, respectively) accessed using certain Apple devices, including the Apple iPhone. WILEY has at times specifically instructed participants in certain wire intercepts to use FaceTime instead of traditional wire communications (*i.e.*, voice calls serviced by the PROVIDER). I also believe that WILEY often uses Apple iMessage instead of traditional electronic communications (*i.e.*, text messages serviced by the PROVIDER). Based upon forensic review of cellular telephones seized and search as part of this investigation in 2020, I know that the WILEY drug trafficking organization uses Apple FaceTime and Apple iMessage. I believe that WILEY's use of encrypted communications services is an effort to be security conscious and is intended to thwart law enforcement.

25.     Because WILEY employs the use of encrypted communications services, DEA investigators, even with use of the wiretap, cannot intercept all communications to and from the TARGET TELEPHONE. Often communications will begin as a wire communication and WILEY will direct the other participant to shift the communication to FaceTime. This causes

DEA investigators to lose their ability to intercept the communication. While intercepted communications over the TARGET TELEPHONE have revealed significant evidence of drug trafficking committed by the WILEY drug trafficking organization, the use of encrypted communications has surely prevented DEA investigators from intercepting a significant portion of communications, those that occur over the TARGET TELEPHONE using Apple FaceTime and Apple iMessage.

     b. <u>WILEY's Use of Multiple Cellular Telephones in Furtherance of Drug Trafficking</u>

  26. Wire and electronic communications intercepted over the TARGET TELEPHONE have revealed that WILEY possesses a second cellular telephone number, in addition to the TARGET TELEPHONE, used in furtherance of drug trafficking.

  27. During a voice call on April 16, 2021 (Session ID 19), WILEY spoked to an unidentified female (using cellular telephone number (203) 317-3469) regarding his use of another cellular telephone for "work:"

| | |
|---|---|
| UF -3469: the you. | I just text you the number. But since I got you on phone . . . hold on. These other numbers I got for Can I delete them? |
| WILEY: | Huh? |
| UF -3469: | These other numbers that I got for you, can I delete them? Or you still have them all – |
| WILEY: | Yeah. Hell yeah, delete them, yo. The police got those phones. |
| UF -3469: | So this is the only number that you have? |
| WILEY: | Yeah, I only got one phone. |
| UF -3469: | Alright. |
| WILEY: | The other phone number, you don't want that … [laughs] |
| UF -3469: | That's, that's … your family phone? |
| WILEY: | No … something else. |
| UF -3469: | What's something else? The phone for your hoes? |
| WILEY: | [Laughs] Is my work phone, bruh. |

14

| UF -3469: | No, I do not fucking want that. |
|---|---|
| WILEY: | [Laughs] |
| UF -3469: | I want whatever number that your momma call, so it better be this one. |
| WILEY: | [Laughs] |
| UF -3469: | Alright. Cause I fucking had all these fucking numbers for you. So every time, I had to text you … all these numbers pop up. And I got them all saved to different things. Tajh with a heart. Tajh, new number. Tajh number three, number two. Like what the fuck … |

28.     Based on my training and experience, knowledge of common drug-related slang based on other DEA investigations, knowledge of this investigation, and review of the wire communication, I believe that WILEY and the unidentified female are discussing multiple telephone numbers that WILEY has used since 2020, some of which were seized by law enforcement. Based upon the investigation to date, I know that WILEY was arrested by the Fairfield Police Department in possession of three cellular telephones in February 2020, and arrested by the Yonkers Police Department in February 2021 in possession of two cellular telephones. Moreover, on April 20, 2021, as described below, WILEY told GANT that he had tried to call him from a second telephone ("I called you on the extra phone, bro"). DEA investigators believe that WILEY now uses a second cellular telephone number in addition to the TARGET TELEPHONE, his self-described "work phone," in furtherance of the WILEY drug trafficking organization.

29.     When WILEY was arrested in February 2021, he was in New York State custody at the Westchester Department of Correction for approximately seven days. From jail, WILEY communicated with multiple members of the WILEY drug trafficking organization, including WADE, HARRY, GANT and Rashaad Bryant, a.k.a. "Black Frost." The jail calls are recorded, with participants being verbally warned that the telephone conversation is recorded.

30.     In a recorded telephone conversation on February 10, 2021, WILEY called WADE and instructed her to call HARRY using three-way dialing. HARRY conversed with WILEY about the cellular telephones seized by Yonkers PD

> HARRY:       They don't have the password to your phone, right?
> WILEY:       Nah, they don't have the password. Them niggas
>              know a lot bro.

31.     Based on my training and experience, my knowledge based on other DEA investigations, and my knowledge of this investigation, I believe that WILEY was expressing to HARRY that the two handsets seized from him by Yonkers PD would contain incriminating evidence (e.g., communications and photographs) related to the WILEY drug trafficking organization.

32.     Based on my training and experience, my knowledge based on other DEA investigations, drug traffickers often possess and use multiple cellular telephones, often using certain cellular telephones to communicate with sources of supply, while using other cellular telephones to communicate with customers. For customers, drug traffickers may use certain cellular telephones to communicate with upscale clientele, those who purchase large quantities of drugs, and other cellular telephones to communicate with street-level customers. This is a tactic to allow for drug traffickers to field a high-volume of incoming calls, prioritize certain customers, and to guard against detection by law enforcement (e.g., if a street-level customer were apprehended by law enforcement the street-level telephone number could be dropped without need to drop the number used by high-end clientele). Members of drug trafficking organizations may also use telephone numbers associated with different geographic areas if sourcing drug supply from different regions or distributing drugs to other areas of the country. I believe this to be the case with WILEY. When arrested in February 2020, he possessed three

16

cellular telephones. When arrested in February 2021, he possessed two cellular telephones. In addition to the TARGET TELEPHONE, he has recently stated that he possesses another cellular telephone (his "work phone"). I believe that cellular telephones possessed and controlled by WILEY are devices used as in instrumentalities of the drug trade and used to facilitate communications in furtherance of the WILEY drug trafficking organization.

c. Pertinent Communications with GANT

33.    Wire and electronic communications intercepted over the TARGET TELEPHONE confirmed a drug trafficking relationship between WILEY and GANT (using telephone number (860) 334-9200, subscribed to GANT). Prior to the interception of communications over the TARGET TELEPHONE, GANT was known to DEA investigators as an individual with a drug trafficking relationship with WILEY based on the judicially authorized tracking of WILEY's vehicle, the judicially authorized forensic analysis of cellular telephones seized from WILEY in 2020, and judicially authorized review of WILEY's Instagram account.

34.    On April 20, 2021, WILEY called GANT and during the voice call (Session ID 552) the parties, in part, discussed drug trafficking, the fact that WILEY uses end-to-end encrypted communications services, and the fact that WILEY possesses a second cellular telephone. Based on my training and experience, knowledge of common marijuana slang based on other DEA investigations, and knowledge of this investigation, I believe that WILEY and GANT had a lengthy (22-minute) conversation regarding marijuana trafficking. I believe that WILEY revealed that, in addition to the TARGET TELEPHONE, he uses a second cellular telephone ("I called you on the extra phone, bro"). The telephone number for WILEY's second cellular telephone is unknown to DEA investigators. WILEY and GANT discussed trafficking

pounds of marijuana, "that 16-pounds." WILEY also intimated to GANT that he would always supply him with marijuana when he said, "I still would have gave you access to that."

35.     WILEY and GANT discussed certain mistakes that had been made in drug trafficking, including "fucking up the Hells Angels thing," and later discussed what I believe based upon the context of the conversation to be WILEY's Yonkers arrest and the seizure of a kilogram of cocaine (WILEY: "Fucked up a whole joint and a half"). WILEY complained that he had to take losses at times ("an L"), but that that he can still win or succeed at drug trafficking. WILEY and GANT affirmed their friendship and WILEY further encouraged GANT to work on his connections, which I believe relate to sources of drug supply, as GANT stated he "has a connection for everything."

####        d.   New Jersey Drug Transaction Conducted by WILEY and GANT

36.     On May 11, 2021, WILEY and GANT travelled from Connecticut to New Jersey to conduct a drug transaction. At the time, DEA investigators were intercepting communications to and from the TARGET TELEPHONE, receiving real-time location information for the TARGET TELEPHONE, and receiving real-time GPS tracking data for WILEY's vehicle, TARGET VEHICLE ONE. Communications intercepted over the TARGET TELEPHONE alerted DEA investigators to WILEY's intended travel to New Jersey. On May 10, 2021, WILEY received an incoming telephone call and spoke with an unidentified female subject, UF - 0949. During the voice call (Session ID 2708) the parties, in part discussed WILEY's anticipated travel to New Jersey the next day:

>           WILEY:     I got something to do in Jersey in the morning.

37.     Later on May 10, 2021, WILEY called another unidentified female subject, UF -
3163, and during the voice call (Session ID 2742) the parties, in part, discussed WILEY's
anticipated travel to New Jersey on May 11, 2021:

> WILEY:     I got something to do in Jersey in the morning.
> WILEY:     I gotta... I gotta take a ride tonight, to handle something tomorrow
>            in the morning, but I was gonna pick you up to take and tell you to
>            ride with me.
> ...
> WILEY:     Yo you should [U/I] with me. Ride with me tonight.. tomorrow
>            then, I'll bring you back. Make some bread with me. You don't
>            wanna make no bread?

38.     Based on my training, experience and knowledge of this investigation, and
context of the intercepted communication, I believe that WILEY discussed his anticipated drug
transaction in New Jersey with UF -3163 where he expected to soon make money and offered to
cut in UF -3163 on the profits ("make some bread").

39.     Based upon information received from the GPS tracking device affixed to
WILEY's vehicle, TARGET VEHICLE ONE, in the early morning hours of May 11, 2021,
WILEY travelled to GANT's residence, TARGET PREMISES FIVE. WILEY arrived at
GANT's residence at approximately 4:07 a.m.

40.     WILEY, while at TARGET PREMISES FIVE, made a telephone call to (201)
954-9904 which is a northern New Jersey area code and spoke with an unidentified male subject
(UM -9904) and during the voice call (Session ID 2753) the parties, in part, discussed WILEY's
anticipated travel to New Jersey:

> WILEY:     I'm gonna be running a little late. I forgot [U/I]. Let me tell
>            you what time I'm gonna get there, man.
> UM -9904:  All right.
> WILEY:     Hold on one second. [Pause] Uh, let me tell you the exact E-T-A
>            now. Mm... [Aside: In... In...  Indust... (U/I). (U/I).] [Extended
>            Pause] I'll be there like around 11:30-ish.

| UM -9904: | A'ight, just call me just before you show up. A'right? |
| WILEY: | A'right, I'm just letting you know now. Because I'm, I'm... [Voices Overlap] |
| UM -9904: | All right. No, yeah. I'll be looking at 11:30. You got it buddy. |
| WILEY: | Okay. |
| UM -9904: | Thanks. |

41.     Based on my training, experience and knowledge of this investigation, and context of the intercepted communication, I believe that UM -9904 is a customer of the WILEY drug trafficking organization. I believe that the telephone call between WILEY and UM -9904 was to schedule a drug transaction that subsequently occurred in Northern New Jersey.

42.     At approximately 9:30 a.m. on May 11, 2021, DEA investigators agents observed WILEY and GANT depart GANT's residence, TARGET PREMISES FIVE, in WILEY's vehicle, TARGET VEHICLE ONE. DEA investigators then were able to surveil WILEY's vehicle, TARGET VEHICLE ONE, to the rear of a desolate Northern New Jersey strip mall in Livingston, New Jersey. GPS tracking data for TARGET VEHICLE ONE allowed for DEA investigators to travel on interstate highways at a safe distance away from TARGET VEHICLE ONE and to know the whereabouts of the vehicle without detection. While DEA investigators were unable to observe from their vantage point whether WILEY and GANT met with other individuals, GPS tracking data and physical surveillance revealed that WILEY's vehicle was behind the strip mall for approximately five minutes, then travelled to a Bank of America (a bank used by WILEY's girlfriend, WADE, to finance aspects of the drug trafficking organization), a department store (where intercepted communications between WILEY and GANT later revealed that they were shopping), and the vehicle's return to Connecticut.

43.     While DEA investigators were unable to observe a transaction, I believe that the intercepted communications with UM -9904, the distance travelled, the length of time behind the

20

strip mall, and WILEY's subsequent travel to a bank were indicative of a drug transaction. Moreover, as WILEY was returning to Connecticut from New Jersey, in an intercepted voice communication (Session ID 2798) with co-conspirator WATSON (using telephone number (914) 316-2139, the WATSON telephone) WATSON asked how "everything worked out" and WILEY replied: "I bust a little move," which I believe to mean a drug transaction. I further believe that WILEY's travel to a Bank of America after the transaction, the bank used by WADE, revealed that WILEY received cash proceeds from a drug transaction and deposited at least some of those proceeds into WADE's account. In a voice call (Session ID 2795) with WADE on May 11, 2021 after he left the Bank of America, WILEY stated: "Oh, I just deposited in your account."

44.     DEA investigators have confirmed that GANT resides at TARGET PREMISES FIVE. According to representatives of the Mashantucket Pequot Tribal Police, GANT resides at TARGET PREMISES FIVE and in May 2020, when GANT was the victim of an assault, he provided the Tribal Police with his address, TARGET PREMISES FIVE. In April 2021, DEA investigators installed a pole camera with a line-of-sight view of TARGET PREMISES FIVE, a camera which is currently active, and the pole camera has confirmed that GANT resides at the residence.

   e. Pertinent Communications with HARRY

45.     Wire and electronic communications intercepted over the TARGET TELEPHONE confirmed a drug trafficking relationship between WILEY and HARRY (using telephone number (860) 982-4489, subscribed to HARRY at TARGET PREMISES THREE). HARRY is the owner of the Action Audio Store in Hartford, TARGET PREMISES FOUR. HARRY also resides at a residence in Bloomfield, TARGET PREMISES THREE. Intercepted communications, along with physical surveillance, has revealed that HARRY is a close associate

of WILEY's, and the Action Audio Store, TARGET PREMISES FOUR, is a storage and distribution hub for the WILEY drug trafficking organization. Moreover, in voice communications (*e.g.*, Session ID 2327), WILEY has referred to HARRY's residence, TARGET PREMISES THREE, as "the lab," a location where I believe that WILEY and HARRY package and distribute cocaine.

46.     Based upon the Connecticut Department of State database, K.H. Action Enterprises, doing business as The Action Audio Store, is owned by HARRY. Despite owning the Action Audio Store, Connecticut Department of Labor records revealed that HARRY has not reported any income for the last three years. HARRY also was arrested in 2020 by the Mashantucket Pequot Tribal Police for larceny-related offenses and the case is pending.

47.     In an example of a drug-related communication, on April 19, 2021, HARRY (using telephone number (860) 982-4489, the HARRY TELEPHONE) called WILEY and during the voice call (Session ID 423) the parties, in part, discussed drug trafficking:

| | |
|---|---|
| HARRY: | Yeah, I think Black just call and say... he wants us to go out there. I've told him, I'm trying to get this dude um... if I get them seven racks [$7,000] then I ain't gotta see them 'till next... next, um... two weeks again. And after I see them in two weeks, I just tryna finish up then and done. So, all that chips is gonna be mine and I'm done with them but – |
| WILEY: | Nigga, I . . . I gotta give my man... um... um.. I just gotta give him 30 more racks [$30,000] |
| HARRY: | So – |
| WILEY: | And I... I'm basically, still got... still got.... um... everything accounted for – |
| HARRY: | So how you gonna do that one... um... but anyways we can't talk about that on the phone – |
| WILEY: | Yeah. |

48.     Based on my training and experience, knowledge of common marijuana slang based on other DEA investigations, and knowledge of this investigation, I believe that WILEY

and HARRY discussed drug trafficking. I believe that the reference to "Black" was to Rashaad Bryant, a.k.a. Black Frost ("BRYANT"), a drug trafficker known to the parties. I believe that HARRY owed BRYANT $7,000, "seven racks." WILEY then added that he owed BRYANT $30,000 ("30 more racks") to settle debts related to drug trafficking. I believe that WILEY could afford the $30,000 drug debt, "everything accounted for," because WILEY had sold the product that I believe was purchased on consignment. HARRY then cautioned WILEY not to discuss the matter over the telephone, which I believe was an effort to be security conscious and to avoid detection by law enforcement (*e.g.*, interception of wire communications by law enforcement).

49. DEA investigators received records from Square Inc., the parent company of the mobile payment platform CashApp, related to WILEY's CashApp account (for a period between May 1, 2020 and April 27, 2021). A review of the records revealed multiple financial transactions between HARRY (username Kenston Harry) and WILEY (username Yung 252) using the platform including: a September 13, 2020 payment from HARRY to WILEY in the amount of $3,000 for "rent," a September 26, 2020 payment from HARRY to WILEY in the amount of $2,100 for "rent," an October 3, 2020 payment from HARRY to WILEY in the amount of $500 for "6000," an October 14, 2020 payment from WILEY to HARRY in the amount of $1,00 for "cry baby," an November 22, 2020 payment from WILEY to HARRY in the amount of $300 for "casino," a November 27, 2020 payment from HARRY to WILEY in the amount of $150 [without a description], a December 6, 2020 payment from WILEY to HARRY in the amount of $305 for "casino," an April 2, 2021 payment from HARRY to WILEY in the amount of $500 [without a description],

f.    April Drug Transactions facilitated by WILEY, HARRY, and BROWN

50.    Wire and electronic communications intercepted over the TARGET TELEPHONE revealed a drug trafficking relationship between WILEY and BROWN (using telephone number (215) 558-0334, subscribed in BROWN's name). Communications intercepted over the TARGET TELEPHONE and physical surveillance revealed a cocaine transaction in April 2021 where BROWN transported cocaine to Manhattan for the WILEY drug trafficking organization. BROWN has since disused his telephone number ending -0334 and begun use of another telephone number (telephone number (267) 296-0211, subscribed in the name of David I Smith, PO Box 47724 Philadelphia, PA).

51.    According to criminal history records and information received from the Chester Police Department, BROWN is believed to reside in Chester, Pennsylvania. A check of law enforcement databases (the NCIC databases) revealed that BROWN has sustained the following felony convictions in Pennsylvania: receipt of stolen property, violation of Pennsylvania's controlled substances act, criminal conspiracy and aggravated assault in 1993; driving while license suspended/revoked and fleeing to elude police in 2000; fleeing to elude police in 2012; and additional violations of Pennsylvania's controlled substances act in 2001, 2012 and 2014. BROWN also sustained a 2007 misdemeanor conviction for violation of Pennsylvania's controlled substances act. Additionally, BROWN faces pending charges for possession of an instrument of crime, assault, terroristic threats, strangulation, carrying a firearm without a license and other crimes stemming from a September 2020 arrest in Philadelphia, Pennsylvania. In March 2021, police in Chester, Pennsylvania executed a search warrant at BROWN's residence and recovered 10 pounds of synthetic marijuana, several ounces of cocaine and an assault rifle, which occasioned additional pending charges.

52.     BROWN was physically present with WILEY in Connecticut on April 27, 2021, where I believe that they prepared cocaine to be shipped to an unidentified male, using HARRY's residence, TARGET PREMISES THREE, to package the product. On April 28, 2021, BROWN did transport cocaine to the unidentified male in Manhattan, as described below.

53.     On April 27, 2021, at approximately 11:30 a.m., DEA investigators conducted physical surveillance which included observations of WILEY on Capitol Avenue in Bridgeport, at TARGET PREMISES TWO. Based upon the investigation to date, I believe that WILEY uses TARGET PREMISES TWO, the home of his uncle, RICHARDSON, to stash contraband (*i.e.*, cocaine and marijuana). Using a court-authorized GPS tracking device affixed to WILEY's vehicle, TARGET VEHICLE ONE, DEA investigators tracked WILEY when he departed his (former) apartment in Trumbull and travelled toward Bridgeport. WILEY travelled to TARGET PREMISES TWO, travelled past TARGET PREMISES TWO, looped the block, and then parked his vehicle at the rear of TARGET PREMISES TWO. Based on where TARGET VEHICLE ONE was parked, DEA investigators could not observe whether WILEY placed an item or items into the vehicle while at TARGET PREMISES TWO.

54.     At approximately 12:45 p.m., WILEY departed TARGET PREMISES TWO in TARGET VEHICLE ONE and travelled to a convenience store in Bridgeport. WILEY's vehicle was being driven by another male, BROWN, and WILEY was seated in the front passenger seat. I believe this male to be BROWN based upon the interception of wire communications between WILEY and BROWN's telephone number, subscribed in his name to an address in Chester, Pennsylvania, and review of BROWN's arrest photographs provided by the Chester, Pennsylvania Police Department. When at the convenience store, WILEY exited the vehicle and entered the store. Soon after entering the convenience store, WILEY exited the store holding a

25

shopping bag containing unknown items and reentered his vehicle, again in the front passenger seat. WILEY and BROWN then departed Bridgeport and travelled north toward Hartford. WILEY's vehicle travelled north to Hartford at a relatively slow rate of speed, the highway speed limit, despite TARGET VEHICLE ONE being a 2021 Mercedes-Benz AMC GT 63 coupe, a performance luxury vehicle capable of high rates of speed. I believe, based on the investigation to date, that WILEY, at times, travels on highways at a slow rate of speed as a countersurveillance ploy to thwart law enforcement, and I believe that WILEY will travel slowly and obey speed limits if transporting controlled substances.

55.     WILEY's vehicle arrived at Action Audio in Hartford, TARGET PREMISES FOUR, at approximately 2:15 p.m. Action Audio is owned by HARRY. Based upon the investigation to date, TARGET PREMISES FOUR is used by the WILEY drug trafficking organization to stash contraband (*i.e.*, cocaine and marijuana). DEA investigators observed that TARGET VEHICLE ONE was backed into one of the service bays of the business and the garage door was then partially closed, obscuring a line-of-sight into the vehicle bay. Approximately two minutes later, the garage door was fully reopened, and TARGET VEHICLE ONE was driven out of the vehicle bay and then parked in the business parking lot.

56.     Approximately 20 minutes later, HARRY exited Action Audio, TARGET PREMISES FOUR, carrying a large bag which appeared to DEA investigators to weigh several pounds based upon its size and the manner in which it was being carried. HARRY placed the bag into the trunk of TARGET VEHICLE ONE and then entered the rear passenger seat of the vehicle. TARGET VEHICLE ONE then departed with BROWN driving and WILEY and HARRY as passengers. The vehicle travelled to HARRY's residence in Bloomfield, TARGET PREMISES THREE, arriving at approximately 3:14 p.m. DEA investigators observed the

26

vehicle park in HARRY's driveway. HARRY then exited the vehicle, retrieved the bag from the trunk of TARGET VEHICLE ONE, and HARRY, WILEY, and BROWN entered TARGET PREMISES THREE. Based upon location information received by DEA investigators from the TARGET TELEPHONE, WILEY then stayed mostly in the vicinity of TARGET PREMISES THREE for the remainder of the afternoon into the evening, and DEA surveillance was terminated.

57.     I believe that this physical surveillance confirms that the WILEY drug trafficking organization stashes and transfers contraband (*i.e.*, cocaine and marijuana) and proceeds derived from drug sales using the TARGET PREMISES TWO, TARGET PREMISES THREE, and TARGET PREMISES FOUR. Moreover, this physical surveillance revealed BROWN as a member of the WILEY drug trafficking organization. During the physical surveillance on April 27, 2021, DEA investigators intercepted communications, discussed below, indicative of drug trafficking (though WILEY was also likely using encrypted communications services like Apple FaceTime, which investigators are unable to intercept). I believe that, during the surveillance that occurred on April 27, 2021, while BROWN was with WILEY, WILEY sent a shipment of cocaine to an unidentified male in New York. I further believe that the afternoon and evening of April 27, 2021, WILEY acquired and prepared a second shipment of cocaine to the unidentified male, which was then transported by BROWN to New York on April 28, 2021.

58.     The morning of April 27, 2021, WILEY was scheduled to meet with an interior designer who is assisting in the design of a New Britain restaurant project, a project I believe is financed using proceeds of the WILEY drug trafficking organization. WILEY sent his "business partner," Shawanda Wakefield ("WAKEFIELD"), in his stead and, in an intercepted wire communication at 9:31 a.m., told WAKEFIELD that he was running late. In another intercepted

27

wire communication to his interior designer at 9:48 a.m., he told the interior designer that he had "two appointments" that morning that he had "forgot about." At 9:53 a.m., WILEY sent a text message, "Yo," to FELIZ, a source of cocaine and marijuana supply for the WILEY drug trafficking organization, described above.

59.     In a brief voice call at 11:23 a.m., an unidentified male (using telephone number (201) 705-4084) called WILEY (Session ID 1291) regarding a transaction or delivery:

| UM -4084: | Yeah. Hey, you got it, everything a'ight? |
| WILEY: | Yeah, yeah I'm Gucci. Call you when he outside – |
| UM -4084: | A'ight. A'ight. |
| WILEY: | A'ight. |

This unidentified male, UM -4084, is believed to be a customer of the WILEY drug trafficking organization, and the male to whom BROWN provided cocaine on April 28, 2021.

60.     In a voice call at 12:05 p.m., WILEY called (Session ID 1306) an unidentified male (using telephone number (203) 690-6145) to ask if he was coming to meet WILEY:

| WILEY: | You coming over here, right? |
| UM -6145: | Yeah, I'm coming right now |
| WILEY: | A'ight |
| UM -6145: | This damn Uber driver, what the hell? A'ight. |

Based upon this communication, I believe that WILEY asked the unidentified male to meet him while he was at TARGET PREMISES TWO. In an intercepted wire communication to his interior designer at 1:39 p.m., WILEY told the interior designer that he "got out of a meeting late." WILEY further told the interior designer, "I'm just so busy right now, you know."

61.     In a voice call at 1:50 p.m., the unidentified male (using telephone number (201) 705-4084) again called WILEY (Session ID 1321), and WILEY told him that a shipment was en route to the male:

| WILEY: | . . . went down there like 40 minutes ago. |
| UM -4084: | 40 minutes ago? |
| WILEY: | Yeah. |
| UM -4084: | So I gotta cancel my ni... I gotta cancel that plane... What time you think he gon' get down here? |
| WILEY: | He's... He... Shit, I don't... Bro, he... You know how exactly how long it was, so he been on the road for like 40 minutes. |
| UM -4084: | A'ight, so I probably... Let me see. |
| WILEY: | It's already situated, though. He got everything already. He already on the road. |

62.     Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, knowledge of this investigation, review of the wire and electronic communications from April 27, 2021, and physical surveillance, I believe that on April 27, 2021, WILEY facilitated the shipment of cocaine to UM -4084. WILEY travelled to stash locations, TARGET PREMISES TWO, TARGET PREMISES THREE, AND TARGET PREMISES FOUR. WILEY was unable to attend preplanned meetings with an interior designer for his New Britain restaurant project. WILEY was communicating with UM -4084 who, DEA investigators later learned, is a customer of the WILEY drug trafficking organization. WILEY also sent electronic communications to FELIZ, a source of supply for the WILEY drug trafficking organization, but later told her that he had acquired cocaine, as discussed below. WILEY told UM -4084 that the transaction was going as planned ("it's situated"), that someone was transporting the cocaine ("he got everything"), and the cocaine trafficker was en route to UM -4084 ("he already on the road"). Based upon communications intercepted over the TARGET TELEPHONE coupled with physical surveillance, DEA investigators believe that on April 27, 2021, WILEY trafficked cocaine to UM -4084.

63.     I also believe that the next day, April 28, 2021, WILEY trafficked an additional shipment of cocaine to UM -4084. WILEY prepared that shipment throughout the afternoon of

April 27, 2021, and BROWN delivered it in Manhattan the next day on behalf of the WILEY

drug trafficking organization.

64.     Specifically, I believe that on April 28, 2021, WILEY supplied a second shipment

of cocaine to the unknown male, UM -4084, amounting to nearly a kilogram. In the intercepted

communications described below, WILEY told FELIZ that he had "just grabbed something."

This conversation occurred after WILEY had told UM -4084 that the April 27th shipment was

already on the road. But in a voice call at 4:21 p.m. (Session ID 1330) with WADE, WILEY's

girlfriend, WILEY told her that he was "handling something," which I believe means preparation

for the second shipment of cocaine to UM -4084. At 4:55 p.m., WILEY sent a second text

message, "Yo," to FELIZ, a supplier. When FELIZ finally called WILEY back at 4:57 p.m.

(Session ID 1342), as described below, WILEY told her that he "he just grabbed something,"

which I believe to mean that WILEY recently acquired cocaine:

| | |
|---|---|
| WILEY: | Hello |
| FELIZ: | Yo, um... I get back tomorrow, so I'ma have that. |
| WILEY: | The joint [the kilogram of cocaine]? |
| FELIZ: | You heard me? |
| WILEY: | Yeah, the joint you was talking about? |
| FELIZ: | Yeah, 33 [$33,000 per kilogram] |
| WILEY: | Damn, I just grabbed something too. I thought you was gonna be a minute. Let me see it though – |
| FELIZ: | No, I... – |
| WILEY: | When you come down. |
| FELIZ: | Huh? |
| WILEY: | I said, when you get down here, let me see it. Check it out. |
| FELIZ: | It's fire. It's fire though. It's fire. |
| WILEY: | Yeah. |
| FELIZ: | So... I'll call you when I get in town. |
| WILEY: | A'ight, bet.  Let me know about the weed too. |
| FELIZ: | Alright, bye. |

30

Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, knowledge of this investigation, and review of the wire communication, I believe that FELIZ offered WILEY a kilogram of cocaine ("the joint") for $33,000. FELIZ vouched for its purity stating that it was "fire," slang for highly pure and high quality. WILEY replied, "damn, I just grabbed something too," which I believe means that WILEY had just acquired a large quantity of cocaine because he thought FELIZ required more time to source the cocaine ("thought you was gonna be a minute"). WILEY also asked that FELIZ provide an update on sourcing marijuana: "let me know about the weed."

65.     I believe that WILEY turned down FELIZ's offer because he had already sourced cocaine from another party and had planned that the cocaine be delivered to a buyer in Manhattan, UM -4084. After the first cocaine shipment mid-day on April 27, 2021, I believe that WILEY was coordinating the second shipment throughout the afternoon of April 27, 2021, to occur on April 28, 2021. Ultimately, BROWN, with whom WILEY was observed the evening of April 27, 2021, travelled to New York on April 28, 2021 to deliver cocaine to UM -4084. After the transaction, the recipient, UM -4084, complained to WILEY that the weight of the product (*i.e.*, cocaine) was 900 grams, or less. During the transaction, based upon location information from the TARGET TELEPHONE, WILEY was located in Weehawken, New Jersey, most likely at a music recording studio. But in the days preceding April 28, 2021, WILEY had been communicating with UM -4084 using the TARGET TELEPHONE, in furtherance of the cocaine transactions.

66.     In an earlier voice call on April 23, 2021, WILEY called UM -4084 (Session ID 767) to coordinate a payment using mobile payment platform, Cash App:

UM -4084:            Yo

31

| | |
|---|---|
| WILEY: | Yo bruh, send the Cash App. Trust me, send it right now. |
| UM -4084: | A'ight |
| WILEY: | A'ight. |

67.    In a second voice call on April 23, 2021, UM -4084 called WILEY (Session ID 769) to confirm payment using Cash App:

| | |
|---|---|
| UM -4084: | Yo. |
| WILEY: | Yo. |
| UM -4084: | How many of these, send you? |
| WILEY: | Huh? |
| UM -4084: | How many of these, send you? |
| WILEY: | Send me um... Just send me like two or three CashApps.  I'ma... I'm trying to figure this... I'm trying to figure this shit out. |
| UM -4084: | A'ight. |
| WILEY: | A'ight. |

68.    In a voice call on April 28, 2021, at 10:46 a.m., WILEY called UM -4084 (Session ID 1429) to confirm directions so that BROWN could travel to Manhattan:

| | |
|---|---|
| WILEY: | That's, but what part on New York, that's in? |
| UM -4084: | That's New York, New York. That's Manhattan. That's [Audio Breaks] [UI] |
| WILEY: | Yeah, he um... he, he 18 minutes. |
| UM -4084: | 18? |
| WILEY: | Yeah, don't forget you gotta [UI] with the... couple of hundred that you told me you was gonna give him. |
| UM -4084: | A'ight. |
| WILEY: | So you gotta pass... You said, you was giving him four right? |
| UM -4084: | Yeah. |
| WILEY: | A'ight, cause he is expecting that shit. |
| UM -4084: | I bet he is. |
| WILEY: | Alright, he'll be there in 18 minutes. |
| UM -4084: | A'ight. |

69.    In a voice call at 11:12 a.m., UM -4084 (Session ID 1433) called WILEY to ask about the status of the shipment:

| | |
|---|---|
| WILEY: | Yo. |
| UM -4084: | Yeah that boy,... he here yet or – |

WILEY:              Hold on, there's someone calling me right now, hold on.

70.    In a voice call at 11:15 a.m., WILEY called UM -4084 (Session ID 1435) to

provide the make and model of BROWN's vehicle, which WILEY described as a "blue Impala":

| | |
|---|---|
| UM -4084: | Yo. |
| WILEY: | He said [Audio fades] |
| UM -4084M: | Huh? |
| WILEY: | He said, come outside. |
| UM -4084: | I don't see him. What are you-? |
| WILEY: | But he should be pull – he said, "Tell him to come outside. I'm pulling up." |
| UM -4084: | What kind of car you said he had? |
| WILEY: | A navy blue Impala. |
| UM -4084: | Yeah, he not there yet. |
| UM -4084: | Yo. |
| WILEY: | Yeah. |
| UM -4084: | Yeah, I don't see that nigga. |

As described below, BROWN uses a blue Chevrolet Malibu.

71.    In a voice call at 11:25 a.m., UM -4084 called WILEY (Session ID 1437) to

again ask about the status of the shipment:

| | |
|---|---|
| UM -4084: | Nigga lost boy |
| WILEY: | Hold on |
| UM -4084: | Alright |

72.    In a voice call at 11:25 a.m., WILEY called (Session ID 1439), BROWN to ask

his status and to use three-way calling so that BROWN and the unidentified male could facilitate

the meeting:

| | |
|---|---|
| WILEY: | You told me to tell him to come outside. That nigga been sitting outside – |
| BROWN: | Bruh, bruh, bruh it say "zero minutes." I'm on the block. I'm ready to pull 'em up. |
| WILEY: | And I fucking gave you all the bread I had in my pocket and this fucking toll, I forgot all about this shit. |
| BROWN: | That's why I told you [Audio breaks] dollars. Tell him... tell him I'm in a blue car man. I'm |

33

|  |  |
|---|---|
|  | at the Lenox Ave [Lenox Avenue in the Harlem Neighborhood of Upper Manhattan] uh... light. |
| WILEY: | Alright. |
| BROWN: | I see the white van. Tell him... tell him I'm pulling up right behind the white van. |
| WILEY: | Alright. |
| BROWN: | You hear me? |
| WILEY: | Hold on, 'bout to connect him. Both of you are on the phone. |
|  | *Wiley connects BROWN and UM -4084 using three-way calling* |
| BROWN: | Yo |
| UM -4084: | Yo – |
| BROWN: | I'm right pulling up this white van. You see that white van with the hazard lights on? It's behind the truck. A little... a little Jeep? |
| UM -4084: | Alright. |
| BROWN: | I'm ready to pull up. I'm in a blue car. |
| UM -4084: | Alright. |
| BROWN: | I'll be there. I'm at this light. I'll be there in like two seconds. |

73.    In a voice call at 11:25 a.m., UM -4084 called WILEY (Session ID 1441) to then complain about the weight of cocaine provided:

|  |  |
|---|---|
| WILEY: | Yo. |
| UM -4084: | Yo. |
| WILEY: | Yo. |
| UM -4084: | Yeah, what's this? |
| WILEY: | You say, what? |
| UM -4084: | I said, what's this in the bag? |
| WILEY: | Is like, nine hundred [900 grams]. |
| UM -4084: | Ain't even- nah, bruh... that shit look like, less... lesser than that. |
| WILEY: | No it's not bruh just... bruh , is like 900 grams bruh. I've told you it's probably off whatever the... the buck fifty... whatever it is. |
| UM -4084: | If this nine hundred that means is off 250 cause it was... it was 200 and I gave you 50 – |
| WILEY: | Whatever bruh... whatever.... whatever it's off bruh, I just couldn't get the um… the other quarter for um... um, it was like 200 hundred |

34

|          |                                                    |
|----------|----------------------------------------------------|
|          | from my son so. That's it. That's all I gotta get  |
|          | from him.                                          |
| UM -4084: | A'ight. Damn! A'ight —                            |
| WILEY:   | I get that sh... I'll get that shit from him       |
|          | bruh.                                              |
| UM -4084: | Alright.                                          |
| WILEY:   | Send him the addy, bro.                            |
| UM -4084: | I don't got his number. I'm 'bout to send it to   |
|          | you.                                               |
| WILEY:   | Alright.                                           |

74.    Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, knowledge of this investigation, and review of the wire communication, I believe that WILEY facilitated the transportation of nearly a kilogram of cocaine, approximately 900 grams, to Manhattan by BROWN, for purchase by UM -4084. Based on the communications, I believe it is probable the cocaine travelled from Connecticut to Manhattan, as BROWN was observed by DEA investigators in Connecticut on April 27, 2021. The identity of UM -4084 is unknown to DEA investigators.

75.    In one intercepted voice call on April 28, 2021, WILEY told the unidentified male that BROWN drives a "blue Impala," a model of vehicle manufactured by Chevrolet. In the intercepted voice call where WILEY later used three-way calling to connect BROWN and the unidentified male, BROWN stated that he was in a "blue car." DEA investigators determined that BROWN uses a blue 2009 Chevrolet Malibu. A Chevrolet Malibu is similar to a Chevrolet Impala, in that they are both sedans, but they are different vehicle models produced by Chevrolet. BROWN's Chevrolet Malibu, bearing Pennsylvania registration LHG2371, is registered to a Tawanda Thompson at an address in Chester, Pennsylvania. The car is registered to the same street address in Chester, Pennsylvania as BROWN's cellular telephone number

ending -0334, a street address that also appears on BROWN's NCIC criminal history and the address of the residence searched by the Chester Police Department pursuant to a search warrant.

76.     DEA investigators conducted searches of records created by New York City license plate readers ("LPR") at Hudson River crossings (*e.g.*, the Lincoln Tunnel). LPR data revealed that on April 28, 2021, at approximately 10:52 a.m., BROWN's blue Chevrolet was captured by an LPR traveling through the Lincoln Tunnel inbound (eastbound) into Midtown Manhattan from New Jersey. As described above, WILEY connected BROWN and the unidentified male using three-way calling at approximately 11:25 a.m., where BROWN told the unidentified male that he was in a "blue car." At approximately 12:00 p.m., BROWN's blue Chevrolet was captured by an LPR traveling westbound in New Jersey.

77.     Prior to the cocaine transaction, based upon location information for the TARGET TELEPHONE, WILEY was at a recording studio in Weehawken, New Jersey. In an intercepted voice call (Session ID 1443) between WILEY and an unidentified woman at 11:45 a.m., WILEY confirmed that he had been with BROWN ("Farid") on the morning of April 28, 2021:

| | |
|---|---|
| UF -3469: | I'm so fucking hungry. Yo, how is Farid? |
| WILEY: | What you said? |
| UF -3469: | Tajh, how is Farid? |
| WILEY: | I just … I just left him. |
| UF -3469: | When? |
| WILEY: | Like a couple of minutes ago. |
| UF -3469: | He's in Jersey? |
| WILEY: | Yeah, he was in the studio with [UI] out here. He's gonna go to North Carolina for me real quick. |
| UF -3469: | I thought he was in jail. |
| WILEY: | Nah, that nigga been out of jail. |
| UF -3469: | Oh. |
| WILEY: | He always ask about you. I've told him you was supposed to come to the studio. |
| UF -3469: | Tell him, "Hi," next time you talk to him. |
| WILEY: | He said, "What's up with little B?" |
| UF -3469: | Why don't you bring him to CT? |

WILEY:          I am. He was out here.

Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, knowledge of this investigation, and review of the wire communication, and information received from the Chester Police Department, I believe that BROWN ("Farid") was with WILEY the morning of the April 28, 2021 cocaine transaction and that he trafficked cocaine to Manhattan.

78.     BROWN's blue Chevrolet has not been observed by DEA investigators in Connecticut. But, the evening of April 28, 2021, after the cocaine transaction in Manhattan, DEA investigators observed BROWN at Action Auto in Hartford, TARGET PREMISES FOUR, a location which DEA investigators believe is used by the WILEY drug trafficking organization to stash contraband.

79.     Based upon review of records received from Square Inc., the parent company of the mobile payment platform CashApp (for a period between May 1, 2020 and April 27, 2021), revealed multiple financial transactions between BROWN (username Myron) and WILEY (username Yung 252) using the platform including: a January 9, 2021 payment from BROWN to WILEY in the amount of $1,000 [without a description], a January 11, 2021 payment from BROWN to WILEY in the amount of $500 [without a description], a January 13, 2021 payment from BROWN to WILEY in the amount of $900 [without a description], a January 18, 2021 payment from BROWN to WILEY in the amount of $1,000 [without a description], a January 21, 2021 payment from BROWN to WILEY in the amount of $1,000 [without a description], a January 22, 2021 payment from BROWN to WILEY in the amount of $300 [without a description], a January 22, 2021 payment from BROWN to WILEY in the amount of $1,000 [without a description], a April 13, 2021 payment from WILEY to BROWN in the amount of

$250 for "food," a April 14, 2021 payment from WILEY to BROWN in the amount of $100 for "gas."

g.  May 7th Drug Transaction with WATSON, facilitated by WILEY and HARRY

80.    Wire    and    electronic    communications    intercepted    over    the    TARGET
TELEPHONE revealed a drug trafficking relationship between WILEY and WATSON (using
telephone number (914) 316-2139, subscribed in the name of a woman with an address in
Bridgeport, but a telephone number that WATSON has provided to the United States Probation
Office as his contact number).

81.    A check of law enforcement databases (the NCIC databases) revealed that
WATSON has sustained convictions in Connecticut for possession of narcotics with intent to sell
in 2012, running from police in 2012, sale of illegal drugs and possession with intent to sell in
2017, and possession of narcotics with intent to sell in 2018. In 2016, in the United States
District Court for the District of Connecticut, WATSON was convicted of possession with intent
to distribute and distribution of heroin and sentenced to 46 months imprisonment with three
years' supervised release. *See* 3:16CR216 (RNC).

82.    In particular, on May 6, 2021 into May 7, 2021, WILEY arranged the sale of a
significant quantity of cocaine (one or more kilograms) that was purchased by, or brokered by,
WATSON. The sale was consummated on the night of May 7, 2021.

83.    First, on May 6, 2021, WILEY had a conversation (Session ID 2222) at 9:38 p.m.
with an unidentified male (UM -7143), whom DEA investigators believe to be based in
Springfield, Massachusetts based on the content of intercepted communications and prior
knowledge developed by DEA agents in Massachusetts. WILEY discussed with UM -7143
acquiring dilutants to use in cutting cocaine, and discussed a kilogram press he would use to

38

prepare the cocaine. Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that WILEY stated, "I'm looking for something. Like, you know the um..., the joint [Sighs] um..., that you use to um... You know, make it into another one." Based on my training and experience and the context of the communication, I believe that WILEY was looking for cut material, which I know are adulterants commonly used to cut cocaine (or other controlled substances, like heroin) that increases the amount of the supply by decreasing the purity level of the product. By adding adulterants to a certain quantity of cocaine, drug traffickers will reduce the purity of the product but increase the volume of the product (i.e., the quantity of grams to be sold), which allows for greater profits to be earned as more volume is sold. Based on subsequent telephone calls, I believe that WILEY needed the cut material to prepare a large quantity of cocaine for sale. In subsequent calls and text messages, WILEY and UM -7143 agreed to meet, UM -7143 instructing WILEY by text message at 10:10 p.m. (Session ID 2225) to meet "back of Petra Hookah parking lot in 45 minutes," which I understand to mean that the two met to consummate the sale of the cut material.

84. Later that night at 11:49 p.m., WILEY spoke with WAKEFIELD. During the voice call between WILEY and WAKEFIELD (Session ID 2245), the background noise indicated that he was preparing something, which I believe to be cocaine, about which WAKEFIELD inquired. Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that when WAKEFIELD heard a chopping noise in the background and asked WILEY, "What you chopping something now?" WILEY responded, "I'm cooking some... nothing like food, but something else," and then laughed. I believe WILEY used coded language to communicate that

39

he was preparing a controlled substance, which I believe to be cocaine, using the cut material he received from UM -7143.

85.    The following day, May 7, 2021, at 1:34 p.m., WILEY spoke again to UM -7143 (Session ID 2298) in a wide-reaching conversation that specified the large quantities of cocaine that WILEY was trafficking.  Initially, WILEY indicated that he needed additional cut material. WILEY stated, "I'm probably gonna need like another two of them shits." Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation,  I believe WILEY was telling UM -7143 that he needed an additional quantity of cut material in order to cut the entire amount of cocaine that he was preparing.  I further believe that when WILEY stated, "I normally get that shit 10... like 10 of them shits at a time" he was indicated that he typically purchased a large quantity of the cut material, ten at a time. Or, in the alternative, as described herein, WILEY has discussed having a source that can supply him ten kilograms at a time, and WILEY needed a significant amount of cut material to dilute such a large quantity of cocaine. The conversation between WILEY and UM -7143 continued. WILEY asked, "the shit that you said, you got around, that shit still, around?" Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that WILEY was asking UM -7143 if he still had cocaine for sale. When UM -7143 replied, "1 left," which I believe represented one kilogram of cocaine. WILEY then stated, "I don't know what your number looking like.  My peoples is loaded with that shit," which I believe was WILEY telling UM -7143 that though WILEY did not know what price the UM -7143 purchased his cocaine, but WILEY's "people is loaded" meaning that WILEY's suppliers have access to multiple kilograms of cocaine. WILEY and UM -7143 then discussed pricing. Based on my training, experience and

40

knowledge of this investigation, I believe that when WILEY stated, "Like 30... 33- 34," he was telling UM -7143 that the price per kilogram was typically between $30,000 and $34,000 per kilogram.

86.     As the conversation continued, WILEY told UM -7143 that he received a preferential price for cocaine from a supplier:

| | |
|---|---|
| UM -7143: | Yep yep, like can imagine, I was at fucking ... I was just at 29 but these people [Audio Fades] they went back.... they went up [Voices overlap] |
| WILEY: | Yo bruh my man... my man hit me with some... yo listen, my man hit me with some crazy shit. Like, 'Yo, what up? I got four on me right now. Come drop me off a buck." And I was like, 'Damn, bruh.' [Voices overlap] |
| UM -7143: | That's beautiful. |
| WILEY: | Nah, but he want... yo, he was just ... he was just thirsty for the bread because he wanna to go do something. And I was just like "Yo ," He wanted it right then and there, I couldn't get up and jump in the highway right now [Voices overlap] |
| UM -7143: | Yeah, four for a buck. |
| WILEY: | Four for a buck. He was letting them shit go for a quarter. That's what he got them for. That's what he paid for. So he like, 'Just give me what I paid for this shit but I need the bread.' [Voices overlap] |
| UM -7143: | Yeah, that's gonna [U/I] |
| WILEY: | He really was like... he really... first he was like... like, he's like, 'Yo, just give me a buck 10.' Like, 'Yo,.. bruh, if you coming right now bruh, just bring me one hundred thousand bruh. Just take these shits bruh.' |

87.     Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that when UM -7143 stated, "was just at 29 but these people [Audio Fades] they went back.... they went up," he was

41

telling WILEY that he was paying $29,000 per kilogram of cocaine, but the price recently went up. Further, I believe that when WILEY stated that his "man" had said, "I got four on me right now. Come drop me off a buck." Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that WILEY was stating that he had a source of supply who offered to sell him four kilograms of cocaine for $100,000 (a "buck"). I believe that when WILEY stated, "Four for a buck. He was letting them shit go for a quarter," WILEY was reiterating that his supplier offered to sell him four kilograms of cocaine for $25,000 a per kilogram, $100,000 total. Then, when WILEY said, "he's like, "Yo, just give me a buck 10," I believe that WILEY was clarifying that the original price the supplier offered was four kilograms of cocaine for $110,000. But WILEY reported that the supplier then told him to "just bring me one hundred thousand" or $100,000, if he could purchase the cocaine quickly. WILEY went on to describe the significant amount of money he had recently spent on cocaine: "And I was calling him... I'm like yo, so I'm like... cause, I just had grab the other shit. I'm like, "Yo, I just spend like 200." Based on my training, experience and knowledge of this investigation, I believe that when WILEY stated, "I just had grab the other shit. I'm like, "Yo, I just spend like 200," WILEY was conveying that he had just spent $200,000 on a quantity of cocaine.

88.     Later on May 7, 2021, at 1:53 p.m., WILEY spoke to HARRY, who asked WILEY to bring "boxes," into HARRY's house (Session ID 2299). Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe "boxes" was code for a quantity of narcotics. Surveillance units then observed WILEY arrive at HARRY's Bloomfield residence (TARGET

PREMISES THREE) and remove several boxes from HARRY's Bentley, TARGET VEHICLE THREE, and carry the boxes into HARRY's house.

89.     During a subsequent call that day (Session ID 2309) at 2:59 p.m., WATSON spoke to WILEY to arrange the details of a transaction, whereby WILEY later supplied WATSON with controlled substances that I believe to be cocaine. Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that when WATSON stated, "Just come down and grab... give it to me. I'm pulling up on it," WATSON was asking WILEY to travel from Hartford, TARGET PREMISES THREE and/or TARGET PREMISES FOUR, to Bridgeport ("come down") to supply WATSON with a quantity of cocaine ("give it to me").   WILEY responded, "you could grab... grab him bruh, so we could do this at the same time., by which I believe WILEY meant that he (*i.e.,* WILEY) wanted his payment for the cocaine ("so we could do this at the same time") at the same time that WILEY provided the cocaine to WATSON.

90.     During a subsequent voice call (Session ID 2314) at 3:05 p.m., WATSON asked WILEY for further details regarding the upcoming cocaine transaction:

| WILEY: | Yo. |
| WATSON: | Bruh, what time you're gonna meet me out here so I could tell them. |
| WILEY: | Um, I'm doing that shit now bruh. |
| WATSON: | Huh? |
| WILEY: | I said, I'm doing that shit now. |
| WATSON: | A'ight, I'll tell them niggas 3:45-4:00 o'clock. So what should I tells them? |
| WILEY: | Where they at, in New Haven? |
| WATSON: | Nah, they in Stratford, Bridgeport. |
| WILEY: | A'ight.  I'm 'bout to... I'm 'bout to text you, hold on. |

| WATSON: | A'ight so I'ma just call them and tell them hold on. Cause I don't wanna, listen bruh... I don't want them going somewhere else bruh. |
| WILEY: | No, I know, but we gotta do it.. I'ma tell you, we gotta do it a different way.  I'll tell you why in a second. |

91.     Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation,  I believe that when WILEY stated, "I'm doing that shit now," he was referring to preparing cocaine for sale. Physical and electronic surveillance conducted by DEA investigators revealed that WILEY was with HARRY at TARGET PREMISES THREE during the above-described communications.   Subsequent intercepted communications, discussed below, further revealed that WILEY was in the process of cutting and packaging the cocaine, which DEA investigators believe occurred at HARRY's Bloomfield residence, TARGET PREMISES THREE. Based on my training, experience and knowledge of this investigation, I believe that when WILEY stated, "I'ma tell you, we gotta do it a different way," he was indicating that he wanted to discuss the particular details by which he and WATSON were going to conduct the transaction to sell the cocaine. In an follow-up call on May 7, 2021 (Session ID 2316) at 3:17 p.m., WILEY urges WATSON to speak to him by "FaceTime." Based on my training, experience and knowledge of this investigation, I believe that WILEY wanted WATSON to use FaceTime to communicate in order to have a secure conversation not easily intercepted by law enforcement.

92.     In a subsequent voice call (Session ID 2327) on May 7, 2021 at 4:25 p.m., WILEY told a woman that he was "in the lab (a reference to TARGET PREMISES THREE)," which based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe he was referring to a place

where he was conducting alteration, dilution, preparation, and packaging of the cocaine for sale. In the same call, a noise can be heard in the background of metal/machinery clanging, which, based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe to have been the cocaine kilogram press. A cocaine press is a tool used to shape powder cocaine for packaging, particularly after using a cutting agent to dilute the product. WILEY, heard grunting at the exertion of operating the kilogram press, noted as an aside "Yo this ain't going no more," by which I believe he was referring to the fact that the cocaine press had completed its work. Given his operation of a kilogram press, I believe that WILEY was packaging and distributing multiple kilogram quantities of cocaine.

93.     At approximately 5:46 p.m., WILEY and HARRY drove HARRY's Honda Accord, TARGET VEHICLE FOUR, from HARRY's residence back to HARRY's business, Action Audio, arriving at approximately 6:00 p.m. Pole camera footage showed WILEY take from the Honda a medium-sized shopping bag which, based upon the appearance of the bag and the manner in which it was being carried, appeared to weigh several pounds. At approximately 6:30 p.m., WILEY placed the bag into his Mercedes-Benz, TARGET VEHICLE ONE, and then drove away. At 4:08 p.m., WILEY had sent WATSON a text message (Session ID 2324) advising him that he (i.e., WILEY) was "On highway be ready brudda," indicating that he was preparing to meet WATSON to conduct the cocaine transaction.

94.     Law enforcement surveillance followed WILEY to a rest stop on Interstate 95 near the Orange/Milford area, where, at approximately 7:35 p.m., WILEY pulled near to a gray Hyundai with tinted windows, which investigators had observed during prior physical surveillance visiting the Capitol Avenue address. The Hyundai was registered to a rental car

company and was later confirmed to be driven by WATSON. WILEY and WATSON then drove their respective cars to the east side of Bridgeport onto a dark residential street. After circling the block to avoid law enforcement detection, DEA investigators observed the two cars parked on a Bridgeport city street at approximately 7:50 p.m. Given the dark night and the dark tinted windows in each car, DEA investigators were unable to see anything that occurred inside of the vehicles, who was inside of the vehicles, or whether an exchange occurred. DEA investigators remained moving so that they would not be detected but did not observe individuals enter or exit the vehicles from their vantage point. Ultimately, however, DEA investigators observed the two cars drive away. But based upon intercepted communications, DEA investigators believe that a cocaine transaction occurred. WILEY's vehicle then departed at approximately 8:00 p.m.

95.      Shortly after WILEY completed what DEA investigators believe to be a cocaine transaction with WATSON, WILEY, using the TARGET TELEPHONE, spoke to HARRY (Session ID 2353) at 8:30 p.m. In that call, WILEY told HARRY, "That nigga literally just got out my car as we speak," and went on to say "I'm about to go count the bread now." Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that when WILEY stated, "That nigga literally just got out my car as we speak," he was referring to WATSON providing him with cash proceeds from the completed cocaine transaction. WILEY went on to say, "I'm about to go count the bread right now," by which I believe WILEY meant that he was about to count the cash proceeds ("bread") provided to him by WATSON in exchange for the cocaine.

96.      DEA investigators followed WATSON's gray Hyundai to the west side of Bridgeport. Noticing that WATSON's vehicle lights were off even though it was dark outside, an officer of the Bridgeport Police Department pulled over the Hyundai. In the subsequent law

46

enforcement interaction, by reviewing a driver's license provided to the Bridgeport Police Department, WATSON was confirmed as the sole occupant of the vehicle.   WATSON was released without incident.

97.     Based on this sequence of events, I believe that WILEY prepared and sold one or more kilograms of cocaine in a transaction brokered by WATSON in Bridgeport.

        h.   Pertinent Communications with WATSON

98.     On May 11, 2021, as described above, WILEY and GANT had travelled from GANT's residence in Ledyard, TARGET PREMISES FIVE, to New Jersey. I believe that WILEY and GANT engaged in a drug transaction while in New Jersey. After the transaction, in a voice call (Session ID 2798) with WATSON, WILEY discussed sharing profits with WATSON:

| | |
|---|---|
| WILEY: | Nah, I told you I was breaking bread with you on my profit that I made. Off the 1500, I was breaking bread with you. |
| WATSON: | Oh, okay.  [Voices Overlap] |
| WILEY: | To take off, the tab. [Voices Overlap] |
| WATSON: | Okay, okay.  Yeah, we figure that out later, bro. |
| WILEY: | A'ight.  A'ight, say no more. |

99.     Based on my training, experience and knowledge of this investigation, and context of the intercepted communication, I believe that WILEY had just conducted a drug transaction ("bust a little move") and just made a "profit" of $1,500 ("1500"). I further believe that WILEY was going to share his profit with WATSON ("I was breaking bread with you") and likely owed WATSON some sum of money ("to take off, the tab") due to their drug-trafficking relationship. Based upon this communication, other intercepted communications, physical surveillance, and the May 7 drug transaction in Bridgeport, I believe that WATSON is a member of the WILEY drug trafficking organization and conspires with WILEY to distribute controlled

substances. WILEY has communicated with WATSON (with WATSON using the WATSON TELEPHONE) as recently as June 5, 2021. On May 20, 2021, WATSON (using the WATSON TELEPHONE) called WILEY (Session ID 4432). WATSON asked whether WILEY had access to low-quality marijuana ("You still got more of those lows?"). WILEY also complained to WATSON about RICHARDSON ("This nigga Uncle Charles is annoying calling my phone. Blowing me up, cause he can't get no credit. Calling my phone to go cook him a "bizzy." I'm busy man. Get out of here, man."). Based on my training, experience and knowledge of this investigation, and context of the intercepted communication, I believe that WILEY believes that RICHARSON calls him too much, cannot get drugs on consignment ("credit"), and is requesting too much of WILEY. On June 5, 2021, WATSON and WILEY discussed taking a trip to Miami (*e.g.*, Session ID 5312), though the pair did not ultimately travel.

  i.   Pertinent Communications with RICHARDSON

100.   Wire   and   electronic   communications   intercepted   over   the   TARGET TELEPHONE has revealed a drug trafficking relationship between WILEY and RICHARDSON (using telephone number (203) 685-9545, subscribed to a company in New Jersey). RICHARDSON is WILEY's uncle and, in intercepted communications, WILEY frequently refers to RICHARDSON as "Uncle Charles" and his uncle.

101.   A check of law enforcement databases (the NCIC databases) revealed that RICHARSON has sustained convictions in Connecticut for larceny, criminal trespass and failure to appear in 1996, and for assault and possession of narcotics in 1999, and he previously was convicted of sale of marijuana in 1985 in North Carolina. RICHARDSON lives at TARGET PREMISES TWO, which based upon the investigation to date is believed to be a stash house for the WILEY drug trafficking organization, frequented by WILEY.

102.     On May 8, 2021, in a voice call (Session ID 2480) RICHARDSON requested that

WILEY supply RICHARDSON with cocaine:

| | |
|---|---|
| WILEY: | Yo. |
| RICHARDSON: | Yo, where you at man? |
| WILEY: | I had to get some shit to cut that shit up. So you gotta give me a minute. I'm coming. |
| WILEY: | I know, I got you. [Voices overlap] |
| RICHARDSON: | That that dude.. that dude bothering all day. |
| WILEY: | I got you. Give me a second. I'll be right over there. [Voices overlap] |
| RICHARDSON: | Nobody else ordered [U/I] for a minute [Voices overlap] |
| WILEY: | I'm waiting for the... I'm waiting... I'm waiting for... [Voices overlap] |
| RICHARDSON: | [U/I]. [Voices overlap] |
| WILEY: | I know, I got somebody that went to go buy the stuff for me to cook up. So just give me a minute. [Voices overlap] |
| RICHARDSON: | Alright. A'ight. |

103.     Based on my training and experience, knowledge of common cocaine slang based

on other DEA investigations, and knowledge of this investigation, I believe that WILEY was

describing to RICHARDSON that he had to dilute and package cocaine ("cut") and that he

would come to soon meet RICHARDSON.

104.     Later on May 8, 2021, RICHARDSON left WILEY a voicemail (Session ID

2522): "Yeah! Tajh! I need a eight ball, man. Give me a call. Quick!" Based on my training and

experience, knowledge of common cocaine slang based on other DEA investigations, and

knowledge of this investigation, I believe that RICHARDSON was requesting one-eighth of an

ounce of cocaine. WILEY then called RICHARDSON back (Session ID 2532):

| | |
|---|---|
| WILEY: | Yo. |
| RICHARDSON: | Yo, where you at man? |
| RICHARDSON: | Yo, man! What's up? |
| WILEY: | Yo, I just woke up uncle Charles. I'ma come over there. But I gotta cook it up over there. |

| RICHARDSON: | I thought you already had it cooked. Aright, come up. Alright, he'll wait. [Voices Overlap] |
| WILEY: | Alright, just give me. [Background: Noise] I'll be over there... Just give me a second, I'm 'bout to leave my house. |
| RICHARDSON: | Alright. |

105.     Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that WILEY was discussing transporting a controlled substance, cocaine, to "Uncle Charles," RICHARDSON. WILEY stated that he first had to "cook it up," which I believe based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, to mean that WILEY had to dilute, prepare, and package cocaine for sale. In a later voice call (Session ID 2472), RICHARDSON asked WILEY: "What time you gonna bring that stuff to me?"

106.     On May 9, 2021, I believe that WILEY and RICHARDSON discussed the proceeds from the sale of cocaine in a voice call (Session ID 2590):

| WILEY: | Hello. |
| RICHARDSON: | Hey, I got uh... I sold one. |
| WILEY: | Alright. |
| RICHARDSON: | Alright. So what you wanna do? Give you the money of the sold one or just hold the money until I finish? |
| WILEY: | I'ma be down there [UI], but I'ma c... [Audio Fades] |
| RICHARDSON: | Alright. So how many you gave me? You gave me, how many three? |
| WILEY: | Three and then um..., two ... two grams. |
| RICHARDSON: | Oh, okay. Alright, so... So what I owe you? All together? |
| WILEY: | A buck [UI]. [Audio Fades] |
| RICHARDSON: | Alright. A'ight. |
| WILEY: | A'ight. |

50

107.    Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that WILEY transported controlled substances to RICHARDSON in Bridgeport—specifically, gram quantities of cocaine ("three and then um…, two… two grams"). In earlier calls, RICHARDSON requested an "eight ball" from WILEY which is one-eighth of one ounce of cocaine, or roughly 3.5 grams.

108.    On May 10, 2021, I believe that RICHARDSON and WILEY discussed that RICHARDSON had sold out of cocaine and the parties argued about the money that RICHARDSON had paid for the cocaine so far (Session ID 2593):

| | |
|---|---|
| RICHARDSON: | I got rid of them, there's nothing. I got 130 for you. |
| WILEY: | A'ight, so... Yeah, cause you gave me... You gave me... [Voices Overlap] |
| RICHARDSON: | I gave you one (1) 30 already. |
| WILEY: | You gave me 100 |
| RICHARDSON: | I have you 130 dollars, man. Nigga whats wrong with you? |
| WILEY: | When? |
| RICHARDSON: | Yesterday! When you came over here. I gave you 130 dollars for one eight ball already. |

109.    Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that RICHARDSON is selling quantities of cocaine for WILEY using TARGET PREMISES TWO, and providing proceeds of the sales to the WILEY drug trafficking organization.

110.    On May 11, 2021, I believe that RICHARDSON and WILEY further spoke about the distribution of cocaine (Session ID 2861) where RICHARDSON asked, "Hey, you got anymore?" WILEY replied, "Yeah," and RICHARSON told him to bring him some.

j.   Cocaine Preparation Communications with HARRY

111.   On May 22, 2021, WILEY and HARRY exchanged the following voice call

(Session ID 3160):

| | |
|---|---|
| WILEY: | Yo, what I told you... What I told you last night, get that ready. I'm 'bout to... I'm 'bout to come up there. |
| HARRY: | Yo, I'm getting ready to... I want to go to..., up your way to, to, to go to Farmington. |
| WILEY: | So you wanna bring that with you? |
| HARRY: | I don't wanna go up there with...  Cause I'm trying to...  I have...  I gotta find... I gotta find something to um... |
| WILEY: | Nigga, I got a store we could go to. |
| ... | |
| WILEY: | A'right, so... Yo, um... what you wanna do? 'Cause... |
| HARRY: | I'm at home, 'bout to get dressed. So that's why I was calling to see what you wanna do about that at the same time. |
| WILEY: | Yeah, so bring... Damn. I'ma um... So [Pause] bring two dollars with you and then bring 100 dollars of the other thing. |
| HARRY: | Me no, have the other thing ready. |
| WILEY: | Like the thing you gave me in a cup yesterday. |
| HARRY: | Yeah, but lately that could be... What you call it? Lately... [Voices Overlap] |
| WILEY: | I know. I know. [Voices Overlap] |
| HARRY: | It be, it be biscuit and I can't put that in biscuit right now. [Pause] |
| WILEY: | How the fuck can we do this shit? |
| HARRY: | Yo, but when you um... When you drive all these tires and they get flat. When these niggas realize that it flat, you know nobody gonna call you back ever again. So how you gonna do that. You keep doing... [Voices Overlap] |
| WILEY: | I know. [Voices Overlap] |
| HARRY: | All you gonna... [Voices Overlap] |
| WILEY: | I know. |
| HARRY: | Create, when you get...  When you become or when you [U/I]. [Voices Overlap] |
| WILEY: | Yeah, but I don't know. Bro', listen though... This what I'm saying, right? |
| HARRY: | Mm-hmm. [Voices Overlap] |
| WILEY: |  'Cause I told... I even had a... I had a conversation with my man. I'm like; "Yo, bro'. I can't do that price for you. You gotta pay like 45 or $50 for that. And I can't do that at that. |

|        | Cause that's how it's gonna, it's gonna be coming." He was like; "Yo, bro'!" He's like; "I'll buy a lot, bro'. I just wanna be..." He said; "Bro, I just want the fire. I just wanna be at 40. I can't pay no higher than that, bro'." I'm like; "That's what I'm getting it for right now, bro'."I'm like; "And the shit is..." I'm like... [Voices Overlap] |
|--------|---|
| HARRY: | What I'm... What I'm saying to you, there's niggas that's paying 45. If you can get him to pay 45... Why not take $10... [Voices Overlap] |
| WILEY: | And just sell as is? |
| HARRY: | Why not sell it as is? Take 10... Take $10 each one and you coming out to have the same amount of money. |
| WILEY: | If we... Yeah, if we do that... I could do that all day. |
| HARRY: | Yeah, "I'ma give you... I give 35, you sell 45 and we good." [Audio Breaks] [Voices Overlap] |
| WILEY: | Bro' if you... Bro', listen if you do that, bro'. We could just... We don't even gotta talk. We just... I just leave it as is and, and... |
| HARRY: | That's what's supposed to take place. [Voices Overlap] |
| WILEY: | I just gotta get... I just... But I just gotta... [Voices Overlap] |
| HARRY: | But you not... |
| WILEY: | I gotta get these... I gotta just get these niggas locked in, because they, they stuck on the price of the other thing. [Pause] I gotta get these niggas off 30. Gotta get 'em off that. |
| HARRY: | [Chuckles] Good luck with that. [Voices Overlap] |
| WILEY: | Yo, I thought ab... I thought about it though. I was like; "Yo, this nigga right, though." We went through mad shit, we 'posed to be... we 'posed to be all the way situated. But the way we... And the thing is, bro'. The way when we put it together, it's like we 'posed to do it like that, but... We just not doing it the right way. 'Cause my boy told me, he said; "Yo, bro. You know how you make smoothies?" He said; "That's the real way to do it. And you gotta, and you gotta get it down, like you gotta get the smoothie down to the, 'til, 'til it's like all the way, all the way like, filtered out." And he said; "You gotta do it in the right way." He said, if you don't do it like that, it's gonna fuck up. 'Cause you have chunks and shit. He said; "You can't just mix it with your hand, you gotta put it... You gotta put the fruit in the blender and blend it all the way up, 'til it can't blend no more." |

53

112.   Based on my training and experience, my knowledge of common drug slang based on other DEA investigations, review of the content of the communication and knowledge of this investigation, I believe that WILEY instructed HARRY to have a quantity of controlled substances ready for WILEY to pick up ("what I told you last night, get that ready, bro."). HARRY stated that he was "home," which I believe to be a reference to TARGET PREMISES THREE. Based on the context of the communications, I believe that WILEY and HARRY were attempting to find cut material to dilute the controlled substance ("I gotta find something to,..")—a substance that, because it is being diluted, DEA investigators probably cocaine—and WILEY stated that he had a source for cut material ("I got a store we could go to."). HARRY cautioned WILEY not to dilute the product too much, or else customers would no longer want to purchase the product due to its weak purity ("When you drive all these tires and they get flat. When these niggas realize that it flat, you know nobody gonna call you back ever again."). Instead, HARRY and WILEY discussed prices ("If you can get him to pay 45") and a lesser profit margin ("why not take $10") rather than over-dilute the product ("and just sell as is?"). WILEY later discussed diluting and repackaging controlled substances where another party instructed him the correct way to dilute the substance ("we just not doing it the right way"), that cut material cannot be hand mixed ("you can't mix it with your hand") or else there would be "chunks," but instead must be blended ("you gotta put the fruit in the blender and blend it all the way up."). right now.").

k.   Pertinent Communications with MUNOZ

113.   Wire and electronic communications intercepted over the TARGET TELEPHONE has continued to reveal a drug trafficking relationship between WILEY and MUNOZ (using telephone number (203) 383-3479, subscribed to MUNOZ).

114.    A check of law enforcement databases (the NCIC databases) revealed that MUNOZ has a pending Connecticut state criminal case where he is charged reckless endangerment, assault, threatening, disorderly conduct, and criminal mischief.

115.    On May 7, 2021, WILEY and MUNOZ exchanged the following voice call (Session ID: 2320):

| | |
|---|---|
| WILEY: | Talk to me. |
| MUNOZ: | Yo, you around Bridgeport? |
| WILEY: | No... not right now. In a little bit, I will [Voices overlap] |
| MUNOZ: | Oh [Voices overlap] |
| WILEY: | What's good? What you wanted to talk about? |
| MUNOZ: | Well, something bro. |
| WILEY: | Huh? |
| MUNOZ: | You have time today or not? |
| WILEY: | Yeah. But what, what, what happen? What, you need something, like, what's good? [Background: Male voice] |
| MUNOZ: | Damn. |
| WILEY: | You heard? |
| MUNOZ: | Yeah, I hear. |
| WILEY: | Like what? Huh? [Background: Male voice] Yo? |
| MUNOZ: | Uh huh. |
| WILEY: | Yeah, what you needed? What you needed, bro? Talk to me. |
| MUNOZ: | You [ Clear throat] The other one, bro. |
| WILEY: | The white girl? |
| MUNOZ: | Yup. |
| WILEY: | How much? I got it. |
| MUNOZ: | No, that's what I told you, bro. Because I, I, I know two guys, you know? They are- [Voices Overlap] |
| WILEY: | All right, how much they want? [Voices Overlap] |
| MUNOZ: | But, but... he buy, he buy all the time 300, 300, 300. |
| WILEY: | 300 dollars or 300 grams? |
| MUNOZ: | Nah, nah, nah. |
| WILEY: | Grams? [Voices Overlap] |
| MUNOZ: | Dollars no, bro. Yeah, man. |
| WILEY: | Grams or 100, or 100, or 300 [Voices Overlap] |
| MUNOZ: | Yes. Yes. Dollar, nah. |
| WILEY: | [Background: Unintelligible Male] [Aside: Uh-uh, audio (ph)] |

55

| | |
|---|---|
| MUNOZ: | Not dollar, no. |
| WILEY: | Huh? Wait. Which one are you talking about? |
| MUNOZ: | Not dollar, bro, not dollar. |
| WILEY: | A'ight, I got it right now, he want it? |
| MUNOZ: | That's why I want to see you, man. |
| WILEY: | Yo... do he want it right now, bro? 'Cause I'm about to come down there, what do you want to do? |
| MUNOZ: | Yeah, 'cause he need first sample, you know? |
| WILEY: | Bro... a'ight, so... [Stammers] A'ight. So when you wanna do this? |
| MUNOZ: | I don't know, that's why I told you, man. When you have time? [Voices Overlap] |
| WILEY: | Damn, bro. Why he want a sample of that? |
| MUNOZ: | I don't know, bro. Because he said it's some, uh, some people selling garbage, man. |
| WILEY: | Said what? What's garbage? |
| MUNOZ: | No, no. He say some people, he said, is selling garbage. That's why he wants a sample first. [Voices Overlap] |
| WILEY: | Who is this dude? |
| MUNOZ: | Uh, he's uh, *Hondureño*, man. |
| WILEY: | Who? |
| MUNOZ: | *Hondureño*! |
| WILEY: | Hondurian[ph]? |
| MUNOZ: | No. You don't know. Salva- like... *Salvador*? |
| WILEY: | I don't know what that is, Spanish? |
| MUNOZ: | Yeah. Yeah Spanish guy, man. Don't worry about. |
| WILEY: | A'ight, I'll bring you a sample. |
| MUNOZ: | All right. But make sure if you give me a sample, it's the same shit, bro. [Voices Overlap] |
| WILEY: | I already know, I already know. |
| MUNOZ: | All right, bro. |

116.    Based on my training and experience, knowledge of common drug slang based on other DEA investigations, review of the content of the communication and knowledge of this investigation, I believe that WILEY was asking whether MUNOZ needed cocaine ("the white girl"). WILEY asked the quantity that MUNOZ sought to purchase ("300 dollars or 300 grams"), and MUNOZ confirmed 300 grams ("not dollar"). MUNOZ, facilitating the sale of cocaine, first

wanted a sample of the product for his purchaser ("yeah, 'cause he need first sample"). WILEY confirmed that he would bring MUNOZ a sample of cocaine ("A'ight, I'll bring you a sample").

117.    In a subsequent call on May 7, 2021, WILEY and MUNOZ exchanged the following voice call (Session ID: 2379):

| | |
|---|---|
| WILEY: | Yo meet me, meet me in, meet me in Trumbull. |
| MUNOZ: | Trumbull? Shit. [Voices Overlap] |
| WILEY: | Yeah, bro. Meet me at, um, I'm about to text you a address right now. You gotta come right now, though, 'cause I'm about to leave. |
| MUNOZ: | Um, right now bro, I don't wanna, I don't wanna play, like, like... [Voices Overlap] |
| WILEY: | Oh, you know what, I'mma have somebody, I'mma have somebody drop it to you. I'mma have somebody drop it to you. [Voices Overlap] |
| MUNOZ: | Oh, okay. Oh, okay. |
| WILEY: | A'ight. |
| MUNOZ: | A'ight. |

118.    Based on my training and experience, knowledge of common drug slang based on other DEA investigations, review of the content of the communication and knowledge of this investigation, I believe that WILEY was instructing MUNOZ to meet him at WILEY's apartment, then in Trumbull before he moved to another apartment in Norwalk, TARGET PREMISES ONE. MUNOZ did not want to travel to Trumbull ("I don't wanna play") so WILEY instead had the sample delivered to MUNOZ ("I'mma have somebody drop it to you"). At the time, WILEY was communicating with RICHARDSON (e.g., Session ID 2367), and WILEY asked RICHARDSON to travel to WILEY's apartment in Trumbull. Based upon this communication, I believe that WILEY requested that RICHARDSON pick up a quantity of cocaine so that he could provide MUNOZ with a sample.

119.    On May 8, 2021, WILEY and MUNOZ communicated by voice call (Session ID 2482), and WILEY directed MUNOZ to meet him at in Southport. WILEY then text messaged

(Session ID 2483) MUNOZ an address of a steakhouse in Southport. MUNOZ later replied (Session ID 2487): "I'm out here." DEA investigators conducting physical surveillance observed WILEY outside of the Southport steakhouse, along with TARGET VEHICLE ONE, but did not observe MUNOZ. However, DEA investigators believe that WILEY and MUNOZ conducted a cocaine transaction on May 8, 2021.

120.   On May 13, 2021, WILEY travelled to a casino in Rhode Island. Before departing, WILEY picked up MUNOZ at an address on Wood Avenue in Bridgeport. MUNOZ had provided this address to the Bridgeport Police Department when he was arrested in 2020 and is the utility subscriber for the address. The last known intercepted communication between the TARGET TELEPHONE and the MUNOZ telephone was on or about May 19, 2021 where MUNOZ called WILEY to tell him that his customer did not need any controlled substances "He said he don't need right now, man"), and that he told his customer that WILEY also has good marijuana ("I told him that bud is good.").

l.   <u>WILEY's Recent Acquisition of Cocaine and a Kilogram Press</u>

121.   I believe that WILEY recently acquired at least one kilogram of cocaine and was in need of a kilogram press to dilute and repackage the product. Wire and electronic communications intercepted over the TARGET TELEPHONE revealed that WILEY requested that UM -7143 (using telephone number (413) 517-7143, subscribed to Tony Rivera in Springfield, Massachusetts) source a kilogram press and a quantity of cutting agent.

122.   On May 28, 2021, WILEY and UM -7143 exchanged the following voice call (Session ID: 4277):

|  |  |
|---|---|
| WILEY: | What's goody my boy? |
| UM -7143: | What's the word my guy? |
| WILEY: | You don't fuck with me man |

| | |
|---|---|
| UM -7143: | Shut up [PH] tryin' to get that shit man, they ain't having that shit. |
| WILEY: | [Chuckles] No, no, no. I'm just fucking with you. Yo um... I need another one of those things |
| UM -7143: | What the, the magic? |
| WILEY: | Yeah the magic. [Voices overlap] |
| UM -7143: | Yeah, I think my man definitely got them, my other man. Let me hit him right now. |
| WILEY: | Alright and yo look... um... you loaded with that shit right now or you need that shit? [Voices overlap] |
| UM -7143: | Shit right now? I mean, I'm kind of good right now. Why what's up? |
| WILEY: | Yeah, cause I got a situation um... my peoples... they've asked like, what I've told you last time [Voices overlap] |
| UM -7143: | Yep. |
| WILEY: | Nigga's is around. I grab... I grab, one of them shits today, just to see and that shit is crazy fire. That shit...[Voices overlap] |
| UM -7143: | What's the number on that ? |
| WILEY: | I don't know. I'm trying to see. Cause, I was tryna to spend like... I was tryna ... like he told me if I was to grab like... like... if I was to grab like a good amount of them shits, he was gonna give me a good number . [Voices overlap] |
| UM -7143: | Yeah but he told you some wild shit last time, like 25 or something, right? |
| WILEY: | Yeah but he is saying that now but he wants me to grab 10 of them at that but I'm only grabbing two myself and my man was grabbing a couple of them shit so, I told him that [Voices overlap] |
| UM -7143: | Damn, at the number. You said 10 at that number? [Voices overlap] |
| WILEY: | Huh? Yeah but I ain't... I got... you know I'm in the other thing, the bud, on- [Chuckles] if I was in one lane, I woulda just jumped right on it, but I ain't.. like that's [Voices overlap] |
| UM -7143: | Right, right, right [Voices overlap] |
| WILEY: | You feel me. That's a lot. That's a, that's a quarter. [Voices overlap] |
| UM -7143: | Yeah, so I'm saying [Voices overlap] |
| WILEY: | Straight up [Voices overlap] |
| UM -7143: | He better send you better number than that, for 10. |
| WILEY: | Yeah, I know [Voices overlap] |
| UM -7143: | Shit. |

| WILEY: | That's 25... that's 25 a joint though. That's good, right? [Voices overlap] |
| UM -7143: | I mean, yeah... that shit for 10 though? |
| WILEY: | What you could get 10 for better than that [Voices overlap] |
| UM -7143: | I'm pretty sure, if I say yes. Shit for 10, Shit. |
| WILEY: | Bro, if you can get 10 for better than that, nigga then we gonna need to holla at you [Chuckles] |
| UM -7143: | Shit .. [U/I] Damn that's great. Nigga[Audio Fades] |
| WILEY: | Yo and another thing to that I'm looking for bro... the um... the machine. My shit fuck up, I need a new one [Voices overlap] |
| UM -7143: | What the "pressi"? |
| WILEY: | You don't know nobody that .. yeah.... you don't know no body that sell them shits, right? [Voices overlap] |
| UM -7143: | Know what? I think [Audio Breaks] The nigga, I'm about to call now for that man, I think he sell them shits. |
| WILEY: | Bro, if he got that bro, oh my god bro, that shit will be a blessing. [Voices overlap] |
| UM -7143: | Let me see. I'ma call him right now. I'll hit you right back. |
| WILEY: | If you could... if I could... and, and... it comes with the box and all that [Voices overlap] |
| UM -7143: | I don't know... if I could make it. |
| WILEY: | Yeah, if not, tell him, I'll buy his shit off him bro. I need that shit right now. I'll come out there right straight out to you [Voices overlap] |
| UM -7143: | Alright let me see, so what you want? Do you need that magic... too? |
| WILEY: | Yeah, I'ma need one of those and then whatever he wants for the machine bro. Or if he wants to let me hold it... I [Stammers] I rather buy it but if he wants to let me ...I just gotta do something up real quick [Voices overlap] |
| UM -7143: | Let me see. I'ma call him right now. Give me like 10 minutes. [U/I] |
| WILEY: | Alright, alright |

123.    Based on my training and experience, knowledge of common drug-related slang based on other DEA investigations, knowledge of this investigation, and review of the wire communication, I believe that WILEY was discussing with UM -7143 acquiring kilogram quantities of cocaine. In early May 2021, as discussed above, WILEY had communications (*e.g.*,

Session ID 2298) with UM -7143 where he discussed acquiring kilogram quantities of cocaine (four kilograms for a price of $100,000) and where UM -7143 provided WILEY with cutting agents to dilute cocaine. Here, WILEY told UM -7143 that he again had a source of cocaine supply ("like last time"). WILEY stated that he acquired a kilogram of cocaine and that it was high-purity ("I grab one of them shits today, just to see and that shit is crazy fire"). The source offered WILEY ten kilograms, but WILEY planned only to purchase two kilograms ("he wants me to grab 10 of them at that but I'm only grabbing two myself"). In order to dilute and repackage the cocaine that he acquired, WILEY asked that UM -7143 to source him a kilogram press ("I'm looking for bro... the um... the machine") and UM -7143 confirmed that WILEY was seeking a press ("the pressi"). UM -7143 stated that he would find WILEY a press and also asked whether WILEY needed a quantity of cutting agent ("the magic"), which WILEY confirmed that he did need the cut material.

     124.    Later, WILEY and UM -7143 exchanged the following voice communication (Session ID: 4278):

| | |
|---|---|
| UM -7143: | Yo. |
| WILEY: | Yeah. |
| UM -7143: | Yo bro, I just hit him up. Yeah, he got um, the magic but he won't be around until like 9:30 -10:00 o'clock. |
| WILEY: | 9:30- 10:00? What about the machine? |
| UM -7143: | But the machine he said, he can get them shit but they be waxing him, like 25 hundred for everything. |
| WILEY: | For the machine? |
| UM -7143: | Yeah, with the box... the whole shit, he said. But he gotta ... he gotta go pick that shit up. |
| WILEY: | So, it's far? |
| UM -7143: | Yeah, he said, he gotta go get it, yup. |
| WILEY: | Damn. |
| UM -7143: | But he gotta know for sure if you wanna or not because what he's gonna do, he'll pay out of his pocket, you know what I'm saying, to go get it. |

| WILEY: | Yeah, I need that shit bro. |
| UM -7143: | I don't know if he gonna be able to get it today, that's the shit. |
| WILEY: | Nah, tell him to grab it bro. I need that shit bro. |
| UM -7143: | Alright. So fucking... [Voices overlap] |
| WILEY: | And then I [Voices overlap] |
| UM -7143: | You want that other shit for tonight ? |
| WILEY: | Um... he said, he's not gonna be around 'til 9:00 [Voices overlap] |
| UM -7143: | Yeah, 'till 9:00- 9:30, He'll be back. |
| WILEY: | Alright tell him definitely grab the machine. Let me see cause I need... I'm tryna to think.... uh... let me see right now. I'mma call you right back [Voices overlap] |
| UM -7143: | Alright. call me right back [Voices overlap] |

125.    Based on my training and experience, knowledge of common drug-related slang based on other DEA investigations, knowledge of this investigation, and review of the wire communication, I believe that UM -7143 sourced WILEY the cutting agent and a kilogram press. The cutting agent would be available for pick up that evening ("the magic but he won't be around until like 9:30 -10:00 o'clock"). The kilogram press would cost WILEY $2,500 ("but the machine he said, he can get them shit but they be waxing him, like 25 hundred for everything"), but the source needed to travel some distance to acquire the machine ("he gotta go pick that shit up") and did not know whether the machine would be available that day. WILEY also told UM -7143 that "his man" was acquiring a couple of kilograms of cocaine, which could be a reference to HARRY, or another member of the WILEY drug trafficking organization.

m.  Pertinent Communications with WADE

126.    Wire and electronic communications intercepted over the TARGET TELEPHONE has revealed a drug trafficking relationship between WILEY and WADE (using telephone number (475) 239-0625 subscribed to WADE). WADE is WILEY's girlfriend,

together they have a young daughter, and WILEY and WADE share an apartment in Norwalk, TARGET PREMISES ONE.

127.   DEA investigators believe that WILEY uses WADE to conceal and transfer the proceeds of the WILEY drug trafficking organization. Based on my training, experience and knowledge of other DEA investigations, I know that drug traffickers will often avoid banking and financial transactions, and sometimes financial accounts entirely, in an effort to thwart law enforcement and evade reporting and tax requirements. WILEY has no known bank accounts, and WILEY avoids conducting banking or financial transactions in his name.

128.   According to records received from the Connecticut Department of Labor, WILEY has no employment history. Based on the investigation to date, including forensic review of cellular telephones seized from WILEY in 2020 and review of his telephone records, physical surveillance, tracking and location information, WILEY does not appear to earn any legitimate income or maintain any legitimate employment. Despite WILEY's lack of employment, records provided by the Foxwoods Casino in Connecticut revealed that WILEY has gambled more than $800,000 at the casino since 2019. At the Foxwoods Casino:

   a.   in 2021, WILEY bought-in, or played, $128,946 and lost $79,163;

   b.   in 2020, WILEY bought-in, or played, $223,391 and won $28,164;

   c.   in 2019, WILEY bought-in, or played, $461,622 and lost $310,444.

Based upon information received from the Foxwoods Casino, the "buy-in" number is the total amount wagered at the casino during a calendar year—in other words, the amount of money risked by a player. The "win" or "loss" number is the net result of the totality of wagers.

129.   Records provided by the Connecticut Department of Labor revealed that WADE reported approximately only $3,900 in wages between the first quarter of 2018 through the first

quarter of 2020. Nonetheless, WADE receives and distributes the proceeds of the WILEY drug trafficking organization and leases TARGET VEHICLE ONE, a vehicle actively used by WILEY in furtherance of the WILEY drug trafficking organization and which WILEY told WADE he earns money using.

130.    On April 5, 2021, DEA investigators received records from Mercedes-Benz Financial Services USA which revealed that WADE recently leased TARGET VEHICLE ONE, a 2021 Mercedes-Benz AMC GT 63 4-door coupe, a luxury car valued at over $146,000. On February 25, 2021, WADE was the signatory on a lease for TARGET VEHICLE ONE. According to records, WADE paid a $7,500 down payment at the lease signing and agreed to a 48-month lease with a monthly payment of $2,575.51 (*i.e.*, $30,906.12 annually). WADE did not list a co-applicant or guarantor on the application. WADE claimed on the application that she earns an annual salary of $150,000 working for a healthcare company, where she claimed to have worked for one year (also listing a "previous employer" as another healthcare company, where she claimed to have worked for seven years). WADE also claimed "rental income" of $6,666 per month (i.e., approximately $80,000 annually). This information is contrary to information WADE listed on a prior lease application for a Range Rover in 2020, a vehicle also leased by WADE and used by WILEY in furtherance of the WILEY drug trafficking organization until early 2021. Based upon record received from J.P. Morgan Chase, WADE leased WILEY's Range Rover, listing her occupation as a bartender and her annual salary as $70,000.

131.    In an intercepted voice call (Session ID 1823) on May 1, 2021 between WILEY and WADE, WADE made reference to lying on an application. WILEY and WADE were discussing their finances, including whether they should move from Trumbull to Norwalk, which

they eventually did, later leasing TARGET PREMISES ONE in May 2021. WADE, possibly discussing a lease application for TARGET PREMISES ONE, stated that she lied on the application and stated that she earned $70,000 per year. WADE stated: "I don't like lying. This is not fun. I'm not good at it." WADE then stated that she was giving "them," possibly the leasing company for the apartment, the "run around." I know based on intercepted communications that at the time, WILEY and WADE were moving money in order to be able to finance a new residential lease, including to provide a certified check to a leasing company. WADE said, "well, I put that I make 70 thousand a year...," and later said, "I literally lie on the application." Based on my training and experience, my knowledge of the investigation, and the context of this communication, I believe that WADE, with knowledge that WILEY is a drug trafficker, and certainly aware of WILEY's February 2021 arrest in possession of a kilogram of cocaine (where she communicated with WILEY while he was in jail), is admitting to lying on a lease application, as she did the applications for TARGET VEHICLE ONE and WILEY's Range Rover, by falsely claiming that she earns legitimate income.

132.    WILEY has a considerable amount of unexplained wealth that I believe is attributable to the criminally derived proceeds of the WILEY drug trafficking organization. Investigators have reviewed bank records for WADE's checking account (for a period between August 2018 and August 2020, a joint account held by WADE and a Maritza Perry, believed to be WADE's mother), and I believe that WILEY provides WADE with cash proceeds from the WILEY drug trafficking organization and that WADE deposits the cash into the banking system and into her account using an ATM. On May 3, 2021, investigators received additional records for WADE's bank accounts (for a period between December 2018 and February 2020), and analysis of those records is ongoing.

133.   For the period between August 2018 and August 2020, WADE received approximately $235,000 in deposits:

      a.   The largest percentage of deposits, approximately $183,000, were cash deposits made to ATM machines;

      b.   Approximately $8,600 in cash was deposited at the bank counter (*i.e.*, using a bank teller);

      c.   Approximately $16,000 was deposited by check;

      d.   Approximately $22,000 was deposited via mobile payment platform or peer-to-peer payment platforms, including Square Cash, Apple Cash and Cash App.

134.   During the same period where WADE received approximately $235,000 in deposits, between November 2018 and August 2020, approximately $238,000 was debited from the account:

      a.   Approximately $74,000 was transferred to linked bank accounts at Bank of America;

      b.   Approximately $78,000 was transferred using electronic fund transfers or bill-pay features, and transfers to mobile payment platforms and peer-to-peer payment platforms;

      c.   Approximately $20,000 in checks were paid, primarily monthly rent (though payments for WADE and WILEY's former Trumbull apartment have not been identified);

      d.   Approximately $42,000 was spent through debit card purchases at retailers and businesses including: restaurants, gas stations, Amazon, Walmart,

        Uber, Frontier Airlines, American Airlines, Delta Airlines, Alaska Airlines, Spirit Airlines, and Federal Express;

   e.   Approximately $16,000 was spent to cover interest payments for a retailer (TJMaxx) credit card;

   f.   Approximately $5,000 was withdrawn from ATMs.

135.   In communications intercepted over the TARGET TELEPHONE, WILEY has been direct about his money laundering activities in furtherance of the WILEY drug trafficking organization. WILEY avoids the financial system. Accordingly, WILEY provides cash to WADE, who interacts with the financial system in his stead.  Additionally, as detailed below, I believe WILEY employs similar secrecy with other individuals to protect the proceeds of his drug trafficking organization and remain outside the traditional banking system.

136.   WILEY has admitted as much to WAKEFIELD. In an intercepted voice call (Session ID 2606) on May 9, 2021 between WILEY and WAKEFIELD, which included conversation about the New Britain restaurant project that I believe WILEY is funding with proceeds from the WILEY drug trafficking organization, WILEY said, "Anything that they can trace is not good." WILEY further said, "I'm saying everybody around me got bank accounts, so when I need something, I just go through them." I believe that WILEY then directly referenced money laundering: "That's why when I was, when I was... told you how I used to do, clean, clean the money for me?" Based on my training and experience, my knowledge based on other DEA investigations, and my knowledge of this investigation, I believe that WILEY was stated that he did not want his finances to be traceable by law enforcement ("anything they can trace"), that he uses the bank accounts of others, which I believe includes WADE, and that he launders, or "cleans," money.

67

137.   Intercepted communications between WILEY and WADE have also revealed WADE's role in the WILEY drug trafficking organization, primarily to receive, transfer, and distribute the proceeds of drug trafficking and to make payments in furtherance of the organization (*i.e.*, payment of the vehicle lease on TARGET VEHICLE ONE, payment of the lease for TARGET PREMISES ONE).

138.   On May 1, 2021, WILEY and WADE had a lengthy (approximately 25 minute) conversation (Session ID 1816) in which they discussed their drug activities and the money-laundering transactions they conduct to support the WILEY drug trafficking organization. Based upon my knowledge of the investigation, WILEY and WADE, during this conversation, were considering moving from a luxury apartment in Trumbull to TARGET PREMISES ONE in Norwalk, which they later did in May 2021. Based on my training, experience, and knowledge of this investigation, I believe that when WILEY stated, "I just gave these niggas almost 30 racks from living there for a year," he was complaining to WADE about spending $30,000 in drug proceeds on their Trumbull luxury apartment rent for the past year. WILEY later stated, "My car is making me money.  I'm getting to point A...  I'm making thousands and thousands of dollars off my car, cause I'm getting to point A to point B," thereby justifying his expensive car payment on TARGET VEHICLE ONE, a vehicle he leases in WADE's name with a payment of approximately $2,500 a month, because he uses the car to conduct large-scale drug transactions, which leads to profits for the WILEY drug trafficking organization.

139.   Later in the same conversation, WILEY stated, "It don't matter, before I met you bruh, you didn't have shit, when I met you bruh," which I believe was WILEY affirming to WADE that everything she now has was paid for by WILEY with proceeds from the WILEY drug trafficking organization. WILEY further criticized WADE for not having jewelry. Based on

68

my training, experience, and knowledge of this investigation, I believe that WILEY has purchased high-end jewelry using the proceeds of the WILEY drug trafficking organization. As the conversation continued, WILEY told WADE that they needed to find less expensive accommodations to ensure that more money could be devoted to his drug organization and the purchase of real estate. WILEY again told WADE how much money he has earned through the use of his luxury cars. Specifically, WILEY stated, "You know how much money I made off my cars? How much money I made off my Range Rover? Nigga, I almost ran up 2-300,000 dollars in every car that I got, bruh." Based on my training, experience, and knowledge of this investigation, I believe that WILEY was telling WADE that he has earned $200,000 - $300,000 in drug proceeds during the time he was leasing his Range Rover from approximately June 2020 through February 2021, a pattern of drug-related earnings that also held true during the periods of time he was leasing other cars previously.

140. In the same conversation, WILEY discussed large financial losses that he had suffered in the drug trade. WILEY stated, "you see all the losses I took and you went through it with me, you seen me lose 120,000 from fucking with my cousin. Then you see me lose more money, then you see me go to fucking jail, you seen mad shit happening, bro." Based on the context of this communication and my familiarity with the investigation, I believe WILEY admitted to losing $120,000 in a drug transaction involving his cousin. Further, WILEY stated, "I got a lot of money invested in shit that I'm trying to do and I can't do it by like, like yo, sometimes I have a good week. And I can pay the rent for a whole week up. And then sometimes, like... shit's slow. I gotta go, like, I got other shit that I buy, and then if shit ain't moving, I gotta go, I gotta go do something else and grab something else. I can't sit around. Like, I spend a lot of money on what I gotta make money on. Like, I spend a lot, bro. You don't

understand." I believe that WILEY was explaining to WADE some of the pitfalls of drug trafficking, especially in circumstances in which WILEY's money was tied up in pending drug loads or drugs that he has provided to others on consignment, and at times in which WILEY had to resupply ("grab something else," which I believe is a reference to cocaine or another controlled substance), or when his drug business had slowed (when "shit ain't moving").

141.    WILEY went on, "I gotta always look and watch over my back, bro. That's why I'm tryna change my whole shit up now, bro." Based upon the context of the communication, I believe that he was telling WADE that he is constantly on the lookout for law enforcement (or rival drug traffickers who may rob WILEY) as he engages in his drug trafficking activities, but now wants to use the proceeds of the WILEY drug trafficking organization to attempt to earn legitimate or semi-legitimate income. Based on my training, experience, and knowledge of this investigation, I believe that when WILEY stated, "I been a millionaire, I been a millionaire years ago, bro" that WILEY was stating that he has earned over millions of dollars during his years as a drug trafficker.

142.    DEA investigators confirmed that WADE is now listed on the lease for TARGET PREMISES ONE. WILEY is not listed on the lease. As described herein, I believe that TARGET PREMISES ONE is used in furtherance of the WILEY drug trafficking organization, constitutes proceeds of the WILEY drug trafficking organization, and is used to store contraband and proceeds from the WILEY drug trafficking organization. On May 11, 2021, in a voice call (Session ID 2795), WILEY instructed WADE to pay the rent for TARGET PREMISES ONE with drug proceeds:

| WILEY: | How much was the um... the rent? |
|---|---|
| WADE: | What? Which one? |
| WILEY: | Nigga, for the new house. |

| WADE:  | 15.  |
|--------|------|
| WILEY: | You said 14-something. |
| WADE:  | 14-90. |
| WILEY: | Oh, I just deposited in your account. So pay it. |

143.    This communication occurred directly after WILEY and GANT had travelled to New Jersey to conduct a drug transaction, described above, and after GPS tracking data for TARGET VEHICLE ONE showed that WILEY travelled to a Bank of America branch. Based on my training and experience, review of the content of the communication and knowledge of this investigation, I believe that WILEY conducted a drug transaction, deposited drug proceeds into WADE's bank account, and instructed WADE to pay the rent for TARGET PREMISES ONE using drug proceeds.

144.    Interception of wire and electronic communications have revealed WILEY's plan to design, build, and open a restaurant in New Britain, Connecticut, using proceeds of the WILEY drug trafficking organization, and to use WADE, and at least one other woman, WAKEFIELD, to conceal his full involvement in the restaurant. On April 24, 2021, in a voice call (Session ID 888), WILEY, WADE and WAKFIELD discussed acquiring a liquor license for the restaurant project. WADE and WAKEFIELD discussed listing the liquor license and business licenses in WADE's name. Based on my training and experience, my knowledge of the investigation, and the context of the communication, I believe that WADE was assisting WILEY, a drug trafficker, to conceal his involvement in the project, and that WADE would use proceeds of the WILEY drug trafficking organization to finance aspects of the restaurant project.

## VI.    USE OF PREMISES FOR DRUG TRAFFICKING, GENERALLY

145.    During my tenure with the Drug Enforcement Administration, I have investigated and participated in operations that involved drug trafficking violations, the flow of the illegal

proceeds obtained from drug trafficking, money laundering, and other offenses including violations of firearms laws. Search warrants relating to these investigations have covered vehicles, businesses and residences of drug traffickers and their co-conspirators. In addition, I have participated in authorized searches of "stash houses" used as storage and distribution points for controlled substances and currency used by drug dealers for unlawful drug trafficking activities.

146.    Materials searched for and recovered in these locations have included controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, records reflecting the names, addresses, and telephone numbers of co-conspirators, sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones, computers and electronic storage media; and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking, or used in furtherance of drug trafficking. These items obtained during the executions of search warrants has constituted evidence of drug violations, the acquisition of assets with drug trafficking proceeds, the use of assets to facilitate drug trafficking violations, and money laundering.

147.    Based on my training, experience and participation in this and other drug trafficking investigations, I know that:

> a. drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement;

72

b.  drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

c.  even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.  drug traffickers must maintain and have quick access to large amounts of United States currency (or foreign currency, or cryptocurrency), or other liquid assets in order to maintain and finance their ongoing drug business and these materials, as well as records, generally described below, are often kept and maintained within premises controlled or used by the drug traffickers within safes or lock boxes;

e.  drug traffickers maintain in their residences (and stash houses) computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, computers and cellular telephones, electronic storage media, and other papers and data relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed and these materials are often maintained within the memory of computers and cellular telephones, external hard drives, memory cards and "thumb drives" kept and maintained at premises under the control of the drug traffickers, or data

stored to the Internet or cloud-based data storage that can be accessed using computers or cellular telephones maintained under the control of the drug traffickers;

f.   drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore, the above mentioned books, computerized records and data, records, receipts, notes, ledgers, etc., will be secured by the drug traffickers within their residences (and stash houses) and/or businesses for their ready access for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

g.   drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses, cellular telephone numbers, and Internet usernames (e.g., social media usernames, mobile payment platform usernames) of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

h.   drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers, and Internet usernames (e.g., social media usernames, mobile payment platform usernames) of both their current and past drug associates;

i.   drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions. However, it is common for drug traffickers, particularly

74

traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts;

j.  drug traffickers commonly use their residences (and stash houses) to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

k.  drug traffickers will commonly conceal within their residences (and stash houses) or within the curtilage of their residences (and stash houses), quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value that are proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

l.  drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts, or by using mobile payment platforms and prepaid debit cards;

m. persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities will conceal, liquidate, and

transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

n.  persons who are involved in drug trafficking who are aware of a criminal investigation into their drug activities will attempt to delete and destroy data, whether preserved to computers and cellular telephones, or Internet-based or stored to cloud data stored, to prevent law enforcement from seizing evidence of their drug trafficking activities;

o.  drug traffickers often have photographs and video recordings of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and video recordings movies are normally in the drug trafficker's possession or residence, often stored to cellular telephones and computers;

p.  drug traffickers often have video surveillance systems at their residences, businesses and stash locations. Video surveillance systems, particularly Internet-connected systems (e.g., a Ring brand video doorbell), have become more popular in residential contexts. These systems are inexpensive but effective ways for drug traffickers to safeguard contraband and to be alerted to law enforcement activity;

q.  drug traffickers often have evidence of drug trafficking activity stored inside of vehicles used for drug trafficking. This evidence commonly includes records and/or receipts reflecting travel made in furtherance of the distribution of controlled substances, records and/or receipts of travel-related expenses (*e.g.*, gasoline or food receipts), and electronic roadway

toll payment devices which can reveal travel made by the vehicle. Records found in vehicles often include notes or writings created by drug traffickers while traveling to distribute controlled substances.

148. The State of Connecticut is generally viewed as a consumer state in regards to narcotic activity. However, it is common for drug traffickers to travel to major distribution centers such as New York to purchase their narcotics for distribution. It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. It is known that the methods of drug traffickers to transport narcotics include, but are not limited to, commercial airlines, private motor vehicles, tractor trailer units, public transportation, motor vehicles with concealed compartments, and government and contract mail carriers. DEA investigators know that the residences of drug traffickers will often contain records of drug-related travel. These records may include credit card receipts, airline ticket receipts, luggage tags reflecting points of travel, rental car receipts, roadway toll records, and records of travel-related expenses (*e.g.*, gasoline receipts).

149. Based upon my training and experience, my knowledge of the investigation, my knowledge of other DEA investigations, and my review of intercepted communications, I believe that the WILEY drug trafficking organization is an ongoing long-term drug conspiracy. WILEY has been involved in drug trafficking since at least 2018, when he was intercepted during an FBI wiretap investigation discussing marijuana trafficking with the target of that investigation, Kevin Jones II. See 3:18CR291 (AWT). WILEY was arrested in February 2020 and review of his cellular telephones seized from him revealed ongoing marijuana trafficking, including marijuana-related communications with GANT and others. DEA investigators have been

investigating WILEY since mid-2020. Cellular telephones seized from Fabian Francis ("FRANCIS") in October 2020, and analyzed by the FBI, also revealed communications between WILEY and FRANCIS related to drug trafficking, including Apple iMessages depicting video and photographs of marijuana.

150.   As described herein, members of the WILEY drug trafficking conspiracy have conspired with WILEY, and others, over a period of many months. Where a drug conspiracy is a continuing enterprise, based on my involvement in searches related to other active drug trafficking organizations, I expect to find evidence of recent activity (*e.g.*, a recent drug transaction) as well as historical evidence of the long-term ongoing drug conspiracy (*e.g.*, retained proceeds, records and data spanning months or years). Here, I believe it probable that a search of each TARGET PREMISES would result in evidence of recent drug-related acts, but also evidence of the historical and ongoing nature of the WILEY drug trafficking organization, and evidence of each co-conspirator's role in the ongoing drug trafficking organization.

## VII.   FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE TARGET PREMISES

### a.  TARGET PREMISES ONE – 200 Glover Avenue, Apartment 226, Norwalk, CT

151.   TARGET PREMISES ONE is a located at The Curb Apartments, a multi-story luxury apartment complex located at 220 Glover Avenue Norwalk, CT. From Glover Avenue, the street number "200" is visible in white numbering above the front entrance to the Curb Apartment building. Apartment 226, TARGET PREMISES ONE, is located on the second floor of the apartment building. Apartments within the building are individually numbered. The

apartment number "226" is located in white numbering to the right of the orange colored apartment door which is the entrance to TARGET PREMISES ONE.

152.    TARGET PREMISES ONE is an apartment shared by WILEY, WADE, and their young daughter. Access to the apartment complex is access controlled, meaning it has a gate and locked doors to gain access to the lobby area, which makes physical surveillance difficult, although agents have been able to conduct limited surveillance. WILEY's vehicle, TARGET VEHICLE ONE, is often parked outside the apartment complex. There is probable cause to believe that TARGET PREMISES ONE contains evidence of the commission of the TARGET OFFENSES by the WILEY drug trafficking organization, including contraband, fruits of the crime, and property used, intended for use, or used the commission of the TARGET OFFENSES.

153.    WILEY and WADE moved to TARGET PREMISES ONE in May 2021, while DEA investigators were intercepting communications to and from the TARGET TELEPHONE. Representatives of the Curb Apartment Complex, operators of the building in which TARGET PREMISES ONE is located, confirmed that WADE is the lessee of TARGET PREMISES ONE. Communications between WILEY and WADE have also revealed that WILEY resides at the location and provides WADE with cash to pay rent for the apartment (though WILEY does not sleep at the apartment each night). Based upon intercepted communications over the TARGET TELEPHONE and physical surveillance, I believe that TARGET PREMISES ONE is used to store contraband, including marijuana and cocaine, drug proceeds, and evidence of the commission of the TARGET OFFENSES by WILEY and WADE, and other members of the WILEY drug trafficking organization.

154.    WILEY is typically security conscious. The apartment complex containing TARGET PREMISES ONE is access-controlled with security. WILEY recently moved, on or

about May 10, 2021, to TARGET PREMISES ONE from another apartment in Trumbull. DEA investigators do not have direct evidence (*i.e.*, an intercepted communication) that WILEY has conducted drug transactions from TARGET PREMISES ONE. But WILEY has allowed certain trusted individuals to meet him at his home when he previously resided at the Trumbull apartment, as recently as May 7, 2021, including his uncle, RICHARDSON, in furtherance of drug transactions.

155.    For example, on May 7, 2021, RICHARDSON called WILEY. WILEY told RICHARDSON that he was at his (former) Trumbull apartment ("I'm at my house"). RICHARDSON told WILEY that he had cocaine customers who would purchase anything that WILEY could sell ("Anything you got. 8. 8-balls. 20's …"). WADE could also be heard in the background of the call. WILEY told RICHARDSON he would call him back. Less than a half hour later, WILEY told RICHARDSON, referring to WILEY's Trumbull residence: "come to my house real quick." Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that WILEY possessed cocaine at his Trumbull apartment and instructed RICHARDSON to travel to the apartment so that WILEY could supply RICHARDSON with cocaine.

156.    I also believe that WILEY allowed a limited number of individuals to meet with him when he lived at his (former) Trumbull apartment, which was a luxury apartment similar to TARGET PREMISES ONE. On May 7, 2021, WILEY instructed MUNOZ (Session ID 2379) to meet him in Trumbull to acquire a cocaine sample. MUNOZ declined but WILEY said he would have the cocaine delivered to him. Based upon this conversation I believe that WILEY has recently used his (former) residence (Trumbull apartment) to store controlled substances. Based on my training and experience, my knowledge of the investigation, and my review of intercepted

80

communications, I believe it probable that WILEY continues to behave similarly with respect to TARGET PREMISES ONE as he did the Trumbull apartment. WILEY does not, and never has, conducted frequent transactions from his residence, but instead allows for limited trusted individuals (*e.g.*, his uncle) to know where he lives. But I believe that WILEY stored contraband (*i.e.*, cocaine) and proceeds at the Trumbull apartment and likewise is doing so at TARGET PREMISES ONE.

157.    Based on an intercepted communication on May 28, 2021, I believe that WILEY also stores cash proceeds at TARGET PREMISES ONE. On May 28, 2021, WILEY had a voice call (Session ID 4263) with his mother (Erica Morris, utilizing telephone number (708) 465-5958) in which WILEY wanted to briefly store cash proceeds at Morris's house:

| | |
|---|---|
| WILEY: | No, because, fucking, it's too much traffic, I gotta go to Hartford and I was seeing if you was at the house, cause I didn't wanna drive all the way to Norwalk, fuck... cause I had ... I had to put this money up. I didn't wanna drive with it. |
| MORRIS: | What mo- what do you mean? |
| WILEY: | No, I have some money on me, that I didn't wanna drive with so I was seeing if you was at the house, just gonna go put it up [Audio Breaks] |
| MORRIS: | Tajh, you better not be putting nothing in my house. |
| WILEY: | I didn't put nothing in your house. I was about to... I'm 'bout to drop it to you and tell you to bring it to the house [Voices overlap] |
| MORRIS: | Oh [Voices overlap] |
| WILEY: | And then Destiny get it. |
| MORRIS: | Alright. |

158.    Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that WILEY sought to briefly store cash proceeds from drug trafficking at his mother's house in Fairfield because he did not want to travel with a large sum of cash, likely for fear of being robbed or the cash being

seized by law enforcement. Based upon MORRIS's response ("you better not be putting nothing in my house") I believe that MORRIS is aware that WILEY is a drug trafficker in possession of contraband, and based upon the investigation to date I am aware that MORRIS has knowledge that WILEY was arrested in February 2021 with a kilogram of cocaine. WILEY instead told MORRIS that he would soon have WADE pick up the money, which I believe WADE would then transport to TARGET PREMISES ONE.

159.    WILEY then called WADE (Session ID 4265) to instruct WADE to transfer the money to TARGET PREMISES ONE:

| | |
|---|---|
| WILEY: | When you get a chance, cause I didn't want... it was too much traffic, um... I'm dropping this money off to my mom. Can you pick it up from her house, when you get a chance, please. |
| WADE: | Uh... [Aside: Oh my god, look at the wall.] |
| WILEY: | You heard? |
| WADE: | Hmm. Today? I'm not gonna have time today. I'm busy. I ain't even [U/I] today. |
| WILEY: | Then fuck it, I'm not gonna... bro... this shit is crazy bro. |
| WADE: | Oh way, actually... I could go get it on my way home. Yeah, yeah, on my way back. Okay, I forgot, I gotta [U/I] Fairfield. |
| WILEY: | Where, where? On your way back from where? |
| WADE: | My mother's. I gotta go pick up the dog. |
| WILEY: | And then you coming straight home, right |
| WADE: | Yeah. |
| WILEY: | You better be |
| WADE: | Ain't better .. what do you mean? |
| WILEY: | You heard what I said. |
| WADE: | What the hell. Tajh I don't wanna try be out all night. |

160.    Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe that WILEY was in possession of a large quantity of cash drug proceeds and directed WADE to bring them to

TARGET PREMISES ONE. I believe the quantity of cash to be large because WILEY instructed WADE to go "straight home."

161.    Based on an intercepted communication on June 4, 2021, I believe that WILEY recently stored at least $10,000, proceeds from the WILEY drug trafficking organization, at TARGET PREMISES ONE. In a June 4, 2021 voice call with WADE (Session ID 5093), WILEY instructed WADE to make a financial transaction using cash located at their apartment:

| | |
|---|---|
| WILEY: | Alright well can you go and deposit the money in your account and CashApp to Ron? |
| WADE: | What money? |
| WILEY: | Um.. I put... is in the kitchen. |
| WADE: | Oh my god, TAJH, I'm in a good sleep and she ... oh my god. Why can he just wait. |
| WILEY: | I think I gotta pay before I pick my car up. |

162.    Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, and review of intercepted communications, WILEY's Mercedes, TARGET VEHICLE ONE, required repairs to its brakes. WILEY needed money for the repairs to pay "Ron," a male I believe to be employed at a Mercedes-Benz dealership. WILEY stated that he stored money at TARGET PREMISES ONE ("in the kitchen") and requested that WADE use CashApp to transfer funds to "Ron."

163.    In a second voice call shortly thereafter (Session ID 5106), WILEY told WADE that he left $10,000 in a kitchen cabinet:

| | |
|---|---|
| WADE: | You didn't leave no money here. |
| WILEY: | Huh? |
| WADE: | I said, you didn't leave no money here. |
| WILEY: | Yes, I did. I left... is like 10... like 10 thousand. I put it in t he um.. in the.. I threw it in the cab... the kitchen... where the cleaner stuff is. |
| WADE: | Oh [Voices overlap] |
| WILEY: | On the top shelve all the way in the back. |

| WADE: | You said, you left it on the counter. That's why I was like, ' Um." never mind. |
| WILEY: | You could reach it? |
| WADE: | I ain't look. I just.... thought you said the counter and I didn't see nothing up, that's why I've called you. |

164.     Based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, and review of intercepted communications, I believe that WILEY instructed WADE to find $10,000 in cash stored in a kitchen cabinet ("I threw it in the cab... the kitchen... where the cleaner stuff is."). WILEY then instructed WADE to travel to the bank so that WADE could send a $2,500 to repair TARGET VEHICLE ONE, a car that WILEY uses to traffic controlled substances. In later voice calls, WADE confirmed that she travelled to a Bank of America and that payment had been sent.

165.     Based upon the investigation to date, I believe that TARGET PREMISES ONE contains cash proceeds of the WILEY drug trafficking organization as well as jewelry and other high-value items. WILEY and WADE live a luxurious lifestyle. WILEY and WADE each have a 2021 Mercedes-Benz, both leased by WADE. The lease on TARGET VEHICLE ONE is approximately $2,575.51 per month while the lease on TARGET VEHICLE TWO is approximately $1,461.68 per month. As described above, WILEY has gambled in excess of $800,000 at the Foxwoods casino since 2019. Review of WILEY's Instagram account, a social media provider, revealed numerous photographs of WILEY holding stacks of cash and possessing high-end jewelry and designer clothing. In a June 2020 Instagram post, WILEY posted a video of himself wearing jewelry with the caption "100k in jewlz on me . . ." Intercepted communications have also revealed WILEY's recent communications related to jewelry and watches:

a. On April 16, 2021, WILEY discussed purchasing a gold chain from an unidentified male subject (Session ID 71) and told the subject, "ask him if he'd take 18," which I believe means $18,000;

b. On May 11, 2021, WILEY contacted a jewelry store in Fairfield (Session ID 2770) and inquired about replacing diamonds on a watch and a chain;

c. On May 28, 2021, WILEY contacted an unidentified male subject (Session ID 4227) and discussed purchasing a baguette chain for "72" or $7,200 and inquired about Cuban chain links which were "30," or $30,000.

I believe it probable that a search of TARGET PREMISES ONE will reveal fruits and proceeds of the WILEY drug trafficking organization, including cash and jewelry.

166.     I also know that WILEY and WADE use mobile payment platforms (*i.e.*, CashApp) accessed using computers and cellular telephones to exchange funds, including use of the proceeds of the WILEY drug trafficking organization and payments made in furtherance of the WILEY drug trafficking organization (e.g., vehicle payments). Based upon review of records received from Square Inc., the parent company of the mobile payment platform CashApp (for a period between May 1, 2020 and April 27, 2021), WILEY (username Yung 252) and WADE (username Destiny Wade) have made multiple financial transactions using the platform including: a January 12, 2021 payment from WADE to WILEY in the amount of $1,400 for "bills," a January 14, 2021 payment from WILEY to WADE in the amount of $1,000 for "bills," a January 19, 2021 payment from WILEY to WADE in the amount of $1,000 for "etc," a January 19, 2021 payment from WADE to WILEY in the amount of $400 [without a description], a January 22, 2021 payment from WILEY to WADE in the amount of $1,010 for

"rent," a January 22, 2021 payment from WILEY to WADE in the amount of $1,000 for "etc," an February 8, 2021 payment from WADE to WILEY in the amount of $400 [without a description], an February 9, 2021 payment from WILEY to WADE in the amount of $160 for "groceries," an April 14, 2021 payment from WADE to WILEY in the amount of $100 [without a description], an April 22, 2021 payment from WADE to WILEY in the amount of $250 [without a description], an April 26, 2021 payment from WADE to WILEY in the amount of $500 [without a description]. On December 7, 2020, WILEY made a payment to WADE in the amount of $2,500 for "car," which I believe to reference WILEY's (former) Range Rover, used in furtherance of drug trafficking.

167.    I also believe that WILEY may possess a firearm that he stores at TARGET PREMISES ONE and/or carries with him when driving TARGET VEHICLE ONE. On May 23, 2021, WILEY and UM -0416 exchanged a voice communication (Session ID 3625). WILEY discussed with UM -0416 that he had previously had tension with "Russ," WATSON, and another individual who had been discussing WILEY to others. WILEY discussed some issue where other individuals had "took work," which may mean that in the past others may have stolen drugs from WILEY or cost the WILEY drug trafficking organization money in some way. WILEY generally had expressed concern that other people may now know where he lives (*i.e.*, TARGET PREMISES ONE) and other individuals may want to assault or rob him ("them niggas been trying to get niggas to drop on me, but them niggas can't do nothing to me, bro."). WILEY also may have referenced possessing a firearm ("I be situated everyday when I go in there bro.").

168.    Based on my training and experience, knowledge of common drug-related slang based on other DEA investigations, knowledge of this investigation, and review of the wire communication, I believe that "being situated" may refer to carrying a firearm, or WILEY

assuring his protection in some other manner. UM -0416 replied, "You know that bum-ass nigga don't even own no gun," which, based on the context of the communication, makes me believe that the conversation referenced a firearm. WILEY later described an instance where he was at a nightclub and had a conversation with "Russ," whom he said he "hangs out with" and with whom he also has a business relationship. WILEY stated that he (or someone he was with) possessed a firearm ("I got the grip inside the club"). WILEY then turned the conversation to Apple FaceTime. I further believe that WILEY's concern that other individuals now know that he may reside at TARGET PREMISES ONE is because he stores contraband and cash proceeds at the location. These individuals who may want to rob him ("get the drop on [him]") could target WILEY and TARGET PREMISES ONE, because they are aware of WILEY's status as a drug trafficker. This firearm-related conversation with UM -0416 further causes me to believe that WILEY stores and maintains contraband at TARGET PREMISES ONE.

169. I respectfully submit that there is probable cause that contraband, property, evidence, fruits, and instrumentalities of the commission of the TARGET OFFENSES by WILEY, WADE, and members of the WILEY drug trafficking organization are present in TARGET PREMISES ONE.

### b. TARGET PREMISES TWO – 587 Capitol Avenue, Bridgeport, CT

170. TARGET PREMISES TWO is a multi-family three story residence with tan colored siding and red colored trim. From Capitol Avenue, there are several cement steps leading to a front porch. On the front porch there are two red doors. On a porch beam to the left of the left door is the number "587," corresponding to the left red door. On a porch beam to the right of the right door are the numbers "589" and "591," corresponding to the right door. 587 Capitol Avenue, the TARGET PREMISES, is accessed through the left red door on the front porch. 587

Capitol Avenue is believed to be an apartment encompassing the first floor of the multi-family building. There is a driveway on the right-hand side of the residence that leads to a rear parking area, the view of which is obstructed from Capitol Avenue. A detached structure, a shed or garage, is visible from driveway at the rear of TARGET PREMISES TWO.

171.     TARGET PREMISES TWO is the residence of CHARLES RICHARDSON. Isabelle Richardson is listed as the subscriber with United Illuminating. Communications intercepted over the TARGET TELEPHONE, with physical surveillance, has revealed TARGET PREMISES TWO as a Bridgeport location used to stash and distribute controlled substances. As part of the investigation, DEA investigators have surveilled WILEY to and from TARGET PREMISES TWO on numerous occasions. Recent communications have also confirmed that TARGET PREMISES TWO, and outbuildings on the property, are used to store controlled substances.

172.     For example, as described above, on April 27, 2021, when WILEY was preparing for shipments of cocaine to UM -4084 in New York, DEA investigators observed WILEY, using TARGET VEHICLE ONE, travel to TARGET PREMISES TWO and, in an intercepted communication, ask that an unidentified male meet him here. WILEY then, with BROWN, travelled to a store, then to Action Audio (TARGET PREMISES FOUR) and then to HARRY's residence (TARGET PREMISES THREE). DEA investigators then intercepted communications where WILEY was preparing and packaging cocaine to be shipped to New York. Based upon this sequence of events, I believe that WILEY obtained contraband (cocaine, cut material, and/or cash proceeds) from TARGET PREMISES TWO to be distributed or used by the WILEY drug trafficking organization.

173.    On April 30, 2021, WATSON, with whom WILEY later conducted a cocaine transaction with on May 7, 2021, was observed at TARGET PREMISES TWO. WATSON was driving the same Hyundai rental car in which he met WILEY for the May cocaine transaction.

174.    Intercepted communications between WILEY and RICHARDSON have also confirmed the use of TARGET PREMISES TWO as a stash location. As described above, RICHARDSON distributes cocaine for the WILEY drug trafficking organization. For example, on April 27, 2021, RICHARDSON telephoned WILEY (Session ID 1390) and the relevant portion of the communication is below:

| | |
|---|---|
| RICHARDSON: | Yeah!  That bag is uh... [Stammers] In the front. |
| WILEY: | You said what? |
| RICHARDSON: | That bag is in the..., in my truck. In the front. |
| WILEY: | Alright, but I need to... I need to come in the house and do something real quick. |

175.    Based on my training, experience and knowledge of this investigation, I believe that RICHARDSON left a quantity of controlled substances (or drug proceeds) in his truck to be acquired by WILEY ("that bag is in the..., in my truck"). But WILEY entered TARGET PREMISES TWO to "do something real quick."

176.    As described above, RICHARDSON has acquired cocaine from WILEY in order to distribute cocaine from TARGET PREMISES TWO. Intercepted communications have also revealed RICHARDSON storing marijuana at TARGET PREMISES TWO (*e.g.*, a May 2, 2021 voice call (Session ID 1982) – WILEY: "Uncle Charles . . . Yeah my boy is outside, he got some weed. Cut that up for me."). On May 8, 2021, as described above, RICHARDSON requested cocaine from WILEY to service customers (*e.g.*, a text message (Session ID 2256) – RICHARDSON: "Tajh, where you at, man! The guy waiting and he want a eight ball bro'. Where you at?"). Based on my training, experience and knowledge of this investigation, I

believe that RICHARDSON requested an eighth of an ounce of cocaine. WILEY then called RICHARDSON back (Session ID 2532) and told RICHARDSON he would "cook it up over there," which based on my knowledge of the investigation I believe to be a reference to WILEY's need to dilute and package the cocaine at HARRY's residence, TARGET PREMISES THREE. WILEY then told RICHARDSON by voice call (Session ID 2536) that he was "bout to pull out," and location data from the GPS tracker installed on TARGET VEHICLE ONE showed that WILEY soon arrived at TARGET PREMISES TWO. Based upon this sequence of events, I believe that WILEY transported cocaine to RICHARDSON so that RICHARDSON could distribute cocaine from TARGET PREMISES TWO.

177.    Based upon communications intercepted over the TARGET TELEPHONE, I also believe that the WILEY drug trafficking organization uses an outbuilding situated behind TARGET PREMISES TWO to store and distribute controlled substances. On May 18, 2021, WILEY called RICHARDSON (Session ID 3161) and asked about a shed on the property:

| | |
|---|---|
| WILEY: | Uncle Charles, that shed and stuff, is still there, right? |
| RICHARDSON: | Huh? |
| WILEY: | The thing that I use to keep the thing in. |
| RICHARDSON: | Yeah. Yeah, is there, why? |
| WILEY: | Alright. Huh? |
| RICHARDSON: | Yeah, why? |
| WILEY: | Nah, I was just making... um... I'm 'bout to have something drop there. [Pause] |
| RICHARDSON: | A'ight. How... how much? |
| WILEY: | I don't know... I'm 'bout to be down there. I'ma talk to you before anything. |
| RICHARDSON: | Yeah. A'ight. |
| WILEY: | One! |

178.    Based on my training, experience and knowledge of this investigation, and context of the intercepted communication, I believe that WILEY and RICHARDSON store controlled substances in an outbuilding ("the shed and stuff") at TARGET PREMISES TWO.

WILEY stated he would store contraband in an outbuilding at TARGET PREMISES TWO ("I'm 'bout to have something drop there"), and RICHARDSON asked the quantity that would be stored ("how much?").

179.    DEA investigators conducting physical surveillance during the May 18, 2021 shed-related call observed a male, believed to be a marijuana trafficker based upon the investigation to date, arrive at TARGET PREMISES TWO in a Jeep Liberty. In a voice call (Session ID 3165) between WILEY and the male (utilizing telephone number (484) 459-3627), WILEY instructed: "My uncle will direct you in the driveway. You could just park there." The male then parked the Jeep at the rear of TARGET PREMISES TWO where DEA investigators, from their vantage point, could not observe whether items were offloaded from the Jeep.

180.    On May 22, 2021, WILEY called RICHARDSON (Session ID 3522) and instructed RICHARDSON to retrieve contraband from a "garage" at TARGET PREMISES TWO:

| | |
|---|---|
| WILEY: | Uncle Charles, that shed and stuff, is still there, right? |
| RICHARDSON: | Huh? |
| WILEY: | The thing that I use to keep the thing in. |
| RICHARDSON: | Yeah. Yo. |
| WILEY: | Uncle Charles, I need you to take two ..., two out of the garage. Make sure they seal real real tight. |
| RICHARDSON: | Why? Where you at? |
| WILEY: | I'm 'bout to pull up. Just get two (2) of the ones that's sealed tight. |
| RICHARDSON: | A'ight. |

181.    Based on my training, experience and knowledge of this investigation, and context of the intercepted communication, I believe that WILEY and RICHARDSON store controlled substances in an outbuilding at TARGET PREMISES TWO (a "garage"). DEA investigators cannot inconspicuously surveil the rear of TARGET PREMISES TWO, accessed

through the driveway on the right-hand side of the building in a densely populated city neighborhood. From Capitol Avenue, DEA investigators can observe what a one story detached outbuilding (consistent with a garage or shed) at the rear of TARGET PREMISES TWO. Based on open source satellite imagery (Google Maps), there appears to be a garage at the rear of TARGET PREMISES TWO, accessed from the driveway that leads from Capitol Avenue. I specifically request authorization to search any outbuildings located on the property consisting of 587/589/591 Capitol Avenue, outbuildings accessed from the driveway leading from Capitol Avenue leading to the rear of TARGET PREMISES TWO. RICHARDSON, using the RICHARDSON TELEPHONE, and WILEY, using the TARGET TELEPHONE, continue to communicate by telephone. On June 5, 2021, RICHARDSON called WILEY (Session ID 5328) to inform WILEY that he had sold cocaine ("I sold two eight balls, you hear me?"). WILEY stated that he would stop by TARGET PREMISES TWO ("Ima hit you, I'll probably, I'll probably um, if I don't come by tonight, I'll probably come tomorrow") to provide RICHARDSON with additional cocaine.

182.     I respectfully submit that there is probable cause that contraband, property, evidence, fruits, and instrumentalities of the commission of the TARGET OFFENSES by RICHARDSON, WILEY and members of the WILEY drug trafficking organization are present in TARGET PREMISES TWO.

<u>c.  TARGET PREMISES THREE – 327 Park Avenue, Bloomfield, CT</u>

183.     TARGET PREMISES THREE is a two-story single-family residence located at 327 Park Avenue, Bloomfield, CT. The residence is tan in color with white trim. From Park Avenue, TARGET PREMISES THREE is accessed through a front door located underneath a small portico above approximately two cement steps.

184.    TARGET PREMISES THREE is the residence of HARRY. According to a check with Eversource, a utilities company, HARRY is listed as the utilities subscriber at the location. Communications intercepted over the TARGET TELEPHONE, with physical surveillance, have revealed TARGET PREMISES THREE as a Bloomfield location used to stash, package, and distribute controlled substances. WILEY has referred to the location as "the Lab," which I believe to be a reference to WILEY using the location to dilute and repackage cocaine.

185.    As described above, on May 6, 2021 into May 7, 2021, WILEY arranged the sale of a significant quantity of cocaine (one or more kilograms) that was purchased by, or brokered by, WATSON. During a voice call (Session ID 2245) with WAKEFIELD, WILEY stated he was "cooking some… nothing like food, but something else." Earlier in the day, WILEY received cut material from UM -7143 and, based upon information received from the GPS tracking device affixed to TARGET VEHICLE ONE, WILEY was at TARGET PREMISES THREE when speaking to WAKEFIELD and while "cooking."

186.    The next day, May 7, 2021, DEA investigators conducting physical surveillance observed WILEY arrive at TARGET PREMISES THREE and transfer boxes from HARRY's Bentley, TARGET VEHICLE THREE, into TARGET PREMISES THREE. In a voice call (Session ID 2327) shortly thereafter, while WILEY was at TARGET PREMISES THREE, WILEY told a woman that he was "in the lab," which based on my training and experience, knowledge of common cocaine slang based on other DEA investigations, and knowledge of this investigation, I believe was referring to a place where he was conducting alteration, dilution, preparation, and packaging of the cocaine for sale. In the same call, as described above, WILEY was operating a machine which I believe to be a kilogram press, a tool used to package cocaine.

187.   WILEY frequently travels to TARGET PREMISES THREE. Based upon location data received from the GPS tracking device affixed to TARGET VEHICLE ONE on April 21, 2021 (and active until May 29, 2021), WILEY's vehicle was located at TARGET PREMISES THREE on April 22, 23, 27, 29, and May 4, 5, 6, 7, 9, 10, 17, and 21. I believe that the frequency with which WILEY travels to TARGET PREMISES THREE, in addition to intercepted communication indicative of drug trafficking, demonstrates the use of TARGET PREMISES THREE by WILEY, HARRY, and the WILEY drug trafficking organization to store, alter, dilute, prepare, package, and distribute controlled substances. The last communication between HARRY and WILEY intercepted through the TARGET TELEPHONE occurred on or about May 22, 2021. As described herein, WILEY has directed individuals to communicate using Apple FaceTime, which cannot be intercepted, and WILEY and HARRY have been cautious about discussing matters over the telephone (*See, e.g.*, Session ID 423). Any recent communications between HARRY and WILEY using Apple FaceTime or Apple iMessage would go undetected by DEA investigators.

188.   A check of law enforcement databases (the NCIC databases) revealed that on March 31, 2020, HARRY registered a nine-millimeter semi-automatic pistol (Springfield Armory bearing serial number HG952738). Based upon the use of TARGET PREMISES THREE by the WILEY drug trafficking organization to store and distribute kilogram quantities of cocaine, I believe that HARRY possesses the firearm in furtherance of the WILEY drug trafficking organization and to protect stashes of controlled substances and cash present at HARRY's residence (TARGET PREMISES THREE) and business (TARGET PREMISES FOUR). After WILEY's arrest in February in Yonkers, New York for possession of a kilogram of cocaine, WILEY and HARRY communicated by telephone (a call recorded by the

Westchester County Jail pursuant to jail policy). WILEY and HARRY discussed how WILEY's cellular telephones were seized but that law enforcement did not have the password to access the devices. Based on my training and experience, my knowledge based on other DEA investigations, and my knowledge of this investigation, I believe that WILEY and HARRY were concerned that incriminating digital evidence could fall into the hands of law enforcement. HARRY also expressed relief that WILEY's arrest somehow disrupted or "stopped" HARRY from also coming under law enforcement scrutiny or being arrested ("and you know how I ride too, oh my God"). Based on my training and experience and knowledge of slang used by drug traffickers, I believe a reference to "how I ride" refers to transporting controlled substances by vehicle, a commonly used phrase being "riding dirty" or driving while in possession of controlled substances and contraband, such as firearms.

189. Based upon surveillance conducted by DEA investigators, I believe that TARGET PREMISES THREE has an exterior video surveillance system. Video cameras appear to be present affixed to certain exterior walls of TARGET PREMISES THREE, including on the front and the driveway side of the residence. TARGET PREMISES THREE also appears to have a video surveillance doorbell. Based on my training and experience, my knowledge based on other DEA investigations, I know that drug traffickers will often use video surveillance at stash locations to monitor contraband and to thwart attempts by others to seize contraband (whether by law enforcement action or robbery by rivals). While residential video surveillance is becoming less expensive and internet connected, TARGET PREMISES THREE appears, based upon the placement of cameras, to have video surveillance on the property.

190. I respectfully submit that there is probable cause that contraband, property, evidence, fruits, and instrumentalities of the commission of the TARGET OFFENSES by

95

HARRY, WILEY and members of the WILEY drug trafficking organization are present in TARGET PREMISES THREE.

        d.  TARGET PREMISES FOUR -- The Action Audio Store, 2814 Main Street, Hartford, CT

        191.    TARGET PREMISES FOUR is a two-story A-frame commercial building located at 2814 Main Street, Hartford, CT. The building exterior is red stucco on the first floor and white siding on the second floor. There are two vehicle service bays located in the center of the building and a sign on top of the building that reads: "The Action Auto Remote Starters Car Stereos." One side of the building, facing Windsor Street, is labeled "The Action Audio Store" and has a sign that reads in red lettering: "2814 Main St. 860-727-8715." TARGET PREMISES FOUR is accessed from Main Street (or Windsor Street) through a parking lot at the front of the building. There are two doorways to enter the building, one to the left of the vehicle bays and one to the right of the vehicle bays.

        192.    TARGET PREMISES FOUR is HARRY's business. According to a check with Eversource, a utilities company, K.H. Action Audio, LLC is listed the utilities subscriber at the location ("K.H." being HARRY's initials). Communications intercepted over the TARGET TELEPHONE, with physical surveillance, have revealed TARGET PREMISES FOUR as a Hartford location used to stash, transfer, and distribute controlled substances. In communications intercepted over the TARGET TELEPHONE, WILEY has made frequent reference to "Hartford," and DEA investigators believe that TARGET PREMISES FOUR, a functioning automotive business with frequent vehicle and foot traffic, is a drug trafficking hub for the WILEY drug trafficking organization.

193.    As described above, on each occasion known to DEA investigators where WILEY has distributed large quantities of cocaine, WILEY first travelled to TARGET PREMISES FOUR to meet with HARRY. On April 27, 2021, when WILEY was distributing cocaine to New York, WILEY travelled with BROWN from the Capitol Avenue residence, TARGET PREMISES TWO, to Action Audio, TARGET PREMISES THREE. DEA investigators observed that TARGET VEHICLE ONE was backed into one of the service bays of the business and the garage door was then partially closed, obscuring a line-of-sight into the vehicle bay. Approximately two minutes later, the garage door was fully reopened, and TARGET VEHICLE ONE was driven out of the vehicle bay and then parked in the business parking lot.

194.    Shortly thereafter, HARRY exited Action Audio, TARGET PREMISES FOUR, carrying a large bag, placed the bag into the trunk of TARGET VEHICLE ONE, and WILEY, HARRY, and BROWN travelled to HARRY's residence, TARGET PREMISES THREE. As described above, I believe that WILEY then packaged cocaine and sent shipments of cocaine to UM -4084 in New York on April 27, 2021 and April 28, 2021.

195.    On May 7, 2021, when WILEY sold a large quantity of cocaine to WATSON, he was also present at TARGET PREMISES FOUR. The day before, on May 6, 2021, DEA agents observed WILEY meet with HARRY and BRYANT, who DEA investigators believe to be a drug trafficker. DEA investigators believe that WILEY was present at TARGET PREMISES FOUR in furtherance of the cocaine transaction, as well as the cocaine dilution, preparation and packaging that occurred at TARGET PREMISES THREE on May 6-7, 2021, as described above.

196.    On May 28, 2021, WILEY was speaking with an unknown female (Session ID 4298). During the conversation, based upon data received from the GPS tracking device affixed to WILEY's car, TARGET VEHICLE ONE, WILEY was at TARGET PREMISES FOUR.

During the communication background conversation could be overheard between WILEY and HARRY related to what sounded like a safe being opened. Earlier in the day, WILEY had a voice communication (Session ID 4277) with an unidentified male where he discussed that he had a source of supply for ten kilograms of cocaine. WILEY told the male that he had purchased one kilogram ("I grab, one of them shits today") and that his associate purchased two kilograms of cocaine ("my man was grabbing a couple of them shit"). Later in the day, when WILEY was speaking with the unknown female (Session ID 4298) while WILEY and HARRY were at TARGET PREMISES FOUR, what sounds like a digital combination lock could be heard as WILEY and HARRY communicated in the background about combinations:

| | |
|---|---|
| WILEY: | [Background: Beep noise.] |
| | I [U/I] change it. [U/I] is four zeros? |
| HARRY: | Zero, four. |
| WILEY: | Zero, four?. |
| HARRY: | Yeah. |
| WILEY: | 0-0-0-0. |
| HARRY: | 0-4-0-2. |
| | [Background: Beeping sound, door opening] |

197.    Based on my training and experience, knowledge of other DEA investigations, knowledge of this investigation, and review of the wire communication, I believe that WILEY and HARRY utilize a digital combination safe at TARGET PREMISES FOUR to store contraband. I know that drug traffickers frequency use safes to safeguard (and hide) contraband, including controlled substances and proceeds from drug trafficking. Based upon GPS tracking data from TARGET VEHICLE ONE, once the digital safe was accessed and WILEY and HARRY had the above conversation, WILEY departed TARGET PREMISES FOUR.

198.    WILEY frequently travels to TARGET PREMISES FOUR. Based upon location data received from the GPS tracking device affixed to TARGET VEHICLE ONE on April 21,

2021 (and active until May 29, 2021), WILEY's vehicle was located at TARGET PREMISES THREE on April 22, 23, 24, 25, 26, 27, 28, 29, 30, and May 1, 3, 4, 5, 6, 7, 9, 10, 11, 12, 15, 16, 17, 18, 21, 22, 26 and 28. I believe that the frequency with which WILEY travels to TARGET PREMISES FOUR, in addition to intercepted communication indicative of drug trafficking, demonstrates the use of TARGET PREMISES FOUR by WILEY, HARRY, and the WILEY drug trafficking organization to store and distribute controlled substances.

199.    I respectfully submit that there is probable cause that contraband, property, evidence, fruits, and instrumentalities of the commission of the TARGET OFFENSES by HARRY, WILEY and members of the WILEY drug trafficking organization are present in TARGET PREMISES FOUR.

### e.  TARGET PREMISES FIVE – 30 Fox Trail, Mashantucket, CT

200.    TARGET PREMISES FIVE is a single-family, two-story residence with a combination of tan siding and stone façade located at 30 Fox Trail, Mashantucket, CT. There is an attached two-car garage located on the right side of the residence. There is no address number visible on TARGET PREMISES FIVE.

201.    TARGET PREMISES FIVE is the residence of GANT, along with his wife Emerita Gant and their children. According to information provided by the Mashantucket Pequot Tribal Police, in mid-2020 GANT provided TARGET PREMISES FIVE as his residential address to the Tribal Police. DEA investigators have confirmed that the two-story residence at 30 Fox Trail is GANT's home based upon a pole camera with a line-of-sight of the residence, installed in April 2021, which has frequently depicted GANT entering and exiting the home. A gray Ford Explorer, registered to Emerita Gant at 30 Fox Trail, is typically parked in the

driveway and/or garage of the residence. A 2006 gray Mazda, also registered to Emerita Gant at 30 Fox Trail, is typically parked in the driveway (which was observed on June 4, 2021).

202.    As described above, in April 2021, WILEY and GANT discussed trafficking pound quantities of marijuana, along with cocaine trafficking. WILEY also intimated to GANT that he would always supply him with marijuana ("I still would have gave you access to that."). GANT and WILEY have a longstanding marijuana trafficking relationship. When WILEY's cellular telephones were seized by the Fairfield Police Department in February 2020, analysis of the devices revealed communications that WILEY, in January 2020, sent videos of marijuana to GANT (utilizing telephone number (860) 334-9200, the same as he uses today). As part of the investigation in October 2020, DEA investigators began to track the vehicle then used by WILEY, a Range Rover. Between October 9, 2020 and October 23, 2020, WILEY made at least four trips to TARGET PREMISES FIVE. Between November 9, 2020 to December 21, 2020, WILEY made at least sixteen trips to TARGET PREMISES FIVE.

203.    As described above, on May 11, 2021, WILEY and GANT travelled to New Jersey in TARGET VEHICLE ONE to conduct a drug transaction. In the early hours of May 11, 2021, WILEY first travelled to GANT's residence, TARGET PREMISES FIVE, from Hartford, TARGET PREMISES THREE. WILEY arrived at GANT's residence at approximately 4:07 a.m. While WILEY was at TARGET PREMISES FIVE, he made a telephone call to an unidentified male subject, UM -9904, with a Northern New Jersey area code. During the voice call (Session ID 2753) the parties, in part, discussed WILEY's anticipated arrival time to New Jersey.

204.    At approximately 9:30 a.m. on May 11, 2021, DEA investigators agents observed WILEY and GANT depart GANT's residence, TARGET PREMISES FIVE. WILEY and GANT, travelling in TARGET VEHICLE ONE, only made two brief stops before arriving in

New Jersey for what DEA investigators believe was a drug transaction. First, WILEY ordered food from a Groton restaurant (Session ID 2755) and the pair stopped to pick up the food while headed to New Jersey. Second, TARGET VEHICLE ONE briefly stopped in parking lot in Tarrytown, New York before travelling across the Tappan Zee Bridge spanning the Hudson River. DEA investigators conducting physical surveillance did not observe WILEY or GANT meet with any other individual or vehicle in Tarrytown, and believe the brief stop was a rest stop.

205. Because WILEY and GANT travelled from TARGET PREMISES FIVE to the May 11, 2021 drug transaction in New Jersey, I believe that TARGET PREMISES FIVE is actively used to store contraband (*i.e.*, marijuana, cocaine, cut material). While WILEY travelled from HARRY's residence, TARGET PREMISES THREE, which I believe is used to package and distribute controlled substances, I believe that WILEY travelled to GANT's residence, TARGET PREMISES FIVE, in furtherance of drug trafficking. It would be inefficient to travel east from Hartford to Mashantucket, arriving at GANT's residence at approximately 4:00 a.m., just to then depart in the morning for New Jersey, without the need to package or prepare controlled substances at TARGET PREMISES FIVE, or acquire contraband from GANT. Nor do I believe that WILEY would travel such a distance just to bring GANT along for a road trip to New Jersey. GANT and WILEY have a longstanding drug trafficking history, dating back to at least January of 2020. In intercepted communications, GANT and WILEY discussed marijuana and cocaine trafficking in April 2021. Based upon review of records received from Square Inc., the parent company of the mobile payment platform CashApp, GANT (username Jammal Gant) has a few small payments to WILEY (Yung 252) using the platform including: a September 20, 2020 transaction in the amount of $275 without a description, a January 15, 2021 transaction in the amount of $95.00 for "platty." Based on my training and experience and knowledge of

marijuana-related slang, I know that "platty" is slang for a high-quality strain of marijuana. After WILEY's February 2021 arrest in Yonkers, New York, GANT picked WILEY up at the Westchester County Jail upon his release.

206.    While GANT has not been intercepted over the TARGET TELEPHONE since May 11, 2021, I believe that GANT and WILEY communicate using end-to-end encrypted communications services, including Apple FaceTime and Apple iMessage, which WILEY has directed GANT to use in prior intercepted communications. I further believe that WILEY and GANT have seen each other in person at a strip club. On May 27, 2021, WILEY spoke with GANT's wife, Emerita Gant ("EMERITA") in a voice call (Session ID 4085). EMERITA discussed with WILEY that her marriage with GANT (referred to as "J.P.," initials for "Jammal Prince") was failing. WILEY informed EMERITA that GANT had been frequenting a strip club in Hartford, a club that based upon GPS tracking data for TARGET VEHICLE ONE has also been visited by WILEY. WILEY stated that GANT was involved with strippers at the club and "blowing thousands of dollars." WILEY further stated that GANT was "sniffing cocaine" and carrying a firearm ("he think cause he be riding around with a gun or whatever"), but WILEY was concerned that GANT would be robbed by other individuals. As described herein, WILEY has directed individuals to communicate using Apple FaceTime, which cannot be intercepted, and WILEY has specifically discussed the use of FaceTime with GANT (*See, e.g.*, Session ID 552). Any recent communications between GANT and WILEY using Apple FaceTime or Apple iMessage would go undetected by DEA investigators.

207.    Based upon GANT's longstanding history as a drug trafficker with the WILEY drug trafficking organization, including his May 11, 2021 travel to New Jersey with WILEY, and WILEY's recent comments that GANT possesses a firearm and cocaine, I believe that GANT is

involved in the continuing WILEY drug enterprise, is a member of the WILEY drug trafficking organization, and that TARGET PREMISES FIVE will contain evidence of GANT's commission of the TARGET OFFENSES.

208. I respectfully submit that there is probable cause that contraband, property, evidence, fruits, and instrumentalities of the commission of the TARGET OFFENSES by GANT, WILEY and members of the WILEY drug trafficking organization are present in TARGET PREMISES FIVE.

### f. TARGET PREMISES SIX – ▇▇ Marcel Street, Bridgeport, CT

209. TARGET PREMISES SIX is a two-story single-family residence located at ▇▇ Marcel Street, Bridgeport, CT. The residence is tan in color with light-blue colored shutters trim. From Marcel Street, TARGET PREMISES SIX is accessed through a front door located underneath a small portico above approximately two cement steps.

210. TARGET PREMISES SIX is the residence of M▇ B▇ ("B▇"), a drug distributor for the WILEY drug trafficking organization, as well as Tamar McCoy and minor children. Wire and electronic communications intercepted over the TARGET TELEPHONE confirmed a drug trafficking relationship between WILEY and B▇ (using telephone number (347) 554-9050, subscribed to Tamar McCoy at an address in the Bronx, New York). According to a check with United Illuminating, a utilities company, Tamar McCoy is listed the utilities subscriber at TARGET PREMISES SIX. Based upon records provided by the Bridgeport Police Department, B▇ was involved in a domestic violence incident, involving Tamar McCoy, at TARGET PREMISES SIX in February 2020. On June 1, 2021, DEA investigators knocked on the door of TARGET PREMISES SIX and spoke with Tamar McCoy and confirmed that McCoy lives at the residence. DEA investigators have observed B▇ use

103

a Nissan Rogue which is frequently parked in the driveway of TARGET PREMISES SIX, including as recently as approximately June 1, 2021.

211. In communications intercepted over the TARGET TELEPHONE, WILEY and B████ have discussed the distribution of controlled substances. In a voice call (Session ID 386) on April 19, 2021, BAILEY called WILEY requesting to discuss controlled substances:

| | |
|---|---|
| WILEY: | Yeah, man! |
| B███: | How much you trying to sell it for? |
| WILEY: | No, no. I'm not selling. |
| B███: | Oh, okay. A'ight – |
| WILEY: | Yo, what's good with the... Yo, anybody... Anybody got any Platinum out here already? |
| B███: | Yo, but the numbers they asking for is... You know? |
| WILEY: | How much they want? |
| B███: | They asking for 20. |
| WILEY: | Yeah. [UI] with that. |
| B███: | Yeah. I'm trying to go and [UI]. [Audio Interference] [UI] |
| WILEY: | [UI] |
| B███: | Yeah. |
| WILEY: | Hold on, bro'. Hold on. |
| B███: | A'ight. |

212. Based on my training and experience, my knowledge from other DEA investigations, my knowledge of this investigation, and context of the intercepted communication, I believe that B████ asked whether WILEY was selling certain controlled substances ("How much you trying to sell it for?") and B████ requested a high-quality strain of marijuana ("Platinum"). B████ then informed WILEY that he had a potential customer who was seeking to acquire twenty pounds of marijuana ("they asking for 20.").

213. In a voice call (Session ID 1386) on April 19, 2021, WILEY called B████ to inquire about the collection of drug proceeds from the sale of controlled substances:

WILEY:  What's the word?

104

| | |
|---|---|
| B▇ : | Me still short, man. Give me a few. |
| WILEY: | Huh? |
| B▇ : | Give me a few. Me still a short. A little short, give me a few. |
| WILEY: | Alright, come on! You said you was gonna have that bread for me, already. [Voices overlap] |
| B▇ : | Yeah, but then I said me still was short. |
| WILEY: | [U/I] I need that shit, bro'! |
| B▇ : | Yeah. |

214.    Based on my training and experience, my knowledge from other DEA investigations, my knowledge of this investigation, and context of the intercepted communication, I believe that B▇ is a marijuana distributor for the WILEY drug trafficking organization. I believe that WILEY provides marijuana to B▇ on consignment and WILEY requested the cash proceeds from the sale of marijuana. B▇ had not yet sold out of product ("a little short"), though WILEY expected payment ("You said you was gonna have that bread for me already").

215.    In a voice call (Session ID 1397) on April 27, 2021, WILEY called B▇ to inquire about items used to package controlled substances:

| | |
|---|---|
| WILEY: | What's the word? |
| B▇ : | Me still short, man. Give me a few. |
| WILEY: | Yo, yo, dog! Yo, listen! You could hear me? |
| B▇ : | Yeah. You can pull up in me yard (house). |
| WILEY: | Yo! [Pause] Y'all have a vacuum seal over there? |
| B▇ : | Me lent it out. |
| WILEY: | Huh? |
| B▇ : | I lent it out! |
| WILEY: | You said, no? |
| B▇ : | I lent it out! |
| WILEY: | Oh. What you got for me? |
| B▇ : | Me just let go two of them. |
| WILEY: | Okay, okay. Okay. Alright, I'm coming down. |
| B▇ : | Now? |
| WILEY: | Alright, me coming now.[PH] |
| B▇ : | Alright man. |

105

WILEY:        A'ight.

216.    Based on my training and experience, my knowledge from other DEA investigations, my knowledge of this investigation, and context of the intercepted communication, I believe that WILEY asked B▮ for use of a vacuum sealer, an item commonly used to package large quantities of marijuana. WILEY then inquired about payment for marijuana provided on consignment ("what you got for me?") and B▮ stated that he could pay WILEY because he had sold two pounds of marijuana ("just let go of two of them"). WILEY then stated he would travel to meet B▮ at B▮'s residence ("me yard"). Based upon GPS tracking data received from a tracking device affixed to WILEY's vehicle, TARGET VEHICLE ONE, shortly after the communication WILEY traveled to Marcel Street and remained at TARGET PREMISES SIX for approximately eight minutes, which I believe was WILEY meeting with B▮ to acquire drug proceeds.

217.    In a voice call (Session ID 2170) on May 5, 2021, WILEY called B▮ to discuss the distribution of controlled substances and to meet with B▮ at TARGET PREMISES SIX:

| B▮: | Hello? |
| WILEY: | Yo where you at, man? I'm 'bout to... I'm 'bout to pull up. |
| B▮: | Huh? |
| WILEY: | I said, I'm 'bout to pull up... I'm 'bout... [Stammers] I'm... like three minutes away. You heard? |
| B▮: | [U/I], come at... Me... [Stammers] just at too at my house. |
| WILEY: | You going to your house? |
| B▮: | I just heading off [to go home] [Pause] |
| WILEY: | So you trying to meet me at your house? |
| B▮: | Yeah. Yeah. |
| WILEY: | Bro'! [Audio Skips] |
| B▮: | Huh? |
| WILEY: | I said, if you're coming around, I'll wait. |
| B▮: | No. I'm... [Stammers] going... I'm just leaving from the backyard. |

106

| WILEY: | A'ight, so you want me to meet you at your house? |
| B    : | Yeah. |
| WILEY: | How long are you gonna be? I'm already here. 'Cause I was coming down Main St. |
| B    : | Where you at? |
| WILEY: | I'm coming down Main St., passing Merritt Canteen. |
| B    : | All right. Make the right at the corner of the, of the barbershop |
| WILEY: | So you want me to go to the barbershop? |
| B    : | No. I'm... [Stammers] pulling out at Garfield. |
| WILEY: | Oh, a'ight. Bro', you know how... Yo? Hello |
| B    : | Yeah. |
| WILEY: | Yeah, you said you wanted 1000 worth, right |
| B    : | Yeah. |
| ... | |
| WILEY: | Oh. A'ight. Me here! Me here! |
| B    : | Where you at? |
| WILEY: | Me at... Me pull in your yard. Yo, do you want me to just come there, bro? |
| B    : | Where you at? [Stammers] I'm just pulling out from Garfield. |
| WILEY: | No, I'm at your crib. I'm not... I'm on your street. |
| B    : | All right, I'm coming up the street |

218. Based on my training and experience, my knowledge from other DEA investigations, my knowledge of this investigation, and context of the intercepted communication, I believe that WILEY was attempting to meet with B     at TARGET PREMISES SIX ("I'm bout to pull up."). WILEY was near to TARGET PREMISES SIX passing Merritt Cantina on Main Street in Bridgeport, about four blocks away from TARGET PREMISES SIX. B     was a few blocks away on Garfield Street in Bridgeport but returned to TARGET PREMISES SIX ("I'm coming up the street."). Based on the conversation, I believe that WILEY provided B     with a quantity of marijuana for $1,000 ("you said you wanted 1000 worth, right?"). Based upon GPS tracking data received from a tracking device affixed to WILEY's vehicle, TARGET VEHICLE ONE, shortly after the communication WILEY traveled to Marcel Street and remained at TARGET PREMISES SIX for approximately three minutes,

107

during which time I believe WILEY was meeting with B███████ to distribute controlled substances.

219. In a voice call (Session ID 3697) on May 27, 2021, WILEY called B███████ to discuss the distribution of controlled substances:

| | |
|---|---|
| B███████: | Yo! |
| WILEY: | Tell me something good bro. |
| B███████: | Nothing. Someone pull up on me for six (6). |
| WILEY: | Hmm? |
| B███████: | Someone pull up on me for six. My...[Stutters]... boss want six. He gonna pull up. But nobody no want this product. [U/I]. |
| WILEY: | So, you sold it for 600? |
| B███████: | One, one, one. Maybe next one [U/I]. [Voices overlap] |
| WILEY: | Damn, bro'. Why you selling it so cheap, bro'? |
| B███████: | So you wanna me to call him and take it back then. |
| WILEY: | Nah, you already sold it, bro'. But you suppose to be selling that shit for more, bro. |
| B███████: | Your auntie gave me one (1) for seven (7). Me try to sell it [U/I] it not sell. [U/I] at eight (8), nobody no want to take it. [U/I]. |
| WILEY: | Bro', why would my aunt tell you 700 and where did she get weed to give it to you? |
| B███████: | I don't even know nigga. She not give me.. she wanna give me a pound a weed. |
| WILEY: | A'ight. I'm 'bout to pull up. |

220. Based on my training and experience, my knowledge from other DEA investigations, my knowledge of this investigation, and context of the intercepted communication, I believe that WILEY and B███████ discussed the sale of marijuana ("weed"). WILEY was concerned that B███████ was selling product too cheaply ("why you sell it so cheap, bro."). Shortly after this communication, WILEY again spoke with B███████ (Session ID 3701) and confirmed that B███████ was "at the store." DEA investigators conducting physical surveillance observed WILEY travel to the corner of Main Street and Capitol Avenue in

108

Bridgeport, near TARGET PREMISES TWO. DEA investigators, who had observed arrest photographs of B     from his 2020 Bridgeport arrest, observed WILEY meet with B     in front of a convenience store on Main Street in Bridgeport. WILEY and B     then entered the store and, eventually, surveillance was terminated.

221. I respectfully submit that there is probable cause that contraband, property, evidence, fruits, and instrumentalities of the commission of the TARGET OFFENSES by WILEY, B    , and members of the WILEY drug trafficking organization are present in TARGET PREMISES SIX.

## VIII. FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE TARGET VEHICLES

a. TARGET VEHICLE ONE – a 2021 black Mercedes-Benz AMG GT 63 bearing Connecticut registration number BB10729 and vehicle identification number W1K7X8JBXMA037538, used by WILEY.

222. TARGET VEHICLE ONE is a Mercedes-Benz luxury coupe used by WILEY. TARGET VEHICLE ONE is registered to Daimler Trust, 14372 Heritage Parkway, Fort Worth, Texas 76177, and is leased to WADE. According to records received from Daimler Trust, WADE first leased the vehicle on or about February 25, 2021, putting down $7,500 for the lease. The vehicle is valued at approximately $146,870, and the monthly payment for the vehicle is approximately $2,575.51 per month.

223. As described above, WILEY actively uses TARGET VEHICLE ONE to transport contraband, including cocaine, marijuana, and cash proceeds, in furtherance of the WILEY drug trafficking organization. I believe that TARGET VEHICLE ONE represents an instrumentality

of the WILEY drug trafficking organization, constitutes evidence of the drug trafficking organization, and constitutes proceeds of the drug trafficking organization.

224.    For example, on April 27, 2021, DEA investigators observed WILEY utilize TARGET VEHICLE ONE in furtherance of a cocaine transaction, described above, where WILEY, with BROWN, drove to TARGET PREMISES TWO, then to TARGET PREMISES FOUR to meet with HARRY. HARRY placed items into TARGET VEHICLE ONE and HARRY, WILEY, and BROWN then travelled to TARGET PREMISES THREE, and retrieved packages from the vehicle. I believe WILEY then made two cocaine shipments to New York.

225.    On May 7, 2021, as described above, WILEY used TARGET VEHICLE ONE to transport controlled substances, believed to be cocaine, from Hartford to Bridgeport in furtherance of a transaction with WATSON. In an intercepted communication WILEY told HARRY: "That nigga literally just got out my car as we speak," and went on to say "I'm about to go count the bread now."

226.    On May 11, 2021, WILEY used TARGET VEHICLE ONE to travel to New Jersey with GANT, which I believe was travel conducted in furtherance of a drug transaction. WILEY uses TARGET VEHICLE ONE daily in furtherance of the WILEY drug trafficking organization including to travel to TARGET PREMISES TWO, TARGET PREMISES THREE, TARGET PREMISES FOUR, TARGET PREMISES FIVE, and TARGET PREMISES SIX.

227.    In the May 1, 2021 call with WADE discussed above, WILEY expressly discussed his use of TARGET VEHICLE ONE to conduct large-scale drug transactions as part of his drug trafficking operation: "My car is making me money. I'm getting to point A... I'm making thousands and thousands of dollars off my car, cause I'm getting to point A to point B."

228.   TARGET VEHICLE ONE is often parked in what appears to be a public street parking spot outside of TARGET PREMISES ONE, 200 Glover Avenue, Norwalk, CT. I request that the court specifically authorize entry upon to the grounds of the Glover Avenue apartment complex to seize TARGET VEHICLE ONE, particularly should certain parking spots located on or adjacent to Glover Avenue actually be located upon private property rather upon a public roadway.

      b.   <u>TARGET VEHICLE TWO</u> – a 2021 white Mercedes Benz GLE 350 4matic bearing Connecticut registration BB10799 and VIN 4JGFB4KB9MA417364, used by WADE.

229.   TARGET VEHICLE TWO is a Mercedes-Benz luxury coupe used by WADE. TARGET VEHICLE TWO is registered to Daimler Trust, 14372 Heritage Parkway, Fort Worth, Texas 76177, and is leased to WADE. According to records received from Daimler Trust, WADE first leased the vehicle on or about April 6, 2021, putting down $4,500 for the lease. The vehicle is valued at approximately $72,000, and the monthly payment for the vehicle is approximately $2,575.51 per month.

230.   As described above, WADE has used TARGET VEHICLE TWO to transport contraband, including cash proceeds, in furtherance of the WILEY drug trafficking organization. I believe that TARGET VEHICLE TWO represents an instrumentality of the WILEY drug trafficking organization, constitutes evidence of the drug trafficking organization, and is a proceed of the drug trafficking organization.

231.   On May 28, 2021, as described above, WILEY directed WADE to travel to his mother's house in Fairfield to pick up a large sum of money. I believe that this money was cash proceeds of the WILEY drug trafficking organization, and WADE used TARGET VEHICLE

TWO, her leased vehicle, to pick up the money and transport the money to TARGET PREMISES ONE. As described above, I do not believe that WADE was truthful when financing TARGET VEHICLE ONE and TARGET VEHICLE TWO when she claimed that she earned $150,000 per year working for a healthcare company.

232.    Based upon intercepted communications, DEA investigators believe that TARGET VEHICLE TWO is typically garaged at 200 Glover Avenue in a shared multi-tenant parking garage accessible to residents of the Curb Apartment complex. With dozens of apartments located in the Curb Apartment Complex at 200 Glover Avenue, the parking garage space in the apartment complex is believed to have dozens of parking spaces. DEA investigators expect to coordinate with representatives of the Curb Apartment complex to locate TARGET VEHICLE TWO and to seize the vehicle if garaged at 200 Glover Avenue but seek authorization to enter the shared multi-tenant parking garage space to seize TARGET VEHICLE TWO.

    c.    <u>TARGET VEHICLE THREE</u> – a 2017 white Bentley Bantayga bearing Connecticut Registration BB90593 and VIN SJAAC2Z0HC016054

233.    TARGET VEHICLE THREE is a Bentley luxury SUV used by HARRY. TARGET VEHICLE THREE is registered to Interstate Automobile Network Inc., 4163 Lincoln Boulevard, Marina Del Rey, California. DEA investigators have not received lease records for TARGET VEHICLE THREE and do not know whether the vehicle is leased to HARRY or another individual. Based upon open source research, in 2017 the make and model of Bentley that is TARGET VEHICLE THREE had a base price of approximately $230,000. As described above, Connecticut Department of Labor records revealed that HARRY has not reported any income for the last three years.

234. I believe that HARRY actively uses TARGET VEHICLE THREE to transport contraband, including cocaine, marijuana, and cash proceeds, in furtherance of the WILEY drug trafficking organization. I believe that TARGET VEHICLE THREE represents an instrumentality of the WILEY drug trafficking organization, constitutes evidence of the drug trafficking organization, and constitutes proceeds of the drug trafficking organization.

235. In a recorded phone call between HARRY and WILEY in February 2021, while WILEY was incarcerated at the Westchester County Jail, as described above, HARRY referenced "how I ride," which I believe refers to transporting controlled substances by vehicle, a commonly used phrase being "riding dirty" or driving while in possession of controlled substances and contraband. On May 7, 2021, prior to WILEY's cocaine transaction with WATSON, HARRY told WILEY in an intercepted communication to bring "boxes" into TARGET PREMISES THREE. WILEY retrieved those boxes from TARGET VEHICLE THREE. Based on the intercepted communications from May 6 and 7, 2021, as discussed above, I believe that the items received were a quantity of controlled substances (and/or cut material). DEA investigators have last observed TARGET VEHICLE FOUR at TARGET PREMSES FOUR on or about June 4, 2021.

236. TARGET VEHICLE THREE is believed to be HARRY's primary vehicle. TARGET VEHICLE THREE has been observed by DEA investigators at TARGET PREMISES THREE and TARGET PREMISES FOUR and is often located overnight at HARRY's residence.

    d. <u>TARGET VEHICLE FOUR</u> – a 2013 black Honda Accord bearing Connecticut Registration BC32740 and VIN 1HGCR2E51DA102279

237. TARGET VEHICLE FOUR is a Honda Accord used by HARRY. TARGET VEHICLE FOUR is registered to HARRY at TARGET PREMISES THREE.

238.    As described above, I believe that HARRY actively uses TARGET VEHICLE FOUR to transport contraband, including cocaine, marijuana, and cash proceeds, in furtherance of the WILEY drug trafficking organization. I believe that TARGET VEHICLE FOUR represents an instrumentality of the WILEY drug trafficking organization and constitutes evidence of the drug trafficking organization.

239.    On May 7, 2021, as described above, WILEY and HARRY packaged cocaine for sale at TARGET PREMISES THREE, and WILEY later sold cocaine to WATSON using TARGET VEHICLE ONE. At approximately 1:53 p.m., WILEY retrieved "boxes" from TARGET VEHICLE THREE, parked at TARGET PREMISES THREE. Shortly thereafter WILEY communicated with a woman and told her he was in the "lab," and I believe that a kilogram press could be heard in use during the call. At approximately 5:46 p.m., WILEY and HARRY drove TARGET VEHICLE FOUR, from HARRY's residence, TARGET PREMISES THREE, to Action Audio, TARGET PREMISES FOUR.  Pole camera footage then showed WILEY and HARRY exit the vehicle.

240.    WILEY then returned to TARGET VEHICLE FOUR, which I believe contains a concealed compartment or "trap," to retrieve a bag. Based on my training and experience and my knowledge of other DEA investigations, I know that Honda Accords are a common vehicle used as "trap" vehicles—that is, vehicles with concealed compartments used for drug trafficking. Honda Accords are commonly used in drug trafficking because they are a popular and common sedan, relatively inexpensive and inconspicuous, and there are areas of the vehicle be easily converted into concealed compartments (*e.g.*, space underneath the center console). A Honda Accord is certainly a more inconspicuous vehicle than a Bentley Bantayga, also used by HARRY. When WILEY returned to TARGET VEHICLE FOUR, DEA investigators observed

114

(via the pole camera) the lights and electrical system flickering, despite it being daytime. Based on my training and experience, my knowledge of other DEA investigations, and my personal experience with "trap vehicles," I know that concealed compartments built into vehicles are often accessed through a sequence of maneuvers using vehicle systems (*e.g.*, activating certain features of the vehicles, including lights and direction signals). I believe the flickering lights of TARGET VEHCLE FOUR are indicative of a concealed compartment inside the vehicle, particularly where I believe that the vehicle was being used to transport freshly packaged cocaine from TARGET PREMISES THREE for sale to WATSON. WILEY took from the interior of TARGET VEHICLE FOUR a medium-sized shopping bag which, based upon the appearance of the bag and the manner in which it was being carried, appeared to weigh several pounds. WILEY placed the bag into his Mercedes-Benz, TARGET VEHICLE ONE, and left to meet with WATSON. Based on this sequence of events, I believe that TARGET VEHICLE FOUR contains a concealed compartment or "trap," which is an instrumentality and evidence of drug trafficking by the WILEY drug trafficking organization. DEA investigators have last observed TARGET VEHICLE FOUR at TARGET PREMSES FOUR on or about June 4, 2021.

241. TARGET VEHICLE FOUR is believed to be a vehicle used by HARRY (and WILEY) as an instrumentality of the drug trade, including as a vehicle with a concealed compartment for transporting contraband. I believe that TARGET VEHICLE FOUR, and any concealed compartments contained therein, will constitute evidence of drug trafficking by the WILEY drug trafficking organization, including WILEY and HARRY. TARGET VEHICLE FOUR has been observed by DEA investigators at TARGET PREMISES THREE and TARGET PREMISES FOUR and is often located overnight at HARRY's residence.

## IX. USE OF COMPUTERS AND CELLULAR TELEPHONES

115

242. As described above and in each Attachment B of the premises warrants and vehicle warrants, this application seeks permission to seize records that might be found at each TARGET PREMISES (and certain records that might be found in each TARGET VEHICLE), in whatever form they are found, including data saved to computers and cellular telephones. One form in which the records are likely to be found is data stored on a computer's hard drive or other electronic storage media. Thus, this warrant would authorize the seizure of computers, cellular telephones, and electronic storage media.

243. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensics tools.

244. I know that when an individual uses a computer (including cellular telephones) in the commission of a crimes including the TARGET OFFENSES, the individual's computer (and cellular telephone) will generally serve both as an instrumentality for committing the crime, and contain data that is evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be electronic storage media for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of communications about the crime (*e.g.*, records and logs from messaging applications); and other records that indicate the nature of the offense.

245. Based on my knowledge, training, and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in

computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of the following:

    a.  The volume of evidence -- storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

    b.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.

117

Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c. Technical requirements – analyzing computer hardware, computer software, or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence, and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

d. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

246. Each TARGET PREMISES may contain computer equipment and cellular telephones whose use in the TARGET OFFENSES or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised,

mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in each Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to seize the device, regardless of how the contents or ownership appear or are described by people at the scene of the search.

247. The law enforcement agents will endeavor to seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B or the premises warrants and vehicle warrants. If, however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize that device pursuant to the probable cause established herein.

   a. Use of Computers and Cellular Telephones in Furtherance of the WILEY Drug
      Trafficking Organization

248. Here, based upon my training and experience and knowledge of the investigation, I believe that WILEY and members of the WILEY drug trafficking organization have used computers and cellular telephones in furtherance of the TARGET OFFENSES. I further believe that computers and cellular telephones found at each TARGET PREMISES will amount to instrumentalities of the commission of the TARGET OFFENSES and contain data and records that is evidence of the commission of the TARGET OFFENSES by members of the WILEY drug trafficking organization, both known and unknown.

249. I am aware that in 2021, ownership and use of cellular telephones in the United States is effectively ubiquitous. According to the Pew Research Center, as of 2021, 97 percent of

adult Americans own a cellular telephone, and 85 percent own a cellular telephone with significant computing capability (a "smartphone"). *Mobile Fact Sheet*, Pew Research Center, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited June 3, 2021). Based on my training, experience, and information provided by other law enforcement officers, I know that many cellular telephones, known as smartphones, can now function essentially as handheld computers. Smartphones (e.g., Apple iPhones or Google Android Phones) have capabilities that include, but are not limited to:

        a.  use to make audio and video calls;

        b.  use to send and receive text messages and media messages (which include the sending of photographs or video);

        c.  use to send and receive emails;

        d.  use as a digital camera;

        e.  use as a portable media player;

        f.  use as a Global Positioning System ("GPS") navigation device;

        g.  use to access the internet;

        h.  use to download and access various mobile applications;

        i.  use to store electronic data (e.g. files, photographs, notes, documents);

        j.  use to make mobile payments.

The majority of a cellular telephone's functions, specifically functions used to communicate with other individuals or to send or receive data, require that the device be connected to a cellular network or a wireless internet ("Wi-Fi") network. Based on my training and experience and information provided by other law enforcement officers, I am aware that the vast majority of

smartphones sold in the United States run on either the Apple iOS operating system (*i.e.*, Apple iPhones) or the Google Android operating system (*e.g.*, a Samsung smartphone).

250.    Based upon records received from Apple Inc., and communications intercepted over the TARGET TELEPHONE, I believe that WILEY uses an Apple iPhone, a cellular telephone produced by the technology provider Apple. Based on my training and experience, my knowledge of the investigation, and my knowledge of other DEA investigations, I know that Apple iPhones, along with a cellular telephone number, are tied to an "Apple ID," which is an email address associated with an Apple account. Apple retains certain subscriber information associated with Apple customers and Apple IDs including name, address, telephone number, and other identifying information. Apple records related to Apple IDs and telephone numbers can provide evidence of use and ownership of a certain Apple iPhone, telephone number, and Apple ID. For example, if WILEY's telephone number is associated with his email address (*e.g.*, wileytajh@yahoo.com), that information can be relevant to WILEY's use and possession of a physical iPhone handset and a cellular telephone number. So too would linkages to certain email accounts provide evidence of use and control of that email account and any other online accounts registered using that account (*e.g.*, CashApp).

251.    I further believe that computers and cellular telephones at each TARGET PREMISES will contain records and information constituting the following:

> a.  <u>Evidence of Communications with WILEY and other members of the WILEY drug trafficking organization</u>: Based upon communications intercepted over the TARGET TELEPHONE, I believe it probable that a search of computers and cellular telephones will reveal evidence of wire and electronic communications with WILEY and other members of the

WILEY drug trafficking organization, including stored communications, call logs, and voicemails.

b.  Evidence of Use of Encrypted Communications in Furtherance of Drug Trafficking: Based upon communications intercepted over the TARGET TELEPHONE, I believe it probable that a search of computers and cellular telephones will reveal evidence of use of encrypted communications services in furtherance of the WILEY drug trafficking organization, and reveal relevant stored encrypted communications. Based upon communications intercepted over the TARGET TELEPHONE, I am aware that WILEY has directed coconspirators to communicate using Apple FaceTime and other encrypted communications applications. While some encrypted communications platforms are native to devices (*e.g.*, FaceTime on an Apple iPhone), other applications must be downloaded to a device (*e.g.*, WhatsApp, a communications service owned by Facebook Inc.). Because encrypted communications (*i.e.*, encrypted video and voice calls, and encrypted electronic communications) cannot be intercepted by a wiretap, use of encrypted communications services would constitute an instrumentality of the commission of the TARGET OFFNESES and reveal relevant evidence of the commission of the TARGET OFFENSES. Moreover, encrypted communications that are stored to the cellular telephone, including those with other members of the WILEY drug trafficking organization, would constitute evidence of the commission of the TARGET OFFENSES. Encrypted communications platforms may be

122

used on cellular telephones as well as computers. For example, Apple FaceTime and Apple iMessage may be accessed using an Apple iPhone, an Apple iPad tablet computer, and MacBook computers. WhatsApp, an encrypted communications platform downloaded by WILEY in April 2021 (Session ID 1754) can be accessed on cellular telephones, tablet computers, and desktop or laptop computers.

c.   Evidence of Use of Mobile Payment Platforms: Based upon communications intercepted over the TARGET TELEPHONE, I believe it probable that a search of computers and cellular telephones will reveal evidence of use of mobile payment platforms to transfer drug-related proceeds amongst members of the WILEY drug trafficking organization. Based upon intercepted communications and records received from Square Inc., I know that WILEY uses the CashApp mobile payment platform to transfer and receive drug proceeds. Based on records received from Square Inc., WILEY has exchanged funds with, at minimum, BROWN, HARRY, GANT, and WADE. Mobile payment platforms can be accessed using an application on a cellular telephone (*e.g.*, an application in the Apple App Store) or by accessing a website using a laptop or desktop computer.

d.   Photographs Consisting of Evidence of Drug Trafficking: Based upon my training and experience, my knowledge of this investigation, and my knowledge of other DEA investigations, I know that drug traffickers and individuals involved in drug trafficking conspiracies often take

123

photographs and video of narcotics products for sale using cellular telephones. Based upon intercepted communications, WILEY has requested that individuals provide him video (usually using Apple FaceTime) of controlled substances for sale. Based upon forensic analysis of cellular telephones seized in 2020 as part of this investigation, I also know that WILEY sends photographs and video of controlled substances to potential customers and receives photographs and video of controlled substances from potential suppliers. I likewise know that it is common for members of a drug trafficking conspiracy to create and store photographs and videos of controlled substances, which can then be provided to co-conspirators using encrypted messaging applications. Members of drug trafficking conspiracies also create and store photographs and videos of the proceeds of drug trafficking, including cash proceeds, jewelry and designer clothing. Based on the investigation to date, I am aware that WILEY has created photographs and video recordings of cash proceeds and jewelry, including those that he has publicly posted to social media accounts (*e.g.*., Instagram). Depending on user settings, photographs and videos, even when created on a cellular telephone, may then also be saved to or "pushed" to a computer (*i.e.*, a desktop or laptop computer) using Internet connectivity. For example, an Apple iPhone may be set so that photographs created on the iPhone are also automatically saved to a MacBook laptop. This feature is for user convenience, but evidence of

drug trafficking even if created on one device may be present upon another device controlled and used by an individual.

e. <u>Digital Notes, Records, Ledgers, Documents</u>: Based on my training and experience, my knowledge of this investigation, and knowledge of other DEA investigations, I know that drug traffickers commonly keep digital notes and records stored to computers and cellular telephones. For example, the "notes" application in an Apple iPhone is a common area where drug traffickers can quickly create and store notes including amounts owed to the drug trafficking organization by other parties. Other records can be created using computers and cellular telephones including word documents, spreadsheets, and other written records. Depending on user settings, these documents, even when created on a cellular telephone, may then also be saved to or "pushed" to a computer (*i.e.*, a desktop or laptop computer) using Internet connectivity. For example, an Apple iPhone may be set so that notes created on the iPhone are also automatically saved to a MacBook laptop.

f. <u>Contact Lists</u>: Based upon my training and experience, my knowledge of this investigation, and my knowledge of other DEA investigations, I know that drug traffickers often keep contact lists of sources of supplies, customers, and coconspirators. Akin to a digital address book, contact lists saved to computers and cellular telephones will reveal associations amongst members of a drug trafficking organization, and reveal the contact information for other individuals unknown to law enforcement.

Contact lists stored to computers and cellular telephones may include a user-generated name, telephone number, address, email address, and other information. I believe it probable that a search of contact lists contained within computers and cellular telephones seized from members of the WILEY drug trafficking organization will reveal relationships between the coconspirators and provide information including names, nicknames, and other personal information.

g. <u>Device Information</u>: A search of computers and cellular telephones associated with members of the WILEY drug trafficking organization will provide device information that can be used to ascertain the owner and user of each device. Without full knowledge of the device numbers, serial numbers, telephone numbers, and/or service providers associated with seized devices, information which often can only be determined by accessing the device, less intrusive investigative steps, including service of subpoenas to cellular providers for subscriber information and payment detail is impracticable. For example, based upon intercepted communications over the TARGET TELEPHONE, WILEY has stated that he uses a second cellular telephone, the telephone number to which is unknown to investigators. If WILEY's second cellular telephone is seized, it will need to be seized and searched so that investigators can determine the associated telephone number. The associated phone number or device identifiers may not be apparent until a search of the device is authorized. Moreover, without knowing the phone numbers associated with certain

devices, legal service to cellular providers for historical cellular site information associated with devices used for drug trafficking would be unrealistic. Security conscious drug traffickers often take specific steps to not be tracked, acquiring multiple cellular telephones and registering the phones as prepaid without subscriber information. But device data and location information indicating control and use of the cellular telephone would implicate members of the WILEY drug trafficking organization, and specific device identifiers associated with the computers and cellular would constitute relevant evidence of drug trafficking by the WILEY drug trafficking organization.

   b.  Authorization to Seize Computers and Cellular Telephones

252.   Based on the foregoing, I request that the proposed premises warrants authorize the seizure of computers and cellular telephones that upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence described in each Attachment B. Upon seizure of devices from each TARGET PREMISES, additional applications to search certain devices will be presented to the Court.

   c.  Authorization to Search Particular Cellular Telephones

253.   I also request warrants to allow DEA investigators to search particular cellular telephones—specifically the TARGET TELEPHONE, used by WILEY, any other cellular telephone possessed by WILEY, and the GANT TELEPHONE, the HARRY TELEPHONE, the MUNOZ TELEPHONE, the RICHARDSON TELEPHONE, the WADE TELEPHONE, and the WATSON TELEPHONE.

254.   Based on my training, experience and knowledge of this investigation, my review of communications intercepted over the TARGET TELEPHONE, and records received by cellular telephone providers, I believe it is probable that the TARGET TELEPHONE and WIRE TELEPHONES are used in furtherance of the TARGET OFFENSES, including to communicate between WILEY and co-conspirators, as heard in intercepted communications described herein, and are facilities used in furtherance of drug trafficking. DEA investigators will be able to confirm that the TARGET TELEPHONE and WIRE TELEPHONES are what they are believed to be by calling the telephone number associated with the devices.

255.   As described above, each WIRE TELEPHONE was intercepted in communications to and from the TARGET TELEPHONE, conversing with WILEY in furtherance of the WILEY drug trafficking organization. I believe that each WIRE TELEPHONE will contain records and information constituting evidence of the commission of the TARGET OFFENSES, as described above, including:

  a.  evidence of communications with WILEY and other members of the WILEY drug trafficking organization;

  b.  evidence of use of encrypted communications in furtherance of drug trafficking;

  c.  evidence of use of mobile payment platforms;

  d.  photographs constituting evidence of drug trafficking;

  e.  digital notes, records, ledgers, documents;

  f.  device information; and

  g.  evidence of use and ownership of the cellular telephone.

256.   I request that the proposed warrants authorize seizure and search of the TARGET TELEPHONE and WIRE TELEPHONES, and authorize the seizure of:

     a.  the TARGET TELEPHONE from the person of WILEY, and from any premises in which the device is located that this Court has authorized to search based upon this affidavit, including but not limited to TARGET PREMISES ONE and TARGET VEHICLE ONE;

     b.  any cellular telephone from the person of WILEY, and from any premises in which WILEY is located that this Court has authorized to search based upon this affidavit, including but not limited to TARGET PREMISES ONE and TARGET VEHICLE ONE;

     c.  the HARRY TELEPHONE from the person of HARRY, and from any premises in which the device is located that this Court has authorized to search based upon this affidavit, including but not limited to TARGET PREMISES THREE, TARGET PREMISES FOUR, TARGET VEHICLE THREE, and TARGET VEHICLE FOUR;

     d.  the GANT TELEPHONE from the person of GANT, and from any premises in which the device is located that this Court has authorized to search based upon this affidavit, including but not limited to TARGET PREMISES FIVE;

     e.  the MUNOZ TELEPHONE from the person of MUNOZ, and from any premises in which the device is located that this Court has authorized to search based upon this affidavit;

     f. the RICHARDSON TELEPHONE from the person of RICHARDSON, and from any premises in which the device is located that this Court has authorized to search based upon this affidavit, including but not limited to TARGET PREMISES TWO;

     g. the WADE TELEPHONE from the person of WADE, and from any premises in which the device is located that this Court has authorized to search based upon this affidavit, including but not limited to TARGET PREMISES ONE and TARGET VEHICLE TWO;

     h. the WATSON TELEPHONE from the person of WATSON, and from any premises in which the device is located that this Court has authorized to search based upon this affidavit.

257. Upon seizure of the TARGET TELEPHONE and WIRE TELEPHONES (that is, the HARRY TELEPHONE, the GANT TELEPHONE, the MUNOZ TELEPHONE, the RICHARDSON TELEPHONE, the WADE TELEPHONE, and the WATSON TELEPHONE), I request that the proposed warrants allow law enforcement to immediately, upon seizure, search the devices in any way necessary. The warrants I am seeking would permit seizing, searching, imaging, or otherwise copying the TARGET TELEPHONE and WIRE TELEPHONES, which I believe are probable to contain some or all of the evidence described in the warrants, and would also authorize a later review of the media or information consistent with the warrants. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrants.

258.    With respect to WILEY, the warrant I am seeking would permit seizing any cellular telephone, in addition to the TARGET TELEPHONE, from WILEY's person and/or inside of TARGET PREMISES ONE, and/or TARGET VEHICLE ONE, and/or from any premises in which WILEY is located that this Court has authorized to search based upon this affidavit. I request that the proposed warrants allow law enforcement to immediately, upon seizure, search devices seized from WILEY in any way necessary, that is, devices seized from WILEY's person, and/or inside of TARGET VEHICLE ONE, and/or cellular telephones that can be unlocked using WILEY's biometric characteristics. I believe that any cellular telephone unlocked using WILEY's biometric characteristics is a cellular telephone used and controlled by WILEY, and a device used in furtherance of drug trafficking. As described above, I believe that WILEY possesses and uses a second cellular telephone in furtherance of drug trafficking (his "work phone"). The warrant I am seeking would permit seizing, searching, imaging, or otherwise copying any cellular telephone possessed by WILEY, in addition to the TARGET TELEPHONE, seized from WILEY's person, and/or inside of TARGET VEHICLE ONE, and/or cellular telephones that can be unlocked using WILEY's biometric characteristics, which I believe would be probable to contain some or all of the evidence described in the warrant, and would also authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant. Other than the TARGET TELEPHONE and WIRE TELEPHONES described herein, I do not request to search any cellular telephone merely because it was found in premises in which WILEY is located, but, beyond the TARGET TELEPHONE and the WILEY TELEPHONES, seek only to search cellular telephones found on

WILEY's person, and/or found in WILEY's vehicle (TARGET VEHICLE ONE, used and controlled by WILEY), and/or cellular telephones unlocked using WILEY's biometric characteristics.

259.    In sum, I seek warrants to seize and immediately search, as necessary, the TARGET TELEPHONE, the HARRY TELEPHONE, the GANT TELEPHONE, the MUNOZ TELEPHONE, the RICHARDSON TELEPHONE, the WADE TELEPHONE, and the WATSON TELEPHONE, and to seize and immediately search, as necessary, any cellular telephone found on WILEY's person, and/or found in WILEY's vehicle (TARGET VEHICLE ONE), and/or cellular telephones unlocked using WILEY's biometric characteristics.

       d.    Authorization to Obtain and Use Biometric Characteristics

260.    The warrants I am applying for would permit law enforcement to obtain from certain individuals, including WILEY, HARRY, GANT, MUNOZ, RICHARDSON, WATSON, and WADE, the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search pursuant to this warrant, specifically the TARGET TELEPHONE and the WIRE TELEPHONES (that is, the GANT TELEPHONE, the HARRY TELEPHONE, the MUNOZ TELEPHONE, the RICHARDSON TELEPHONE, the WADE TELEPHONE, and the WATSON TELEPHONE), and any cellular telephone found on WILEY's person, and/or found in WILEY's vehicle (TARGET VEHICLE ONE), and/or any premises in which WILEY is located that this Court has authorized to search based upon this affidavit.

261.    I seek this authority based on the following:

          a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers,

that many electronic devices, particularly newer mobile devices (*e.g.*, an Apple iPhone) and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, the technology company Apple Inc., offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera

133

detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain

134

period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. *See* About Face ID advanced technology. https://support.apple.com/en-us/HT208108 (published February 26, 2020). Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the TARGET PREMISES and reasonably

135

> believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

262. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of WILEY, GANT, HARRY, MUNOZ, RICHARDSON, WADE, and WATSON, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

263. I am not requesting that any force be authorized to effectuate a press or swipe of fingers or to activate facial recognition features. Should any individual refuse to unlock devices using biometric features, I will promptly notify the Court to request an order to show cause for refusal to unlock devices using biometric features, and/or a further order to compel, and/or a request that the refusing individual(s) be held in contempt of this Court.

## X. CONCLUSION

264. *Manner of execution.* The proposed warrants seek authorization to execute the searches each TARGET PREMISES during the day time – that is 6:00 a.m. to 10:00 p.m.

265. The proposed warrants seek authorization to execute the seizure of each TARGET VEHICLE during the day time – that is 6:00 a.m. to 10:00 p.m. The proposed warrants seek authorization to search each TARGET VEHICLE while it is at a secure law enforcement location at any time, day or night. The proposed warrants seek authorization to seize each TARGET VEHICLE and transport each TARGET VEHICLE to a secure law enforcement location (e.g., a

136

secure parking lot or garage). This warrant specifically authorizes search of the TARGET VEHICLE while it is at a secure law enforcement location (e.g., a secure parking lot or garage).

266. The proposed warrants seek authorization to execute the seizure of the TARGET TELEPHONE, WIRE TELEPHONES, and cellular telephones and devices described herein during the day time – that is 6:00 a.m. to 10:00 p.m., if seized pursuant to the proposed premises and search warrants. The proposed warrants seek authorization to execute the seizure of the TARGET TELEPHONE, WIRE TELEPHONES, and cellular telephones at any time, day or night, if seized incident to an arrest based upon an arrest warrant authorized by this Court. The proposed warrants seek authorization to search seized devices described herein (e.g., the TARGET TELEPHONE), at any time, day or night.

267. Based on the forgoing, I request that the Court issue the proposed search warrants.

Respectfully submitted,

Andrew Hoffman
Special Agent
Drug Enforcement Administration

The truth of the foregoing affidavit has been attested to before me by Special Agent Andrew Hoffman on this 8th day of June 2021, at Bridgeport, Connecticut.

HONORABLE S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

137

## **ATTACHMENT A**

### **Property to Be Searched**

The property to be searched is 30 Fox Trail, Mashantucket, CT, the TARGET PREMISES. The TARGET PREMISES is the residence of Jammal Gant (the "TARGET SUBJECT"). The TARGET PREMISES is a single-family, two-story residence with a combination of tan siding and stone façade located at 30 Fox Trail, Mashantucket, CT (within Mashantucket Pequot Tribal Nation land). There is an attached two-car garage located on the right side of the residence. There is no address number visible on the TARGET PREMISES.



1

ᔑⅅ∨



SDV

## **ATTACHMENT A**

### **Property to Be Searched**

The property to be searched is ███ Marcel Street, Bridgeport, CT, the TARGET PREMISES. The TARGET PREMISES is the residence of M███ B███ (the "TARGET SUBJECT"). The TARGET PREMISES is a two-story single-family residence located at ███ Marcel Street, Bridgeport, CT. The residence is tan in color with light-blue colored shutters. From Marcel Street, the TARGET PREMISES is accessed through a front door located above several stone steps. In front of the TARGET PREMISES is a black mailbox marked "███."



1

$SDV$

　
## **ATTACHMENT A**

### **Property to Be Searched**

The property to be searched is 200 Glover Avenue, Apartment 226, Norwalk, CT, the TARGET PREMISES. The TARGET PREMISES is the residence of Tajh Wiley and Destiny Wade (the "TARGET SUBJECTS"). The TARGET PREMISES is a located at The Curb Apartments, a multi-story luxury apartment complex located at 220 Glover Avenue Norwalk, CT. From Glover Avenue, the street number "200" is visible in white numbering above the front entrance to the Curb Apartment building. Apartment 226, the TARGET PREMISES, is located on the second floor of the apartment building. Apartments within the building are individually numbered. The apartment number "226" is located in white numbering to the right of the orange colored apartment door which is the entrance to TARGET PREMISES.



1

SDV

## **ATTACHMENT A**

### **Property to Be Searched**

The property to be searched is <u>327 Park Avenue, Bloomfield, CT</u>, the TARGET PREMISES. The TARGET PREMISES is a two-story single-family residence located at 327 Park Avenue, Bloomfield, CT. The residence is tan in color with white trim. From Park Avenue, the TARGET PREMISES is accessed through a front door located underneath a small portico above approximately two cement steps.



1

$SDV$

## **ATTACHMENT A**

### **Property to Be Searched**

The property to be searched is 587 Capitol Avenue, Bridgeport, CT, the TARGET PREMISES. The TARGET PREMISES is the residence of Charles Richardson (the "TARGET SUBJECT"). The TARGET PREMISES is a multi-family three story residence with tan colored siding and red colored trim. From Capitol Avenue, there are several cement steps leading to a front porch. On the front porch there are two red doors. On a porch beam to the left of the left door is the number "587," corresponding to the left red door. On a porch beam to the right of the right door are the numbers "589" and "591," corresponding to the right door. 587 Capitol Avenue, the TARGET PREMISES, is accessed through the left red door on the front porch. 587 Capitol Avenue is believed to be an apartment encompassing the first floor of the multi-family building. There is a driveway on the right-hand side of the residence that leads to a rear parking area, the view of which is obstructed from Capitol Avenue. A detached structure, a shed or garage, is visible from driveway at the rear of the TARGET PREMISES.

1





SOV

This warrant to search the TARGET PREMISES specifically authorizes the search of 587 Capitol Avenue, the first floor apartment of the multi-family building and any common areas (*e.g.*, a shared multi-tenant cellar, basement, or laundry space), but not areas on the second and third floors consisting of 589 Capitol Avenue and 591 Capitol Avenue, apartments accessed through the right-side red door on the front porch. This warrant to search the TARGET PREMISES specifically authorizes a search of any outbuildings (*e.g.*, garages and sheds) located on the property consisting of 587/589/591 Capitol Avenue, outbuildings accessed from the driveway leading from Capitol Avenue to the rear of TARGET PREMISES TWO.

3



## **ATTACHMENT A**

### **Property to Be Searched**

The property to be searched is <u>The Action Audio Store, 2814 Main Street, Hartford, CT,</u> the TARGET PREMISES. The TARGET PREMISES is the business of Kenston Harry (the "TARGET SUBJECT"). The TARGET PREMISES is a two-story A-frame commercial building located at 2814 Main Street, Hartford, CT. The building exterior is red stucco on the first floor and white siding on the second floor. There are two vehicle service bays located in the center of the building and a sign on top of the building that reads: "The Action Auto Remote Starters Car Stereos." One side of the building, facing Windsor Street, is labeled "The Action Audio Store" and has a sign that reads in red lettering: "2814 Main St. 860-727-8715." The TARGET PREMISES is accessed from Main Street (or Windsor Street) through a parking lot at the front of the building. There are two doorways to enter the building, one to the left of the vehicle bays and one to the right of the vehicle bays.

1






## **ATTACHMENT B**

### **Particular Things to be Seized**

All property, records, and information, in any format, that constitute fruits, evidence and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute and distribution of controlled substances), Title 21, United States Code, Section 846 (attempt and conspiracy to commit possession with intent to distribute and distribution of controlled substances), Title 21, United States Code, Section 843(b) (use of a communication facility), and Title 18, United States Code, Sections 1956 (money laundering) ("TARGET OFFENSES"), committed by the TARGET SUBJECT(s), described in Attachment A, and members of the WILEY drug trafficking organization, known and unknown, including, but not limited to, the following items:

- (a) Controlled substances, including cocaine and marijuana;

- (b) Items and tools used to prepare and package controlled substances, including: kilogram presses, vacuum sealers, drug packaging materials, plastic bags, scales, materials used to dilute or "cut" controlled substances, sifters, blenders, mixers, and containers used to prepare and package controlled substances;

- (c) United States currency, money orders and other financial instruments;

- (d) Jewelry, precious metals, and other high-value items that may constitute the proceeds of the commission of the TARGET OFFENSES;

- (e) Evidence, records and information related to communications revealing the full scope and identification and roles of persons involved in illegal drug trafficking on behalf of the WILEY drug trafficking organization, including: books, address

1

$S\!\!D\!\!\checkmark$

books, records, receipts, notes, ledgers, and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances;

(f) Evidence, records and information that reveals the identities and roles of all suppliers of controlled substances, including marijuana and cocaine, and controlled substances to the identified conspirators;

(g) Evidence, records and information related to the main customers of the WILEY drug trafficking organization and the others yet unknown and stash locations where marijuana, cocaine, and other controlled substances are stored prior to distribution;

(h) Evidence, records and information related to the management and disposition of proceeds generated by the WILEY drug trafficking organization and the methods and extent of any related money laundering activity, including bank and credit card records;

(i) Evidence, records and information that reveals evidence of the commission of the TARGET OFFENSES by members of the WILEY drug trafficking organization, including the TARGET SUBJECT(s), and other co-conspirators known and unknown, including:

> i. the names, telephone numbers, and residences of associates of the WILEY drug trafficking organization, and others as yet unknown, including their drug suppliers, drug distributors, and individuals used for receipt, distribution, and use of proceeds of the WILEY drug trafficking organization;
>
> ii. the leadership of the WILEY drug trafficking organization;

2

SDV

iii. the dates, times, and places for commission of the illegal activities conducted in furtherance of the WILEY drug trafficking organization;

iv. the location, receipt, administration, control, management, and disposition of controlled substances, including marijuana and cocaine, and the proceeds from the distribution and sale of controlled substances;

v. the nature, scope, places, and methods of operation;

vi. the existence and location of records documenting the distribution of controlled substances, including cocaine and marijuana, by the drug trafficking organization and the receipt, distribution, and use of proceeds from the drug trafficking activity conducted by drug trafficking organization; and,

vii. the means and methods by which the WILEY drug trafficking organization uses, stores, transfers, distributes, and conceals criminally derived proceeds from the distribution and sale of controlled substances.

(j) Any and all evidence, records, and information that demonstrates the commission of the TARGET OFFENSES by members of the WILEY drug trafficking organization, including:

   a. Photographs and videos indicative of drug trafficking;

   b. Evidence of use of encrypted communications in furtherance of drug trafficking;

3

SDV

    c.  Stored information and contact lists indicative of communications with drug traffickers and co-conspirators;

    d.  Notes, records, ledgers and documents indicative of drug trafficking.

(k) Illegally possessed firearms, ammunition, and other weapons, or firearms, ammunition, and other weapons possessed and used in furtherance of drug trafficking;

(l) Safes and other secure storage containers, keys to such containers, and their contents;

(m) Evidence, records and information related to off-site use of secure storage locations including storage lockers and safe deposit boxes, including keys;

(n) Video surveillance systems including video cameras, video-enabled doorbells, and devices used to operate a video surveillance system including storage media;

(o) Evidence, records and information related to ownership, use, or a possessory interest in the TARGET PREMISES, including mail, keys, records, documents, and photographs;

(p) Evidence, records and information related to ownership, use, or a possessory interest in a vehicle used in furtherance of drug trafficking, including keys, records, financial statements, and documents;

(q) Computers, cellular telephones and storage media, as defined below (hereinafter, "device(s)"), used as a means to commit the TARGET OFFENSES;

(r) Any devices used to communicate with members of the WILEY drug trafficking organization;

(s) Any devices that contain any of the above-described records and information;

SDV

(t) Any devices used in furtherance of drug trafficking to access and use encrypted communications (e.g., Apple FaceTime, Apple iMessage, and WhatsApp);

(u) Any devices used in furtherance of drug trafficking to access and use mobile payment platforms (e.g., CashApp);

(v) Any cellular telephones assigned telephone numbers: (203) 690-0831, (860) 334-9200, (860) 982-4489, (203) 383-3479, (203) 685-9545, (475) 239-0625, (914) 316-2139;

(w) Any cellular telephone used by Tajh Wiley;

(x) Any cellular telephone used by the TARGET SUBJECT(s) as an instrumentality of the commission of the TARGET OFFENSES.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile telephones (*i.e.*, cellular telephones), tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

5

## ATTACHMENT A

### Property to Be Searched

The property to be seized and searched is a 2017 white Bentley Bantayga bearing Connecticut Registration BB90593 and VIN SJAAC2Z0HC016054, the TARGET VEHICLE. The TARGET VEHICLE is used by Kenston Harry (the "TARGET SUBJECT"). The TARGET VEHICLE is often located in the vicinity of 327 Park Avenue, Bloomfield, CT.

Seizure of the TARGET VEHICLE must occur during the daytime - that is 6:00 a.m. to 10:00 p.m. Upon seizure of the TARGET VEHICLE, search of the vehicle may occur at any time, day or night.

This warrant specifically authorizes seizure of the TARGET VEHICLE and transportation of the TARGET VEHICLE to a secure law enforcement location (*e.g.*, a secure parking lot or garage). This warrant specifically authorizes search of the TARGET VEHICLE at the location it is seized and/or while it is at a secure law enforcement location (*e.g.*, a secure parking lot or garage).

The warrant specifically authorizes law enforcement to enter upon the grounds of 327 Park Avenue, Bloomfield, CT or 2814 Main Street, Hartford, CT to effectuate the seizure of the TARGET VEHICLE.



1

## **ATTACHMENT A**

### **Property to Be Searched**

The property to be seized and searched is a 2013 black Honda Accord bearing Connecticut Registration BC32740 and VIN 1HGCR2E51DA102279, the TARGET VEHICLE. The TARGET VEHICLE is used by Kenston Harry (the "TARGET SUBJECT"). The TARGET VEHICLE is often located in the vicinity of 327 Park Avenue, Bloomfield, CT.

Seizure of the TARGET VEHICLE must occur during the daytime - that is 6:00 a.m. to 10:00 p.m. Upon seizure of the TARGET VEHICLE, search of the vehicle may occur at any time, day or night.

This warrant specifically authorizes seizure of the TARGET VEHICLE and transportation of the TARGET VEHICLE to a secure law enforcement location (*e.g.*, a secure parking lot or garage). This warrant specifically authorizes search of the TARGET VEHICLE at the location it is seized and/or while it is at a secure law enforcement location (*e.g.*, a secure parking lot or garage).

The warrant specifically authorizes law enforcement to enter upon the grounds of 327 Park Avenue, Bloomfield, CT or 2814 Main Street, Hartford, CT to effectuate the seizure of the TARGET VEHICLE.

1

## ATTACHMENT A

### Property to Be Searched

The property to be seized and searched is a 2021 white Mercedes Benz GLE 350 4matic bearing Connecticut registration BB10799 and VIN 4JGFB4KB9MA417364, the TARGET VEHICLE. The TARGET VEHICLE is used by Destiny Wade (the "TARGET SUBJECT"). The TARGET VEHICLE is often located in the vicinity of 200 Glover Avenue, Norwalk, CT.

Seizure of the TARGET VEHICLE must occur during the daytime - that is 6:00 a.m. to 10:00 p.m. Upon seizure of the TARGET VEHICLE, search of the vehicle may occur at any time, day or night.

This warrant specifically authorizes seizure of the TARGET VEHICLE and transportation of the TARGET VEHICLE to a secure law enforcement location (*e.g.*, a secure parking lot or garage). This warrant specifically authorizes search of the TARGET VEHICLE at the location it is seized and/or while it is at a secure law enforcement location (*e.g.*, a secure parking lot or garage).

The warrant specifically authorizes law enforcement to enter upon the grounds of 200 Glover Avenue, Norwalk, CT and to enter the shared multi-tenant parking garage space located at 200 Glover Avenue, Norwalk, CT to effectuate the seizure of the TARGET VEHICLE.

1

## **ATTACHMENT A**

### **Property to Be Searched**

The property to be seized and searched is a 2021 black Mercedes-Benz AMG GT 63 bearing Connecticut registration number BB10729 and vehicle identification number W1K7X8JBXMA037538, the TARGET VEHICLE. The TARGET VEHICLE is used by Tajh Wiley (the "TARGET SUBJECT"). The TARGET VEHICLE is often located in the vicinity of 200 Glover Avenue, Norwalk, CT.

Seizure of the TARGET VEHICLE must occur during the daytime - that is 6:00 a.m. to 10:00 p.m. Upon seizure of the TARGET VEHICLE, search of the vehicle may occur at any time, day or night.

This warrant specifically authorizes seizure of the TARGET VEHICLE and transportation of the TARGET VEHICLE to a secure law enforcement location (*e.g.*, a secure parking lot or garage). This warrant specifically authorizes search of the TARGET VEHICLE at the location it is seized and/or while it is at a secure law enforcement location (*e.g.*, a secure parking lot or garage).

The warrant specifically authorizes law enforcement to enter upon the grounds of 200 Glover Avenue, Norwalk, CT and effectuate the seizure of the TARGET VEHICLE.

Sov

## **ATTACHMENT B**

### **Particular Things to be Seized**

All property, records, and information, in any format, that constitute fruits, evidence and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute and distribution of controlled substances), Title 21, United States Code, Section 846 (attempt and conspiracy to commit possession with intent to distribute and distribution of controlled substances), Title 21, United States Code, Section 843(b) (use of a communication facility), and Title 18, United States Code, Sections 1956 (money laundering) ("TARGET OFFENSES"), have been committed by the TARGET SUBJECT, described in Attachment A, and members of the WILEY drug trafficking organization, known and unknown, including, but not limited to, the following items:

- (a) Evidence of use of the TARGET VEHICLE as an instrumentality of drug trafficking and commission of the TARGET OFFENSES;
- (b) Evidence of the TARGET VEHICLE as proceeds of drug trafficking and fruits of the TARGET OFFENSES;
- (c) Controlled substances, including cocaine and marijuana;
- (d) Evidence, records and information related to travel in furtherance of illegal drug trafficking on behalf of the WILEY drug trafficking organization, including records and/or receipts of travel-related expenses (e.g., gasoline or food receipts), and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances;
- (e) Evidence of use of the TARGET VEHICLE to secret and conceal contraband, including controlled substances and currency, including vehicle modifications, the

1

addition of lockboxes and other secure storage containers, and secret compartments or "traps" added to the TARGET VEHICLE for the purpose of transporting controlled substances;

(f) Safes and other secure storage containers, keys to such containers, and their contents, including the contents of locked glove boxes or lockboxes;

(g) Roadway toll receipts and electronic toll payment devices (e.g., EZPass);

(h) United States currency, money orders and other financial instruments;

(i) Evidence, records and information that reveals evidence of the commission of the TARGET OFFENSES by members of the WILEY drug trafficking organization, including the TARGET SUBJECT, and other co-conspirators known and unknown, including:

> i. the names, telephone numbers, and residences of associates of the WILEY drug trafficking organization, and others as yet unknown, including their drug suppliers, drug distributors, and individuals used for receipt, distribution, and use of proceeds of the WILEY drug trafficking organization;
>
> ii. the leadership of the WILEY drug trafficking organization;
>
> iii. the dates, times, and places for commission of the illegal activities conducted in furtherance of the WILEY drug trafficking organization;
>
> iv. the location, receipt, administration, control, management, and disposition of controlled substances, including marijuana and

2

SDV

cocaine, and the proceeds from the distribution and sale of controlled substances;

v. the nature, scope, places, and methods of operation;

vi. the existence and location of records documenting the distribution of controlled substances, including cocaine and marijuana, by the drug trafficking organization and the receipt, distribution, and use of proceeds from the drug trafficking activity conducted by drug trafficking organization; and,

vii. the means and methods by which the WILEY drug trafficking organization uses, stores, transfers, distributes, and conceals criminally derived proceeds from the distribution and sale of controlled substances.

(j) Evidence, records and information related to ownership, use, or a possessory interest in the TARGET VEHICLE, including mail, keys, records, documents, and photographs;

(k) Evidence, records and information related to ownership, use, or a possessory interest in any other vehicle used in furtherance of drug trafficking, including keys, records, financial statements, and documents;

(l) Portable computers, cellular telephones and storage media, as defined below (hereinafter, "device(s)"), used as a means to commit the TARGET OFFENSES;

(m)Any portable devices used to communicate with members of the WILEY drug trafficking organization;

3

$SDV$

(n) Any portable devices that contain any of the above-described records and information;

(o) Any portable devices used in furtherance of drug trafficking to access and use encrypted communications (e.g., Apple FaceTime, Apple iMessage, and WhatsApp);

(p) Any portable devices used in furtherance of drug trafficking to access and use mobile payment platforms (e.g., CashApp);

(q) Any cellular telephones assigned telephone numbers: (203) 690-0831, (860) 334-9200, (860) 982-4489, (203) 383-3479, (203) 685-9545, (475) 239-0625, (914) 316-2139;

(r) Any cellular telephone used by Tajh Wiley;

(s) Any cellular telephone used by the TARGET SUBJECT as an instrumentality of the commission of the TARGET OFFENSES.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile telephones (*i.e.*, cellular telephones), tablets, server computers, and network hardware.

4

$SDV$

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

SDV

## **ATTACHMENT A**

### **Property to Be Searched**

The cellular telephone assigned telephone number (860) 334-9200, without a known International Mobile Equipment Identity Number (IMEI) (the "TARGET TELEPHONE"), used by Jammal Gant (the "TARGET SUBJECT").

The warrant authorizes the seizure of the TARGET TELEPHONE from the person of TARGET SUBJECT while in the District of Connecticut. This warrant also authorizes the seizure of the TARGET TELEPHONE during searches authorized by the Court, should the TARGET TELEPHONE be located at the following premises: (1) 200 Glover Avenue, Apartment 226, Norwalk, CT; (2) 587 Capitol Avenue, Bridgeport, CT; (3) 327 Park Avenue, Bloomfield, CT; (4) The Action Audio Store LLC., 2814 Main Street, Hartford, CT; (5) 30 Fox Trail, Mashantucket, CT; (6) 100 Marcel Street, Bridgeport, CT; or should the TARGET TELEPHONE be located inside of the following vehicles while in the District of Connecticut: (1) a 2021 black Mercedes-Benz AMG GT 63 bearing Connecticut registration number BB10729 and vehicle identification number W1K7X8JBXMA037538; (2) a 2021 white Mercedes Benz GLE 350 4matic bearing Connecticut registration BB10799 and VIN 4JGFB4KB9MA417364 ; (3) a 2017 white Bentley Bantayga bearing Connecticut Registration BB90593 and VIN SJAAC2Z0HC016054; (4) a 2013 black Honda Accord bearing Connecticut Registration BC32740 and VIN 1HGCR2E51DA102279.

This warrant authorizes the seizure of the TARGET TELEPHONE TARGET TELEPHONE during the day time – that is 6:00 a.m. to 10:00 p.m., pursuant to search warrants

$S\!\Omega V$

authorized by this Court to search premises and vehicles. This warrant authorizes the search of the TARGET TELEPHONE at any time in the day or night.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.



## **ATTACHMENT A**

### **Property to Be Searched**

The cellular telephone assigned telephone number (203) 383-3479, without a known International Mobile Equipment Identity Number (IMEI) number (the "TARGET TELEPHONE"), used by Peter Munoz (the "TARGET SUBJECT").

The warrant authorizes the seizure of the TARGET TELEPHONE from the person of TARGET SUBJECT while in the District of Connecticut. This warrant also authorizes the seizure of the TARGET TELEPHONE during searches authorized by the Court, should the TARGET TELEPHONE be located at the following premises: (1) 200 Glover Avenue, Apartment 226, Norwalk, CT; (2) 587 Capitol Avenue, Bridgeport, CT; (3) 327 Park Avenue, Bloomfield, CT; (4) The Action Audio Store LLC., 2814 Main Street, Hartford, CT; (5) 30 Fox Trail, Mashantucket, CT; (6) 100 Marcel Street, Bridgeport, CT; or should the TARGET TELEPHONE be located inside of the following vehicles while in the District of Connecticut: (1) a 2021 black Mercedes-Benz AMG GT 63 bearing Connecticut registration number BB10729 and vehicle identification number W1K7X8JBXMA037538; (2) a 2021 white Mercedes Benz GLE 350 4matic bearing Connecticut registration BB10799 and VIN 4JGFB4KB9MA417364 ; (3) a 2017 white Bentley Bantayga bearing Connecticut Registration BB90593 and VIN SJAAC2Z0HC016054; (4) a 2013 black Honda Accord bearing Connecticut Registration BC32740 and VIN 1HGCR2E51DA102279 .

This warrant authorizes the seizure of the TARGET TELEPHONE during the day time – that is 6:00 a.m. to 10:00 p.m., pursuant to warrants authorized by this Court to search premises and vehicles. This warrant authorizes the seizure of the TARGET TELEPHONE at any time in the

$SUV$

day or night if the TARGET TELEPHONE is seized incident to an arrest based upon an arrest warrant authorized by this Court. This warrant authorizes the search of the TARGET TELEPHONE at any time in the day or night.

This warrant authorizes the forensic examination of the TARGET TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

$SJV$

## **ATTACHMENT A**

### **Property to Be Searched**

The cellular telephone assigned telephone number (203) 685-9545, without a known International Mobile Equipment Identity Number (IMEI) (the "TARGET TELEPHONE"), used by Charles Richardson (the "TARGET SUBJECT").

The warrant authorizes the seizure of the TARGET TELEPHONE from the person of TARGET SUBJECT while in the District of Connecticut. This warrant also authorizes the seizure of the TARGET TELEPHONE during searches authorized by the Court, should the TARGET TELEPHONE be located at the following premises: (1) 200 Glover Avenue, Apartment 226, Norwalk, CT; (2) 587 Capitol Avenue, Bridgeport, CT; (3) 327 Park Avenue, Bloomfield, CT; (4) The Action Audio Store LLC., 2814 Main Street, Hartford, CT; (5) 30 Fox Trail, Mashantucket, CT; (6) 100 Marcel Street, Bridgeport, CT; or should the TARGET TELEPHONE be located inside of the following vehicles while in the District of Connecticut: (1) a 2021 black Mercedes-Benz AMG GT 63 bearing Connecticut registration number BB10729 and vehicle identification number W1K7X8JBXMA037538; (2) a 2021 white Mercedes Benz GLE 350 4matic bearing Connecticut registration BB10799 and VIN 4JGFB4KB9MA417364 ; (3) a 2017 white Bentley Bantayga bearing Connecticut Registration BB90593 and VIN SJAAC2Z0HC016054; (4) a 2013 black    Honda    Accord    bearing    Connecticut    Registration    BC32740    and    VIN 1HGCR2E51DA102279 .

This warrant authorizes the seizure of the TARGET TELEPHONE during the day time – that is 6:00 a.m. to 10:00 p.m., pursuant to warrants authorized by this Court to search premises and vehicles. This warrant authorizes the seizure of the TARGET TELEPHONE at any time in the

SDV

day or night if the TARGET TELEPHONE is seized incident to an arrest based upon an arrest warrant authorized by this Court. This warrant authorizes the search of the TARGET TELEPHONE at any time in the day or night.

This warrant authorizes the forensic examination of the TARGET TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

SDV

## **ATTACHMENT A**

### **Property to Be Searched**

The cellular telephone assigned telephone number (475) 239-0625, with International Mobile Equipment Identity Number (IMEI) 352853112754840 (the "TARGET TELEPHONE"), used by Destiny Wade (the "TARGET SUBJECT").

The warrant authorizes the seizure of the TARGET TELEPHONE from the person of TARGET SUBJECT while in the District of Connecticut. This warrant also authorizes the seizure of the TARGET TELEPHONE during searches authorized by the Court, should the TARGET TELEPHONE be located at the following premises: (1) 200 Glover Avenue, Apartment 226, Norwalk, CT; (2) 587 Capitol Avenue, Bridgeport, CT; (3) 327 Park Avenue, Bloomfield, CT; (4) The Action Audio Store LLC., 2814 Main Street, Hartford, CT; (5) 30 Fox Trail, Mashantucket, CT; (6) 100 Marcel Street, Bridgeport, CT; or should the TARGET TELEPHONE be located inside of the following vehicles while in the District of Connecticut: (1) a 2021 black Mercedes-Benz AMG GT 63 bearing Connecticut registration number BB10729 and vehicle identification number W1K7X8JBXMA037538; (2) a 2021 white Mercedes Benz GLE 350 4matic bearing Connecticut registration BB10799 and VIN 4JGFB4KB9MA417364 ; (3) a 2017 white Bentley Bantayga bearing Connecticut Registration BB90593 and VIN SJAAC2Z0HC016054; (4) a 2013 black Honda Accord bearing Connecticut Registration BC32740 and VIN 1HGCR2E51DA102279 .

This warrant authorizes the seizure of the TARGET TELEPHONE during the day time – that is 6:00 a.m. to 10:00 p.m., pursuant to warrants authorized by this Court to search premises and vehicles. This warrant authorizes the seizure of the TARGET TELEPHONE at any time in the

day or night if the TARGET TELEPHONE is seized incident to an arrest based upon an arrest warrant authorized by this Court. This warrant authorizes the search of the TARGET TELEPHONE at any time in the day or night.

This warrant authorizes the forensic examination of the TARGET TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

$SDV$

## **ATTACHMENT A**

## **Property to Be Searched**

The cellular telephone assigned telephone number (914) 316-2139, with International Mobile Equipment Identity Number (IMEI) 353776391059590 (the "TARGET TELEPHONE"), used by Jevaughn Watson (the "TARGET SUBJECT").

The warrant authorizes the seizure of the TARGET TELEPHONE from the person of TARGET SUBJECT while in the District of Connecticut. This warrant also authorizes the seizure of the TARGET TELEPHONE during searches authorized by the Court, should the TARGET TELEPHONE be located at the following premises: (1) 200 Glover Avenue, Apartment 226, Norwalk, CT; (2) 587 Capitol Avenue, Bridgeport, CT; (3) 327 Park Avenue, Bloomfield, CT; (4) The Action Audio Store LLC., 2814 Main Street, Hartford, CT; (5) 30 Fox Trail, Mashantucket, CT; (6) 100 Marcel Street, Bridgeport, CT; or should the TARGET TELEPHONE be located inside of the following vehicles while in the District of Connecticut: (1) a 2021 black Mercedes-Benz AMG GT 63 bearing Connecticut registration number BB10729 and vehicle identification number W1K7X8JBXMA037538; (2) a 2021 white Mercedes Benz GLE 350 4matic bearing Connecticut registration BB10799 and VIN 4JGFB4KB9MA417364 ; (3) a 2017 white Bentley Bantayga bearing Connecticut Registration BB90593 and VIN SJAAC2Z0HC016054; (4) a 2013 black Honda Accord bearing Connecticut Registration BC32740 and VIN 1HGCR2E51DA102279.

This warrant authorizes the seizure of the TARGET TELEPHONE during the day time – that is 6:00 a.m. to 10:00 p.m., pursuant to warrants authorized by this Court to search premises and vehicles. This warrant authorizes the seizure of the TARGET TELEPHONE at any time in the



day or night if the TARGET TELEPHONE is seized incident to an arrest based upon an arrest warrant authorized by this Court. This warrant authorizes the search of the TARGET TELEPHONE at any time in the day or night.

This warrant authorizes the seizure of the TARGET TELEPHONE during the day time – that is 6:00 a.m. to 10:00 p.m., pursuant to warrants authorized by this Court to search premises and vehicles. This warrant authorizes the seizure of the TARGET TELEPHONE at any time in the day or night if the TARGET TELEPHONE is seized incident to an arrest based upon an arrest warrant authorized by this Court. This warrant authorizes the search of the TARGET TELEPHONE at any time in the day or night.

This warrant authorizes the forensic examination of the TARGET TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

$S\!D\!\checkmark$

## **ATTACHMENT A**

### **Property to Be Searched**

The cellular telephone assigned telephone number (860) 982-4489, with IMEI number 310260292523294 (the "TARGET TELEPHONE"), used by Kenston Harry (the "TARGET SUBJECT").

The warrant authorizes the seizure of the TARGET TELEPHONE from the person of TARGET SUBJECT while in the District of Connecticut. This warrant also authorizes the seizure of the TARGET TELEPHONE during searches authorized by the Court, should the TARGET TELEPHONE be located at the following premises: (1) 200 Glover Avenue, Apartment 226, Norwalk, CT; (2) 587 Capitol Avenue, Bridgeport, CT; (3) 327 Park Avenue, Bloomfield, CT; (4) The Action Audio Store LLC., 2814 Main Street, Hartford, CT; (5) 30 Fox Trail, Mashantucket, CT; (6) 100 Marcel Street, Bridgeport, CT; or should the TARGET TELEPHONE be located inside of the following vehicles while in the District of Connecticut: (1) a 2021 black Mercedes-Benz AMG GT 63 bearing Connecticut registration number BB10729 and vehicle identification number W1K7X8JBXMA037538; (2) a 2021 white Mercedes Benz GLE 350 4matic bearing Connecticut registration BB10799 and VIN 4JGFB4KB9MA417364 ; (3) a 2017 white Bentley Bantayga bearing Connecticut Registration BB90593 and VIN SJAAC2Z0HC016054; (4) a 2013 black Honda Accord bearing Connecticut Registration BC32740 and VIN 1HGCR2E51DA102279 .

This warrant authorizes the seizure of the TARGET TELEPHONE during the day time – that is 6:00 a.m. to 10:00 p.m., pursuant to warrants authorized by this Court to search premises and vehicles. This warrant authorizes the seizure of the TARGET TELEPHONE at any time in the

day or night if the TARGET TELEPHONE is seized incident to an arrest based upon an arrest warrant authorized by this Court. This warrant authorizes the search of the TARGET TELEPHONE at any time in the day or night.

This warrant authorizes the forensic examination of the TARGET TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.



## **ATTACHMENT A**

### **Property to Be Searched**

The cellular telephone assigned telephone number (203) 690-0831 and accessed through International Mobile Subscriber Identity (IMSI) number 310260297711433 (the "TARGET TELEPHONE"), used by Tajh Wiley (the "TARGET SUBJECT").

The warrant authorizes the seizure of the TARGET TELEPHONE from the person of TARGET SUBJECT while in the District of Connecticut. This warrant also authorizes the seizure of the TARGET TELEPHONE during searches authorized by the Court, should the TARGET TELEPHONE be located at the following premises: (1) 200 Glover Avenue, Apartment 226, Norwalk, CT; (2) 587 Capitol Avenue, Bridgeport, CT; (3) 327 Park Avenue, Bloomfield, CT; (4) The Action Audio Store LLC., 2814 Main Street, Hartford, CT; (5) 30 Fox Trail, Mashantucket, CT; (6) 100 Marcel Street, Bridgeport, CT; or should the TARGET TELEPHONE be located inside of the following vehicles while in the District of Connecticut: (1) a 2021 black Mercedes-Benz AMG GT 63 bearing Connecticut registration number BB10729 and vehicle identification number W1K7X8JBXMA037538; (2) a 2021 white Mercedes Benz GLE 350 4matic bearing Connecticut registration BB10799 and VIN 4JGFB4KB9MA417364 ; (3) a 2017 white Bentley Bantayga bearing Connecticut Registration BB90593 and VIN SJAAC2Z0HC016054; (4) a 2013 black Honda Accord bearing Connecticut Registration BC32740 and VIN 1HGCR2E51DA102279.

The warrant authorizes the seizure of any cellular telephone from the person of the TARGET SUBJECT, while in the District of Connecticut. This warrant also authorizes the seizure any cellular telephone located in any premises in which the TARGET SUBJECT is located during



searches authorized by the Court, including: (1) 200 Glover Avenue, Apartment 226, Norwalk, CT; (2) 587 Capitol Avenue, Bridgeport, CT; (3) 327 Park Avenue, Bloomfield, CT; (4) The Action Audio Store LLC., 2814 Main Street, Hartford, CT; (5) 30 Fox Trail, Mashantucket, CT; (6) 100 Marcel Street, Bridgeport, CT; or should the TARGET TELEPHONE be located inside of the following vehicles while in the District of Connecticut: (1) a 2021 black Mercedes-Benz AMG GT 63 bearing Connecticut registration number BB10729 and vehicle identification number W1K7X8JBXMA037538; (2) a 2021 white Mercedes Benz GLE 350 4matic bearing Connecticut registration BB10799 and VIN 4JGFB4KB9MA417364 ; (3) a 2017 white Bentley Bantayga bearing Connecticut Registration BB90593 and VIN SJAAC2Z0HC016054; (4) a 2013 black Honda Accord bearing Connecticut Registration BC32740 and VIN 1HGCR2E51DA102279.

This warrant authorizes the forensic examination of the TARGET TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

This warrant authorizes the forensic examination, in the same manner as that of the TARGET TELEPHONE described in Attachment B, of any cellular telephone seized from the person of the TARGET SUBJECT, and/or seized from a 2021 black Mercedes-Benz AMG GT 63 bearing Connecticut registration number BB10729 and vehicle identification number W1K7X8JBXMA037538, and/or any cellular telephone unlocked using the biometric features of the TARGET SUBJECT, for the purpose of identifying the electronically stored information described in Attachment B.

This warrant authorizes the use of biometric characteristics, in the same manner of that of the TARGET TELEPHONE described in Attachment B, to unlock and attempt to unlock any cellular telephone seized pursuant to this warrant using the biometric characteristics of the TARGET SUBJECT.

$S_{\mathcal{D}}\nu$

This warrant authorizes the seizure of the TARGET TELEPHONE, and any other cellular telephone authorized to be seized by this warrant, during the day time – that is 6:00 a.m. to 10:00 p.m., pursuant to warrants authorized by this Court to search premises and vehicles. This warrant authorizes the seizure of the TARGET TELEPHONE at any time in the day or night if the TARGET TELEPHONE is seized incident to an arrest based upon an arrest warrant authorized by this Court. This warrant authorizes the search of the TARGET TELEPHONE at any time in the day or night.

SDV

## ATTACHMENT B

### Particular Things to be Seized

All records and information contained on the TARGET TELEPHONE, described in Attachment A, that constitute evidence and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute and distribution of controlled substances), Title 21, United States Code, Section 846 (attempt and conspiracy to commit possession with intent to distribute and distribution of controlled substances), Title 21, United States Code, Section 843(b) (use of a communication facility), and Title 18, United States Code, Sections 1956 (money laundering) ("TARGET OFFENSES"), committed by the TARGET SUBJECT, described in Attachment A, and members of the WILEY drug trafficking organization, known and unknown, including:

(a) Any and all data related to communications revealing the full scope and identification and roles of persons involved in illegal drug trafficking on behalf of the WILEY drug trafficking organization, including the TARGET SUBJECT;

(b) Any and all data related to communications that reveal the identities and roles of all suppliers of controlled substances, including marijuana and cocaine, and controlled substances to the identified conspirators;

(c) Any and all data related to communications that identify the main customers of the WILEY drug trafficking organization and the others yet unknown and stash locations where marijuana, cocaine, and other controlled substances are stored prior to distribution;

(d) Any and all data related to the management and disposition of proceeds generated by the WILEY drug trafficking organization and the methods and extent of any related money laundering activity;

1

(e) Any and all data that demonstrates beyond a reasonable doubt that the TARGET SUBJECT, members of the WILEY drug trafficking organization, and other co-conspirators known and unknown, committed the TARGET OFFENSES.

(f) Any and all data that reveals evidence of the commission of the TARGET OFFENSES by members of the WILEY drug trafficking organization, including the TARGET SUBJECT, and other co-conspirators known and unknown, including:

- i. the names, telephone numbers, and residences of associates of the WILEY drug trafficking organization, and others as yet unknown, including their drug suppliers, drug distributors, and individuals used for receipt, distribution, and use of proceeds of the WILEY drug trafficking organization;

- ii. the leadership of the WILEY drug trafficking organization;

- iii. the dates, times, and places for commission of the illegal activities conducted in furtherance of the WILEY drug trafficking organization;

- iv. the location, receipt, administration, control, management, and disposition of controlled substances, including marijuana and cocaine, and the proceeds from the distribution and sale of controlled substances;

- v. the nature, scope, places, and methods of operation;

- vi. the existence and location of records documenting the distribution of controlled substances, including cocaine and marijuana, by the

2

drug trafficking organization and the receipt, distribution, and use of proceeds from the drug trafficking activity conducted by drug trafficking organization; and,

    vii. the means and methods by which the WILEY drug trafficking organization uses, stores, transfers, distributes, and conceals criminally derived proceeds from the distribution and sale of controlled substances.

(g) Any and all data that demonstrates the commission of the TARGET OFFENSES by the TARGET SUBJECT including:

    a. Photographs and videos indicative of drug trafficking;

    b. Evidence of use of encrypted communications in furtherance of drug trafficking;

    c. Stored information and contact lists indicative of communications with drug traffickers and co-conspirators;

    d. Notes, records, ledgers and documents indicative of drug trafficking.

(h) Evidence indicating use of encrypted communications in furtherance of the TARGET OFFENSES;

(i) Evidence indicating use of the TARGET TELEPHONE by the TARGET SUBJECT in furtherance of the TARGET OFFENSES;

(j) Evidence indicating use of the TARGET TELEPHONE by the TARGET SUBJECT, including:

    a. Address books, contact lists, all log history, stored usernames, stored passwords;

3

      b. Photographs and videos tending to demonstrate use of the TARGET TELEPHONE;

      c. Search history, internet browsing history; and

      d. Location information tending to demonstrate use of the TARGET TELEPHONE.

(k) Evidence indicating how and when the TARGET TELEPHONE was accessed and used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the user(s) of the TARGET TELEPHONE;

(l) Evidence indicating the specific device identifiers (*e.g.*, serial number, telephone number, International Mobile Equipment Identity number, International Mobile Subscriber Identity number), including the device identifiers of any removable media (*e.g.*, SIM cards);

(m) Any and all data showing use of the TARGET TELEPHONE as an instrumentality of the TARGET OFFENSES, including use of the TARGET TELEPHONE during the commission of the TARGET OFFENSES, including planning, commission and flight therefrom;

During the execution of the seizure and search of the TARGET TELEPHONE described in Attachment A, law enforcement personnel are authorized to:

(1) press or swipe the fingers (including thumbs) of the TARGET SUBJECT to the fingerprint scanner of the device;

4

$S\Lambda\checkmark$

(2) hold the TARGET TELEPHONE in front of the face the TARGET SUBJECT and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.